# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CITIZENS FOR COMMUNITY VALUES, INC., :
                                      :
          Plaintiff,                  :          Case No. 2:08-cv-00223-GCS-NMK
                                      :
    vs.                               :          Judge George C. Smith
                                      :          Magistrate Judge Norah McCann King
UPPER ARLINGTON PUBLIC LIBRARY        :
BOARD OF TRUSTEES,                    :
                                      :
          Defendant.                  :

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

## <u>INTRODUCTION</u>

The Upper Arlington Public Library System has made its meeting rooms generally available to outside organizations to use for a wide array of activities. Its Meeting Room Use Policy, however, expressly prohibits " religious meetings" and "religious services." The Plaintiff, Citizens for Community Values, requested to use a meeting room for an open event discussing the legal and Biblical issues surrounding Christians' involvement in politics, which included a time of prayer and a time of singing praise and giving thanks to God. The Library denied their request pursuant to its ban on religious services.

The Library's denial runs afoul of a long line of Supreme Court "equal access" decisions, starting with *Widmar v. Vincent*, 454 U.S. 263 (1981). These decisions firmly establish that allowing religious speakers equal access to a public forum is not only permissible under the Establishment Clause, but mandated by the Free Speech Clause. Plaintiff is not seeking a special privilege; it merely seeks to utilize the Library's facilities on the same terms and conditions as

other community groups and non-profit organizations. The Library cannot articulate any justification to countermand this constitutional right.

Accordingly, Plaintiff respectfully requests that this Court preliminarily enjoin the Library's discriminatory policy.

## STATEMENT OF FACTS

Plaintiff incorporates herein the facts set forth in its Verified Complaint and Motion for Preliminary Injunction.

## ARGUMENT

Plaintiff is entitled to a preliminary injunction if it shows: (1) a likelihood of success on the merits; (2) a threat of irreparable harm absent an injunction; (3) granting the injunction will cause no substantial harm to others; and (4) an injunction is in the public interest. *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005). These are factors to be balanced, not prerequisites to be met. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

In cases that implicate First Amendment freedoms, the first factor is generally determinative. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). This is because even a minimal infringement on First Amendment values constitutes irreparable injury, and protecting against this injury is always in the public interest. *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County, Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001). Moreover, no substantial harm is inflicted on others merely by protecting such rights. *Id.* As shown below, Plaintiff has a high probability of success on the merits, and a preliminary injunction is warranted in this case.

## I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

### A. The Library's Meeting Room Policy violates Plaintiff's right to religious speech under the First Amendment.

There is no question that, as a general matter, Plaintiff's religious speech is protected by the First Amendment. *See Widmar*, 454 U.S. at 269 ("religious worship and discussion … are forms of speech and association protected by the First Amendment"). In fact, the Supreme Court has emphasized that the First Amendment is particularly protective of religious speech:

> Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression. … Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directly *precisely* at religious speech that a free-speech clause without religion would be *Hamlet* without the prince.

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (emphasis in original) (citations omitted).

#### 1. By singling out "religious meetings" and "religious services" for exclusion from the forum, the Library is engaging in viewpoint discrimination.

At its core, the First Amendment forbids the government from regulating speech "in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). Accordingly, viewpoint discrimination is presumptively unconstitutional irrespective of the forum:

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

*Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995) (citations

omitted); *see also Lamb's Chapel*, 508 U.S. at 384 (explaining that regulations in a non-public

forum must be viewpoint neutral).

The Meeting Room Policy discriminates on the basis of viewpoint. When Plaintiff

requested permission to use a meeting room, it was denied because the Library does not permit

any "religious meetings" or "religious services" to take place in its meeting rooms. (Verified

Complaint ("Compl.") ¶ 27.) Thus, for example, if Plaintiff desired to conduct an event honoring

the founding fathers (instead of God) for the freedom Americans have to participate in the

political process, or an event where attendees sought guidance from political scientists (instead

of God) on the Church's proper role in the political process, the event would not have conflicted

with the Library's Meeting Room Policy. But because the Library determined that Plaintiff

wanted to conduct its event from a religious perspective, it is prohibiting Plaintiff from using the

forum.

The Supreme Court has consistently said that targeting religious speech for unfavorable

treatment is viewpoint discrimination: "Religion is the viewpoint from which ideas are

conveyed. … [W]e see no reason to treat the Club's use of religion as something other than a

viewpoint merely because of an evangelical message it conveys." *Good News Club v. Milford

Central Sch.*, 533 U.S. 98, 112 (2001). Thus, the Library's policy prohibiting religious meetings

and religious services discriminates based viewpoint, both facially and as applied to Plaintiff.

*Good News Club* is dispositive on this issue. There, a school district's community use

policy allowed residents to use school facilities for "social, civic and recreational meetings and

entertainment events, and other uses pertaining to the welfare of the community…." 533 U.S. at

102. But the policy prohibited use "by any individual or organization for religious purposes." *Id.*

at 103. As a result, the school district denied the Good New Club's request to have weekly after-school meetings. *Id.* at 104. The meetings included singing songs and prayer, as well as playing games, Bible memorization, and learning how the Bible applies to Club members' lives, *id.* at 103, which Justice Souter described as "an evangelical service of worship." *Id.* at 112 n.4.

The Supreme Court said it was "quite clear that [the school district] engaged in viewpoint discrimination when it excluded the Club from the afterschool forum." *Id.* at 109. The Court found that "any group that promotes the moral and character development of children is eligible to use the school building." *Id.* at 108 (citation and quotation marks omitted). And it was "clear that the Club teaches morals and character development to children." *Id.* But the Club was not given equal access to the facilities solely because its meetings were religious in nature—constituting blatant viewpoint discrimination. *Id.* at 108-09.

Similarly, in *Lister v. Defense Logistics Agency*, 482 F.Supp.2d 1003 (S.D. Ohio 2007), a federal agency adopted an employee bulletin board policy that allowed employees to post items and announcements of interest to other employees, but prohibited "items reflecting religious preference." *Id.* at 1005. This was unconstitutional viewpoint discrimination. *Id.* at 1010 ("The Court concludes that the exclusion of religious materials from a government bulletin board otherwise available to all employees for virtually all non-commercial messages is unconstitutional.")

Just like *Good News Club* and *Lister*, the Library is impermissibly targeting religious speech. Plaintiff's events provide valuable educational and cultural information, teaching the importance of getting involved in our Nation's political process, and celebrating our freedom to do so—permissible subject matters under the Library's Meeting Room Policy. (Compl. ¶ 12.) But because Plaintiff's event is conducted from a religious perspective and involves speech

5

activities which the Library associates with a "religious service" (*i.e.*, prayer and singing) it was excluded from the forum. This is blatant viewpoint discrimination.

### 2.     The Meeting Room Policy cannot survive strict scrutiny.

Viewpoint discrimination is *always* subject to strict scrutiny, regardless of the forum involved. *See Perry Educ. Ass'n*, 460 U.S. at 46. In the constitutional context, strict scrutiny is an "exacting test," requiring the government to prove that its restriction is narrowly tailored to a compelling government interest. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 680 (1994) (O'Connor, J., concurring). "It is not enough that the goals of the law be legitimate, or reasonable, or even praiseworthy. There must be some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve that goal." *Id.*

The Library cannot articulate a compelling interest that supports its Meeting Room Policy's restriction on religious services. The committee that studied the Library Meeting Room Policy recommended no changes to the Policy, based on the so-called "separation of church and state" and to avoid the appearance of a "state supported religion." (Compl. ¶ 21.) But this is not a legitimate interest in this context. As the Sixth Circuit recently explained:

> [T]he ACLU makes repeated reference to "the separation of church and state." This extra-constitutional construct has grown tiresome. *The First Amendment does not demand a wall of separation between church and state*. Our Nation's history is replete with governmental acknowledgement and in some cases, accommodation of religion. After all, we are a religious people whose institutions presuppose a Supreme Being. Thus, state recognition of religion that falls short of endorsement is constitutionally permissible.

*American Civil Liberties Union of Kentucky v. Mercer County*, 432 F.3d 624, 638-39 (6th Cir. 2005) (internal citations and quotation marks omitted; emphasis added).[1]

The problem with a "separation of church and state" justification in this case—beyond the fact that it is a construct not rooted in the Constitution—is that "there is a crucial difference between *government* speech endorsing religion … and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (2000) (emphasis in original). Private expression is not transformed into government speech merely because it takes place in a government facility. *Good News Club*, 533 U.S. at 116-17.

Nor is there a plausible fear in this case that Plaintiff's speech would somehow be attributed to the Library. The Supreme Court has long held that a policy of equal access for private religious expression to a government forum creates no appearance of government endorsement. *Rosenberger*, 515 U.S. at 819; *Widmar*, 454 U.S. at 269. The Court in *Widmar* explained that where a forum is available on equal terms to a broad class of speakers, allowing religious speech "<u>does not confer any imprimatur of state approval</u> on religious sects or practices … [since] the forum is available to a broad class of nonreligious as well as religious speakers." 454 U.S. at 274 (emphasis added). The *Pinette* Court reaffirmed this point:

> We have twice previously addressed the combination of private religious expression, a forum available for public use, content-based regulation, and a State's interest in complying with the Establishment Clause. Both times, we have struck down the restriction on religious content …. And as a matter of Establishment Clause

---

[1] Although the Supreme Court has held that an interest in complying with the Establishment Clause "'may be characterized as compelling,' and therefore may justify content-based discrimination, it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination." *Good News Club*, 533 U.S. at 112-13 (*quoting Widmar*, 454 U.S. at 271)).

jurisprudence, we have consistently held that it is no violation for government to enact neutral policies that happen to benefit religion.

515 U.S. 762, 763-64.

Here, the Library allows a wide array of organizations to use its meeting rooms. And the Library does not endorse all the events that it permits. In fact, the Library expressly prohibits applicants from stating or implying that the Library is a sponsor of their events. (Compl., Ex. 1.) Under these circumstances, as in *Lamb's Chapel*, there is "no realistic danger that the community would think that the [Library] is endorsing religion or any particular creed, and any benefit to religion or to the [Plaintiff] would have been no more than incidental." 508 U.S. at 395.

The Fifth Circuit applied this principle in *Concerned Women for America Inc. v. Lafayette County*—a case virtually identical to the present matter—holding that the Establishment Clause did not justify a public library's auditorium-use policy that prohibited religious meetings. 883 F.2d 32 (5th Cir. 1989). There, a public library opened its auditorium for civil, cultural, and educational groups to use, but refused to allow such groups to use the auditorium for religious purposes. *Id.* at 33. The plaintiff applied to use the auditorium for a meeting to "discuss family and political issues, pray about those issues, and seek to apply Biblical principles to them," but was denied under the library's policy. *Id.* at 33-34. The library raised a single defense, arguing that allowing religious meetings in its auditorium would violate the Establishment Clause. Relying on *Widmar*, the Fifth Circuit held that a policy of equal access to a government forum does not implicate the Establishment Clause. *Id.* at 35.

Similarly, the Sixth Circuit has held that a school district policy allowing schools to distribute to students flyers from private organizations—including flyers advertising religious activities—does not violate the Establishment Clause. *Rusk v. Crestview Local Sch. Dist.*, 279 F.3d 418, 424 (6th Cir. 2004). Even impressionable elementary students, the Sixth Circuit

explained, would understand that the school's practice of distributing flyers from a variety of organizations does not mean the school is endorsing the religious flyers. *Id.* at 422. If elementary students can understand this simple principle, then the Library's concerns are clearly unfounded.

Simply put, the Establishment Clause does not provide the Library *any* interest—much less a compelling one—that justifies its blatant discrimination against religious speech. Nor does the Library have any other plausible interest that could justify its Policy or the application of that Policy to Plaintiff in this instance. Thus, it cannot survive strict scrutiny.

> **3.**     **The Meeting Room Policy is also subject to strict scrutiny because it is a content-based restriction in a designated public forum.**

Even if we were to assume that the Library's discrimination is not viewpoint-based, the Library cannot escape strict scrutiny review, because it is unquestionably discriminating on the basis of content in a designated public forum. And content-based censorship, like viewpoint discrimination, is presumptively unconstitutional in a public forum:

> [A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content …. The essence of this forbidden censorship is content control …. <u>Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone</u>.

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972) (citations omitted; emphasis added).

> **a.**     **The meeting room is a designated public forum.**

The extent to which the government may limit access to public property for expressive activity depends on whether the forum at issue is public or non-public. A property may be classified as a public forum in one of two situations. First, a property that has immemorially been used for expressive activity, such as a park or a sidewalk, is considered a traditional public forum. *Perry Educ. Ass'n*, 460 U.S. at 45. Second, when the government opens a property "for

use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects," it has created a designated public forum. *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (quoting *Cornelius*, 473 U.S. at 802). In either type of public forum, content-based restrictions, such as the one here, are subject to strict scrutiny. *Id.; Perry Educ. Ass'n*, 460 U.S. at 46.[2]

If a property does not fit into either of these two categories, it is a non-public forum. Government restrictions in a non-public forum must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

Here, the Library meeting room is a designated public forum. Outside organization are eligible to use a meeting room for "cultural activities and discussion of public questions and social issues." (Compl. ¶ 12.) Plainly, in drafting this policy, the Library envisioned a wide array of organizations utilizing its meeting rooms to discuss a vast array of topics.[3] This is not a policy of "selective access," the essential characteristic of a non-public forum. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998). Rather, the policy makes the meeting rooms generally available to a broad class of speakers for a broad class of topics. Policies such as

---

[2] Some circuits recognize a fourth, separate category—the "limited public forum." *See, e.g., DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964-65 (9th Cir. 1999). The circuits are split in their treatment of a limited public forum. The Sixth Circuit, among others, does not recognize the "limited public forum" as a separate category, *see e.g., Jobe v. City of Catlettsburg*, 409 F.3d 261, 266 (6th Cir. 2005), but treats the terms "limited public forum" and "designated public forum" interchangeably. *Kincaid*, 236 F.3d at 348; *see also Whiteland Woods, L.P. v. Township of W. Whiteland*, 192 F.3d 177, 182 n.2 (3d Cir. 1999); *Goulart v. Meadows*, 345 F.3d 239, 250 (4th Cir. 2003).

[3] The Library has acknowledged on multiple occasions that it cannot impose content-based restrictions on meeting room access. During its February 20, 2007 meeting, the Board of Trustees twice discussed the fact that any decisions about who can use the meeting rooms "should not be based on content." (Compl. ¶ 20.) Similarly, during the Board's June 19, 2007 meeting, President Burtch again reminded the Board that "prohibitions based on content have not been supported by case law and Supreme Court decisions." *Id.* These acknowledgements further demonstrate that the Board understood that its Meeting Room Policy created a designated public forum, because the meeting rooms must be made available to all regardless of content.

this create a designated public forum. *See, e.g., United Food & Commercial Workers Union, Local 1099 v Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) (transit authority created designated public forum by opening advertising space for any advertisements that were not "controversial" or were not "aesthetically pleasing"); *Concerned Women for America*, 883 F.2d at 34 (library created a designated public forum by opening its auditorium for use by civic, cultural, or educational groups); *Fairfax Covenant Church v. Fairfax County Sch. Bd.*, 17 F.3d 703, 708 (4th Cir. 1994) (school board policy allowing community groups to rent school facilities created a designated public forum).

        **b.**       **The Policy is a content-based burden on religious speech.**

In *Widmar*, the Supreme Court held that a policy excluding "religious worship and discussion" from a public forum discriminated based on the religious content of a group's intended speech. 454 U.S. at 269-70. The same is true here. Even though Plaintiff is a nonprofit organization that engages in educational and cultural events, the Library refuses to allow Plaintiff to use its meeting rooms solely because Plaintiff presents its events from a religious perspective. Whether Plaintiff can access this forum is determined entirely on the content of its speech.

The Library's denial letter leaves no doubt that the cancellation of Plaintiff's event was based on the content of the Politics and the Pulpit presentation. Library Director Ann Moore explained in a letter to Plaintiff that had she specifically reviewed the *content* of each element of Plaintiff's event and had determined that the latter two elements (involving a time of prayer and singing) were prohibited under the Policy. (Compl. ¶ 27.) Thus, the Library has imposed a content-based restriction in a designated public forum. Such a restriction on religious expression is unconstitutional absent a compelling interest, which the Library is without. The Library, therefore, has violated Plaintiff's free speech rights under the First Amendment.

### 4. The Ninth Circuit's decision in *Faith Center Evangelistic Ministries v. Glover* is inapposite here.

The Library will likely rely on the recent decision in *Faith Center Evangelistic Ministries v. Glover*, 480 F.3d 891 (9th Cir. 2007), to justify its ban on religious meetings and services. In that case, the Ninth Circuit held that a library did not violate the Free Speech Clause by excluding "pure religious worship services"—that is, religious worship that does not convey a religious viewpoint on an otherwise permissible subject—from its meeting rooms. *Id.* at 915.

*Faith Center* is inapposite here for four reasons. First, the policy in this case is subject to more stringent scrutiny. In *Faith Center*, the Ninth Circuit concluded that the Library's policy was a content-based restriction in a limited public forum. 480 F.3d at 918. Ninth Circuit precedent treats a limited public forum differently than a designated public forum; restrictions on the forum need only be reasonable and viewpoint neutral. *Id.* at 910. But the Sixth Circuit does not make this distinction; rather, the Library meeting room is properly viewed as a designated public forum, and restrictions are subject to strict scrutiny. (*See, supra,* Section I.A.3.a.)

Second, the restriction imposed here is broader than was allowed in *Faith Center*. The Ninth Circuit explained that a broad array of religious expression was permissible in the library's meeting room, including: "discussing the Bible and other religious books as well as teaching, praying, singing, sharing testimonies, sharing meals, and discussing social and political issues." *Faith Center*, 480 F.3d at 914 (quotation marks omitted). These activities "convey a religious perspective on subjects that are or have been permitted in the … meeting room," and therefore cannot be prohibited. *Id.* But here, the Library categorically prohibits all "religious" meetings as well as any speech that it considers to be "an inherent element[] of a religious service." (Compl. ¶ 27.) This includes singing and praying, *id.*, both of which the *Faith Center* court specifically said were permissible.

Third, *Faith Center* noted that the government is incompetent to distinguish between "pure religious worship services" and other forms of religious speech. 480 F.3d at 918. Rather, the government must rely on the speaker to self-identify what constitutes "pure religious worship services" and what constitutes discussion of a permissible topic from a religious perspective. *Id.* Here, the Library did not follow this direction. Rather, the Library Director attempted to parse out the permissible religious speech from the impermissible (*see* Compl. ¶ 27), which may itself create unconstitutional government entanglement with religion. *See, e.g., Faith Center*, 480 F.3d at 924 (Tallman, J., dissenting) ("Any attempt by the County to parse religious worship from other religious speech would trigger inherent Establishment Clause entanglement problems it seeks to avoid"); *Mergens*, 496 U.S. at 253 ("[A] denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur").

Finally, the *Faith Center* decision only evaluated the meeting room policy under the Free Speech Clause. It did not consider Faith Center's other claims, including those under the Free Exercise Clause and the Equal Protection Clause. 480 F.3d at 906 n.7. A policy that singles out religious speech for exclusion from an otherwise open forum raises significant concerns under those provisions, as demonstrated below. As such, *Faith Center* has no bearing on Plaintiff's remaining claims.

B. **The Meeting Room Policy violates Plaintiff's right to the free exercise of religion under the First Amendment and the Ohio Constitution.**

The Library specifically singles out organizations that wish to conduct events from a religious perspective, and excludes them from a forum that would otherwise be available to them. This is an unconstitutional burden on the free exercise of religion.

1. **The Meeting Room Policy is not neutral and generally applicable, and is therefore subject to strict scrutiny under the Free Exercise Clause of the First Amendment.**

Laws which discriminate on the basis of religion are presumptively invalid, and only pass constitutional muster if they survive strict scrutiny. *Church of the Lukumi Babalu Aye v. City of Haileah*, 508 U.S. 520 (1993); *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). The government may not impose "special disabilities on the basis of religious views or religious status." *Id.* at 877. The only time the government may justify a law which burdens the free exercise of religion without a compelling government interest is if the law is neutral and generally applicable.

The meeting room policy is not neutral and generally applicable, since it singles out "religious meetings" and "religious services" for disparate treatment. The Fourth Circuit reached this conclusion in *Fairfax Covenant Church*, where a school district allowed community groups to rent school facilities, but charged religious organizations an escalating rental fee that other non-profit groups did not have to pay. 17 F.3d at 705. The Fourth Circuit concluded that giving a church unequal access to a designated public forum "interferes with or burdens the Church's right to speak and practice religion protected by the Free Exercise Clause." *Id.* at 709. The burden here is even greater, as Plaintiff is wholly excluded from the forum. Therefore, the Library is unconstitutionally burdening Plaintiff's free exercise of religion.

2. **The Meeting Room Policy is subject to strict scrutiny under the Ohio Constitution because it burdens Plaintiff's free exercise of religion.**

Article I, Section 7 of the Ohio Constitution provides even greater protection for religious liberty than the First Amendment. *Humphrey v. Lane*, 89 Ohio.St.3d 62, 68 (2000). Under this provision, any government regulation that "direct[ly] or indirect[ly] encroach[es] upon religious

freedom" must "serve a compelling state interest and must be the least restrictive means of furthering that interest." *Id.*

Plaintiff sincerely believes that the Bible is the source of all ethical standards governing the affairs of men, and is sovereign over all areas of life, including the socio-political order. (Compl. ¶ 8.) Plaintiff also sincerely believes that Christian pastors have a duty to preach and teach Biblical truths, and that Christians in general have a duty to participate in the political process. *Id.* The "Politics and the Pulpit" event is specifically designed to communicate and carry out these beliefs. (Compl. ¶ 9.) The Library is imposing a substantial burden on those beliefs by excluding Plaintiff from an otherwise available forum.

As a result, the Library's Meeting Room Policy is subject to strict scrutiny under the Ohio Constitution, even if it were found to be neutral and generally applicable. As explained above, the Library cannot articulate a compelling interest that justifies this intrusion on Plaintiff's constitutional rights.

### C. The Meeting Room Policy violates Plaintiff's right to equal protection under the Fourteenth Amendment.

The Library has also violated the Equal Protection Clause by denying Plaintiff access to a widely-available forum, solely because of the religious viewpoint and content of its speech. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). This means that the Library cannot deny Plaintiff a government benefit solely based on religion. But it is indisputable that Plaintiff is excluded from the Library's meeting rooms because it desires to use them for certain religious expression. (Compl. ¶¶ 27-28.) Had Plaintiff sought to address the same issues from a secular perspective, it would have been permitted to use the forum. Thus, Plaintiff is being treated differently because of religion.

When the government treats someone unequally because of religion, the government's actions must pass strict scrutiny, *i.e.*, it must serve a compelling interest and be narrowly tailored to achieve that interest. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("[C]lassifications affecting fundamental rights … are given the most exacting scrutiny"); *Hansen v. Ann Arbor Pub. Schs.*, 293 F.Supp.2d 780, 807 (E.D. Mich. 2003) (censorship of student's religious viewpoint is subject to strict scrutiny under the Equal Protection Clause). As explained above, the Library cannot proffer any interest for excluding Plaintiff from conducting its religious event in the Library's meeting rooms. Yet, by policy and practice, the Library is treating Plaintiff differently based on religion. Therefore, the Library is violating Plaintiff's right to equal protection.

D.     **The Meeting Room Policy is unconstitutionally vague and vests unbridled discretion in Library officials to determine what speech is allowed in the meeting rooms.**

The Meeting Room Policy suffers from another constitutional shortcoming. It lacks objective standards for deciding what speech, particularly what religious speech, is permitted in the meeting rooms. Without these standards, Library officials have unbridled discretion in enforcing the Policy, creating the risk of *ad hoc* and discriminatory application. As such, the Meeting Room Policy violates the First and Fourteenth Amendments.

The Due Process Clause of the Fourteenth Amendment requires that regulations "provide explicit standards for those who apply them" in order to prevent application "on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Similarly, the First Amendment prohibits regulations from giving unbridled discretion to government officials charged with licensing or regulating speakers because it "gives a government official or agency substantial

power to discriminate based on the content or viewpoint of speech." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

Yet that is precisely what the Meeting Room Policy does. The Policy initially states that "the library welcomes the use of its meeting rooms for cultural activities and discussion of public questions and social issues," and affirms that the rooms "are available on equal terms to all groups in the community regardless of the beliefs and affiliations of their members." (Compl. ¶ 12.) Then, the Policy reverses itself and states that meeting rooms cannot be used for "commercial, religious or political campaign meetings." (Compl. ¶ 13.) Bryce Kurfees, a member of the Library's Board of Trustees, has openly criticized the "incongruity" between these statements. (Compl. ¶ 19.)

Moreover, the Policy never defines what constitutes a prohibited "religious meeting." Rather, it compounds the problem by stating that "committees affiliated with a church will be allowed to use the meeting rooms provided no religious services are involved." (Compl. ¶ 13.) But this provides virtually no objective guidance, as the Policy does not define "religious services" or explain what it means to be "affiliated with a church." (Compl. ¶ 14.)

The Library's unbridled discretion in enforcing its Meeting Room Policy is plainly evident in its denial letter to Plaintiff. Two elements of Plaintiff's event –a time of singing praise and giving thanks to God, and a time prayer—were prohibited as "inherent elements of a religious service." (Compl. ¶ 27.) Yet Plaintiff's "discussion of Biblical teachings" element is permissible. *Id.* Apparently the Library does not believe that discussing the Bible is part of a "religious service." But without any objective criteria, there is no way to ensure consistent enforcement.

The Supreme Court has explained that trying to distinguish among types of religious speech in this way is problematic. *Widmar*, 454 U.S. at 269 n.6. Such distinctions have no "intelligible content," and even if such a distinction could be made, "it is highly doubtful that it would lie within the judicial competence to administer." *Id.* In light of these difficulties, the Library's lack of any objective criteria is even more problematic. As such, the Meeting Room Policy allows for arbitrary application in violation of the First and Fourteenth Amendments.

## II.     PLAINTIFF IS SUFFERING IRREPARABLE HARM THROUGH THE LOSS OF CONSTITUTIONAL FREEDOMS.

"[W]hen reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, Plaintiff seeks to exercise its fundamental right to free speech and free exercise of religion, but is singularly excluded from a public forum because of the religious nature of its expression. This deprivation of fundamental rights constitutes irreparable harm. "The constitutional right of free expression is intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Simon & Shuster, Inc. v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (internal quotation marks and citation omitted). As such, Plaintiff will continue to suffer irreparable harm until injunctive relief is granted.

## III.  PLAINTIFF'S IRREPARABLE HARM FAR OUTWEIGHS ANY HARM TO THE LIBRARY.

The Sixth Circuit has held that if a plaintiff "shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Déjà Vu of Nashville, Inc.*, 274 F.3d at 400 (citing *Connection Distrib. Co.*, 154 F.3d at 288). The Library will in no way be injured by an injunction. It currently allows outside organizations to use its meeting rooms for a wide array of topics from secular perspectives. An injunction will merely allow those same meetings from religious perspectives. The Library will be able to retain all of its other conditions for use of the meeting rooms. Safeguarding the bedrock constitutional freedoms at stake in this case are well worth this protection.

## IV.  THE INJUNCTION WILL SERVE THE PUBLIC INTEREST.

"It is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). This is particularly true of First Amendment rights. "Numerous Supreme Court opinions attest to the fact that First Amendment rights are not private rights … so much as they are rights of the general public," because the First Amendment "protect[s] the interest of the public in hearing all sides of a public issue." *Machesky v. Bizzell*, 414 F.2d 283, 289 (5th Cir. 1969) (internal quotation marks and citations omitted).  Moreover, no public interest is served by judicial countenance of a government policy excluding religious expression from an otherwise open forum.

## CONCLUSION

Twenty years of Supreme Court "equal access" jurisprudence establishes that speech cannot be excluded from a public forum solely because of its religious nature. Under the First and Fourteenth Amendments, Plaintiff is entitled to access the Library's public forum under the same terms and conditions as all other community groups. Accordingly, Plaintiff respectfully requests this Court to preliminarily enjoin the Library from enforcing its discriminatory policy so that Plaintiff can access the Library's meeting rooms for its events.

Respectfully submitted,

_/s/ David R. Langdon_

Benjamin W. Bull[+]
AZ Bar No. 009940
Attorney for Plaintiff
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Email: bbull@telladf.org

David R. Langdon
OH Bar No. 0067046
Attorney for Plaintiff
LANGDON & HARTMAN LLC
11175 Reading Road, Ste. 104
Cincinnati, Ohio 45241
Telephone: (513) 733-1038
Email: dlangdon@langdonlaw.com

Kevin H. Theriot*
KS Bar No. 21565
Attorney for Plaintiff
ALLIANCE DEFENSE FUND
15192 Rosewood
Leawood, Kansas 66224
Telephone: (913) 685-8000
Email: ktheriot@telladf.org

Timothy D. Chandler*
CA Bar No. 234325
Attorney for Plaintiff
Heather Gebelin Hacker*
AZ Bar No. 024167, CA Bar No. 249273
Attorney for Plaintiff
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 932-2850
Email: tchandler@telladf.org
    hghacker@telladf.org

*Motion for admission _pro hac vice_ filed concurrently
+Of Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2008, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system. In addition, I hereby certify that the

foregoing document will be served upon the named defendant with the complaint.

/s/ *David R. Langdon*
David R. Langdon
OH Bar No. 0067046
Attorney for Plaintiff
Langdon & Hartman LLC
11175 Reading Road, Ste. 104
Cincinnati, Ohio 45241
Telephone: (513) 733-1038
Email: dlangdon@langdonlaw.com
