## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **CITIZENS FOR COMMUNITY VALUES, INC.,** | : | |
| | : | Case No. 2:08-cv-00223 |
| Plaintiff, | : | |
| | : | Judge George C. Smith |
| v. | : | |
| | : | Magistrate Judge King |
| **UPPER ARLINGTON PUBLIC LIBRARY BOARD OF TRUSTEES,** | : | |
| | : | |
| Defendant. | : | |

---

### *DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

---

Dated:      May 13, 2008

Susan Porter, Esq. (0036867)
Angelique Paul Newcomb, Esq. (0068094)
SCHOTTENSTEIN, ZOX & DUNN
250 West Street
Columbus, Ohio 43215
(614) 462-2700 (telephone)
(614) 462-5135 (facsimile)
SPorter@szd.com
ANewcomb@szd.com
*Attorneys for Defendant*

{H1230099.1 }

TABLE OF AUTHORITIES ....................................................................................... iii

I.     Introduction ................................................................................................... 1

II.    Summary Of Argument ................................................................................. 1

III.   Statement Of Facts ........................................................................................ 5

IV.    Law And Argument ..................................................................................... 10

       A.    Standard For Granting A Preliminary Injunction ............................... 10

       B.    The Court Should Deny Plaintiff's Motion For Preliminary Injunction
             Because It Is Unlikely To Succeed On The Merits Of Its First Amendment
             Claims ........................................................................................... 11

             1.    The Library's Meeting Rooms Are Non-Public Fora ............................... 13

                   a.    The Library Grants Only Selective Access To Its Meeting
                         Rooms ................................................................................. 14

                   b.    The Limits Imposed By The Library On The Use Of Its
                         Meeting Rooms Compliment The Forum's Purpose .................... 15

             2.    Restrictions On Access To The Library's Meeting Rooms Are Subject
                   To The Reasonableness Standard, Not Strict Scrutiny ........................... 16

             3.    The Library's Meeting Room Policy Is Viewpoint Neutral And
                   Constitutional ........................................................................... 18

                   a.    Religious Worship Is Not A Viewpoint But A Category Of
                         Discussion Properly Excluded From The Library's Meeting
                         Rooms ................................................................................. 19

                   b.    The Ninth Circuit's Decision In *Faith Center* Provides
                         Meaningful Guidance For The Court's Resolution Of This
                         Factually Similar Dispute .......................................................... 22

             4.    The Library's Meeting Room Policy Also Passes Strict
                   Scrutiny Review ........................................................................ 26

                   a.    The Library Has A Compelling Interest In Complying
                         With The Establishment Clause ................................................. 27

b.     The Library's Meeting Room Policy Does Not Result In Excessive Entanglement In Religion ............................................ 32

C.     The Court Should Deny Plaintiff's Motion For Preliminary Injunction Because It Is Unlikely To Succeed On The Merits Of Its Free Exercise Claims ............... 34

D.     The Court Should Deny Plaintiff's Motion For Preliminary Injunction Because It Is Unlikely To Succeed On The Merits Of Its Equal Protection Claim ............ 37

E.     The Court Should Deny Plaintiff's Motion For Preliminary Injunction Because It Is Unlikely To Succeed On The Merits Of Its Due Process Claim ................... 39

F.     The Court's Denial Of Plaintiff's Motion For Preliminary Injunction Will Not Cause Plaintiff Irreparable Harm, But Granting The Motion Will Inflict Substantial Harm On Others And Will Disserve The Public Interest ................... 41

V.     Conclusion ................................................................................................. 42

CERTIFICATE OF SERVICE ................................................................................. 44

# TABLE OF AUTHORITIES

## Federal Cases

37712, Inc. v. Ohio Dept. of Liquor Control, 113 F.3d 614 (6th Cir. 1997) .................................. 37

ACLU of Kentucky v. Grayson County, No. 4:01CV-202-JHM,
    2008 WL 859279 (W.D.Ky. Mar. 28, 2008) .................... 30

ACLU of Kentucky v. Mercer County, 432 F.3d 624 (6th Cir. 2005) .......................................... 31

ACLU of Ohio Foundation, Inc. v. Ashbrook, 375 F.3d 484 (6th Cir. 2004) ........................ 27, 30

Ams. United for Separation of Church & State v. City of Grand Rapids,
    980 F.2d 1538 (6th Cir. 1992) ..................................................................... 32

Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 118 S.Ct. 1633,
    140 L.Ed.2d 875 (1998) ................................................................ 13

Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 803 (1973) ...................... 4, 40

Brody v. Spang, 957 F.2d 1108 (3rd Cir. 1992) ........................................................ 18

Bronx Household of Faith v. Bd. of Educ. of City of New York,
    127 F.3d 207 (2nd Cir. 1997), cert. denied, 523 U.S. 1074,
    118 S.Ct. 1517, 140 L.Ed.2d 670 (1998) .......................................... 3, 4, 36, 38

Bronx Household of Faith v. Bd. of Educ. of City of New York,
    492 F.3d 89 (2nd Cir. 2007) ....................................................................... 3, 12

Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 63 (1966) ..................... 15

Byrne v. Terrill, No. 2:05-CV-15, 2005 WL 2043011 (D.Vt. Aug. 1, 2005)............................... 39

Campbell v. St. Tammany Parish School Bd., 231 F.3d 937 (5th Cir. 2000)................................ 24

Church of the Lukumi Babalu Aye v. City of Haileah, 508 U.S. 520,
    113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ........................................................ 35

City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249,
    87 L.Ed.2d 313 (1985) .................................................................................. 4, 37

Concerned Women for America, Inc. v. Lafayette County, 883 F.2d 32 (5th Cir. 1989)............. 29

Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,
    473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)............. 2, 12, 13, 14, 15, 16, 17, 38

County of Allegheny v. ACLU Greater Pittsburgh Chapter,
    492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)............................................ 27, 29

Denver Area Educ. Telecomms. Consortium, Inc. v. Federal Communications Comm'n,
    518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996)................... 13

Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir. 1990) ................... 3, 30

Employment Div., Dept. of Human Resources v. Smith, 494 U.S. 872,
    110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ....................... 35

Fairfax Covenant Church v. Fairfax County Sch. Bd., 17 F.3d 703 (4th Cir. 1994)................... 36

Faith Center Church Evangelistic Ministries v. Glover, 480 F.3d 891 (9th Cir.), *cert. denied,*
    128 S.Ct. 143, 169 L.Ed.2d 30 (2007)...................... 2, 3, 12, 14, 15, 16, 17, 18,
                                   21, 22, 23, 24, 25, 26, 33

Gillard v. Norris, 857 F.2d 1095 (6th Cir. 1988) ....................... 4, 37

Glauser-Nagy v. Medical Mut. of Ohio, 987 F.Supp. 1002 (N.D.Ohio 1997) ............ 11

Gonzales v. National Bd. of Med. Examiners, 225 F.3d 620 (6th Cir. 2000) ........................ 10, 41

Good News Club v. Milford Central School, 533 U.S. 98,
    121 S.Ct. 2093, 150 L.Ed.2d 151 (2001)................................. 2, 18, 20, 21, 22, 24, 27, 28

Hamad v. Woodcrest Condominium Assoc., 328 F.3d 224 (6th Cir. 2003)................... 10

Hansen v. Ann Arbor Public Schools, 293 F.Supp.2d 780 (E.D.Mich. 2003) ............. 35

Harper ex rel. Harper v. Poway Unified Sch. Dist.,
    345 F.Supp.2d 1096 (S.D.Cal. 2004)........................................................ 40, 41

Heffron v. Internat'l Soc. For Krishna Consciousness, Inc., 452 U.S. 640,
    101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ............................. 24

Hopper v. City of Pasco, 241 F.3d 1067 (9th Cir. 2001)................................ 15

Johnson v. Robinson, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) .............................. 39

Kincaid v. Gibson, 236 F.3d 342 (6th Cir. 2001) ...................... 12

Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242 (3rd Cir. 1992)...... 2, 15

Lamb's Chapel v. Center Moriches Union Free School Dist.,
    508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)........... 2, 19, 20, 21, 22, 23, 24, 28

Leary v. Daeschner, 228 F.3d 729 (6th Cir. 2000) ....................................................... 11

Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2125, 29 L.Ed. 2d 745 (1971)................................ 30

Lister v. Defense Logistics Agency, 482 F.Supp.2d 1003 (S.D.Ohio 2007)........................ 12, 22

Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ................................ 28, 38

Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)........................... 30, 33

Make the Road by Walking v. Turner, 378 F.3d 133 (2nd Cir. 2000).............................................. 27

Mozert v. Hawkins Cty. Bd. of Educ., 827 F.2d 1058 (6th Cir. 1987), *cert. denied,*
    484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1998)............................................... 3, 34

Neinast v. Bd. of Trustees of Columbus Metropolitan Library,
    346 F.3d 585 (6th Cir. 2003) .................................................................. 14

Neveux v. Webcraft Tech., Inc., 921 F.Supp. 1568 (E.D. Mich. 1996) ............................ 1, 11, 41

Northeast Ohio Coal for Homeless and Serv. Employees Int'l Union,
    Local 1199 v. Blackwell, 467 F.3d 999 (6th Cir. 2006) ................................................. 1, 10

Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566 (6th Cir. 2002).................. 10

Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37,
    103 S.Ct. 948, 74 L.Ed.2d 794 (1983) ............................................................ 12, 16, 19, 36

Putnam Pit, Inc. v. City of Cookeville, Tennessee, 221 F.3d 834 (6th Cir. 2000) ........ 2, 12, 13, 26

Reno v. Flores, 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ......................................... 37

Rosenberger v. Rector and Visitors of Univ. of Virginia, 515 U.S. 819,
    115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).......................................................... 20, 23

Rusk v. Crestview Local Sch. Dist., 379 F.3d 418 (6th Cir. 2004) ............................................... 29

Santa Fe Independent Sch. Dist. v. Doe, 530 U.S. 290, 120 S.Ct. 2266,
    147 L.Ed.2d 295 (2000) ..................................................................... 33

Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 105 S.Ct. 3216,
    87 L.Ed.2d 267 (1985) ..................................................................... 31

School Dist. of Abington Township, Pa. v. Schempp, 374 U.S. 203,
    83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) .......................................................... 3, 31

Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707,
    101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ............................................................ 34

United Food & Commercial Workers Union, Local 1099 v.
    Southwest Regional Transit Auth., 163 F.3d 341 (6th Cir. 1998) ......................... 12, 14, 15

Univ. of Texas v. Camenisch, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ................ 11

Virginian Ry. Co. v. System Fed'n, R.E.D., 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937)... 10

Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ..................... 11, 12, 27

**Constitutional Provisions**

Ohio Constitution, Article I, Section 7 .............................................................. 9, 35, 37

U.S. Constitution, Amendment I....... 2, 9, 11, 17, 25, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 40, 43

U.S. Constitution, Amendment XIV ....................................................... 4, 9, 25, 38, 40

**Federal Rules**

U.S. District Court, S.D. of Ohio, Local Rule 7.2(a)(3) ............................................ 1

# I. INTRODUCTION

Plaintiff Citizens for Community Values, Inc. ("Plaintiff") contends that the United States and Ohio Constitutions give it the unequivocal right to transform the limited public meeting room space available to some 58,000 cardholders who use the Upper Arlington Public Library System ("the Library")[1] into its own house of worship where, free of charge, its members can sing praise and give thanks to God during the Library's normal operating hours. This is not the law. While the Library permits outside groups to use its meeting rooms for "cultural activities and discussion of public questions and social issues" from a religious perspective, the Library permissibly draws the line at letting patrons convert its meeting rooms into a free house of worship and its decision to do so is fully supported by the law. Accordingly, the Court should deny Plaintiff's Motion for Preliminary Injunction in its entirety and with prejudice.

# II. SUMMARY OF ARGUMENT

Pursuant to Local Rule 7.2(a)(3), Defendant offers the following summary of its argument. As discussed in Section IV, Part A, *infra*, Plaintiff's Motion for Preliminary Injunction seeks to alter the status quo (*e.g.*, the Library's current Meeting Room Policy) so that it may receive essentially all the relief to which it would be entitled after a successful trial on the merits. Hence, Plaintiff must satisfy an even heavier burden of showing that the four factors a courts considers in granting a preliminary injunction weigh heavily and compellingly in its favor. Neveux v. Webcraft Tech., Inc., 921 F.Supp. 1568 (E.D. Mich. 1996); Northeast Ohio Coal for Homeless and Serv. Employees Int'l Union, Local 1199 v. Blackwell, 467 F.3d 999 (6th Cir. 2006). Plaintiff cannot make this showing because it is unlikely to succeed on the merits of its constitutional claims, it will not suffer irreparable harm if its Motion for Preliminary Injunction

---

[1] While Plaintiff has named the Upper Arlington Public Library Board of Trustees as the defendant in this action, Defendant will refer to itself as "Defendant" or "the Library" in this Memorandum.

is denied, and because granting Plaintiff's Motion for Preliminary Injunction will substantially harm others and disserve the public interest.

With regard to Plaintiff's First Amendment Free Speech Claim, as discussed in Section IV, Part B, *infra*, the Library is a non-public forum, not a designated public forum. Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); Putnam Pit, Inc. v. City of Cookeville, Tennessee, 221 F.3d 834 (6th Cir. 2000). The Library grants selective access to its meeting rooms, which are not open for unlimited public expression. The limitations imposed by the Library on the use of its meeting rooms, which are consistently applied, are designed to preserve the purpose of the Library as a institution dedicated to the acquisition of knowledge through reading, writing and quiet contemplation and to maximize the Library's ability to make its meeting rooms available as a free community resource for the non-profit endeavors of the diverse population served by the Library. Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242, 1255 (3rd Cir. 1992). Accordingly, the limitations imposed by the Library are reasonable and, therefore, constitutional. Faith Center Church Evangelistic Ministries v. Glover, 480 F.3d 891 (9th Cir.), *cert. denied,* 128 S.Ct. 143, 169 L.Ed.2d 30 (2007).

The Library's Meeting Room Policy, which prohibits religious services from being held in its meeting rooms, is also viewpoint neutral and constitutional because pure religious worship is not a viewpoint but a category of discussion that may be properly excluded from the Library's meeting rooms in order to preserve the purpose of this non-public forum. Lamb's Chapel v. Center Moriches Union Free School Dist, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); Good News Club v. Milford Central School, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). The law has never compelled the government to open the doors of a public building

for religious worship services.  Faith Center, *supra*; Bronx Household of Faith v. Bd. of Educ. of City of New York, 492 F.3d 89 (2nd Cir. 2007).

Even if the Court were to apply strict scrutiny to the Library's Meeting Room Policy, it is still constitutional because the Library's ban on permitting religious services to be conducted in its meeting rooms is justified by its compelling need to comply with the Establishment Clause. A reasonable observer who overhears a religious worship service emanating from the Library's meeting rooms during regular business hours is likely to conclude that the Library is endorsing that religious service.  Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir. 1990).  Moreover, the Library makes its meeting rooms available to non-profit groups free of charge.  The Establishment Clause prohibits the use of public funds to subsidize religion.  School Dist. of Abington Township, Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).  For these reasons, Plaintiff is unlikely to succeed on the merits of its First Amendment Free Speech claim.

Plaintiff's Free Exercise Claims, under the First Amendment and Ohio Constitution, are equally untenable as discussed in Section IV, Part C, *infra*.  Plaintiff has not proffered any evidence that the Library's ban on allowing religious services to be held in its meeting rooms has interfered with its members' ability to engage in any religious practice mandated by their religion.  Mozert v. Hawkins Cty. Bd. of Educ., 827 F.2d 1058 (6th Cir. 1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1998).  Plaintiff's members are free to practice their religion; they just cannot conduct their religious worship services in the Library's meeting rooms. Bronx Household of Faith v. Bd. of Educ. of City of New York, 127 F.3d 207 (2nd Cir. 1997), *cert. denied*, 523 U.S. 1074, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998).

Next, Plaintiff's Equal Protection Claim, as discussed in Section IV, Part D, *infra*, is unlikely to succeed on the merits because Plaintiff was not treated any differently by the Library than any other non-profit group seeking to use its meeting rooms. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); Gillard v. Norris, 857 F.2d 1095, 1100 (6th Cir. 1988). Plaintiff was welcome to engage in the religious discussion aspects of its proposed program; the Library simply asked that it refrain from engaging in religious services activities, which was its prerogative. Plaintiff has no fundamental right to free speech or free exercise of religion in a non-public forum. Bronx Household, *supra*, 127 F.3d 207.

Plaintiff also cannot establish its Due Process Claim, as discussed in Section IV, Part E, *infra*, because a reasonable person of ordinary intelligence could review the Library's Meeting Room Policy and understand what conduct is prohibited in the Library's meeting rooms. Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 803 (1973). This is especially true where the record shows that the Library's ban on permitting religious services has been readily understood by applicants and consistently enforced by the Library.

Finally, as discussed in Section IV, Part F, *infra*, the other factors to be weighed by the Court in determining whether to grant a Motion for Preliminary Injunction all weigh in favor of denying Plaintiff's Motion. Since Plaintiff has no fundamental free speech or free exercise rights in a non-public forum, it will suffer no irreparable injury its Motion is denied. Moreover, if the Court were to grant Plaintiff's Motion, this would transform the Library's meeting rooms into a free house of worship and sharply curtail the availability of these rooms for use by other non-profit groups without funds or resources to meet elsewhere. To do so would harm the public's interest in maximizing the Library's limited resources for use by the community at large in

furtherance of the Library's mission.  Accordingly, the Court should deny Plaintiff's Motion for Preliminary Injunction.

## III. <u>STATEMENT OF FACTS</u>

The Library maintains meeting room space at its three branches, which it makes available to the public, free of charge,[2] when it is not being used for Library functions.  (Verified Complaint, Ex. 1).  The Library's written rules regarding use of its meeting rooms (hereinafter "the Library's Meeting Room Policy") "welcomes the use of its meeting rooms for cultural activities and discussion of public questions and social issues."  <u>Id.</u>  The Library's meeting rooms "are available on equal terms to all groups in the community regardless of the beliefs and affiliations of their members, provided that the meeting is open to the public and no fee is charged for attending the meeting."  <u>Id.</u>  However, the Library does not condone the use of its meeting rooms for "commercial, religious or political campaign meetings," and further prohibits their use for "religious services."  <u>Id.</u>  The Library's Meeting Room Policy is available on the Library's website as is the *Upper Arlington Public Library Organizational Profile for Meeting Room Reservation* form ("Profile Form") that must be completed and submitted to the Library for approval by anyone wishing to reserve a meeting room.  (*See* Moore Afd. ¶3, Tab A, Ex. 1).

Bruce Purdy, one of Plaintiff's representatives, completed a Profile Form on behalf of Plaintiff indicating that Plaintiff wanted to use one of the Library's meeting rooms for an event on February 27, 2008.  (Verified Complaint, Ex. 4).  The Profile Form asks the applicant to provide information about its organization.  <u>Id.</u>  In response, Mr. Purdy checked boxes indicating that Plaintiff is a "civic" and "community" organization but, suspiciously, did not check the box next to "Faith-based."  <u>Id.</u>  The signature line on the Profile Form expressly states: "I have read

---

[2] Non profit organizations may use the Library's meeting room space for free.  (Verified Complaint, Ex. 1).  For-profit groups and businesses may also use the Library's meeting room space for non-profit reasons but are required to pay per hour to use the space.  <u>Id.</u>

the attached UAPL meeting room policy and agree to the terms of the meeting room use." Id. Mr. Purdy signed the Profile Form on February 13, 2008, thereby indicating his agreement with this statement. Id.

On February 14, 2008, after Mr. Purdy completed and signed the Profile Form, he contacted the Library. (*See* Newcomb Afd. ¶3, Tab A, Plaintiff's Answer to Defendant's Interrogatory No. 2 and Answer to Defendant's Request for Admission No. 2, Ex. 2). Jan Mell, a thirty-year veteran of the Library who works in its Community Relations Department, took Mr. Purdy's call. (Mell Afd. ¶¶2-3, Ex. 3). As is her practice, Ms. Mell asked Mr. Purdy some general questions about his group and the proposed event to determine if his group and the event complied with the Library's Meeting Room Policy. (Id. at ¶3). Mr. Purdy told Ms. Mell that Plaintiff's event would be a community focus group and that some ministers would attend. (Id.) When Ms. Mell specifically asked Mr. Purdy if any religious services would be conducted during the event, he told her "no." (Id.). Accordingly, Ms. Mell confirmed that the Friends Theatre, which can accommodate 100 people, was available and reserved the room for Plaintiff on February 27, 2008 as requested. (Id. at ¶3, Tab A) Ms. Mell told Mr. Purdy that he would need to complete a Profile Form and fax it to the Library to reserve the room. (Id. at ¶3) Mr. Purdy specifically requested that Ms. Mell sent him written confirmation of Plaintiff's reservation and she agreed to do so. (Id. at ¶4).

That same morning, Mr. Purdy faxed the Profile Form that he completed and signed the day before to Ms. Mell along with a two-page letter directed to Ruth McNeil, Community Relations Manager, describing Plaintiff's proposed event as follows:

*The events we have planned, what we are calling "Politics and the Pulpit," will address the following topics:*

- *A discussion of what the Bible teaches regarding involvement by Christians, Pastors, and Churches in politics;*

- *A discussion of the current status of the law regarding political involvement by Christians, Pastors, and Churches;*

- *A time of prayer petitioning God for guidance on the Church's proper role in the political process; and*

- *A time of signing praise and giving thanks to God for the freedom we have in this country to participate in the political process.*

(Verified Complaint, ¶¶10, 24, Ex. 4). However, Ms. Mell did not see Mr. Purdy's Profile Form or his letter to Ms. McNeil on February 14, 2008. (Mell Afd. ¶5).

On February 15, 2008, Mr. Purdy called Ms. Mell to again request written confirmation of Plaintiff's meeting room reservation, which she had not yet sent. (Newcomb Afd. ¶3, Tab A, Plaintiff's Answer to Defendant's Interrogatory No. 2; Mell Afd. ¶¶4-5). Ms. Mell faxed the requested confirmation to Mr. Purdy that day even though she still had not reviewed the Profile Form or the letter Mr. Purdy faxed to the Library. (Id. at ¶4-5, Tab B).

Five days later on February 20, 2008, when Ms. Mell returned to work after the President's Day Holiday, she saw the Profile Form submitted by Mr. Purdy for the *first time* and was very surprised to find a written letter attached to it that described Plaintiff's proposed event very differently than Mr. Purdy had described it to her over the phone. (Id. at ¶5). For example, when Ms. Mell spoke with Mr. Purdy, he affirmatively told her that his group's proposed event would not involve any religious services, but his letter said otherwise. (Id.). Ms. Mell was now concerned that Plaintiff's event conflicted with the Library's Meeting Room Policy which does not permit religious services to be held in the meeting rooms. (Id.).

After Ms. Mell reviewed these documents, she promptly tried to contact Mr. Purdy but had to leave a message for him. (Id. at ¶6). Ms. Mell's message was returned that same day

(February 20, 2008) by Barry Sheets, another one of Plaintiff's representatives. (Id.). Ms. Mell told Mr. Sheets that she was concerned about Plaintiffs proposed event because Mr. Purdy's letter described it very differently than he had described it to her over the phone. (Id.). Mr. Sheets was getting angry, so Ms. Mell told him that she would refer the matter to Community Relations Manager Ruth McNeil and that Ms. McNeil would contact him if there was a problem. (Id.).

That afternoon, Ms. McNeil spoke to Mr. Sheets and apologized for not calling earlier, but that she had just received the Profile Form and accompanying letter from Mr. Purdy explaining the proposed "Politics and the Pulpit" event. (McNeil Afd. ¶5, Ex. 4). Ms. McNeil told Mr. Sheets that the Library had reserved a meeting room for Plaintiff's use as requested, but when it did so, it did not fully appreciate the nature of the event and she was now concerned that certain elements of it were not permitted by the Library's Meeting Room Policy. (Id.). Mr. Sheets told Ms. McNeil that he did not understand her concerns and asked her to confirm them in writing, which she agreed to do. (Id.).

Thereafter, Ms. McNeil spoke with Library Director Ann Moore about the issue and drafted a letter for her signature setting forth the Library's concerns regarding those elements of the proposed "Politics and the Pulpit" event that conflicted with the Library's Meeting Room Policy. (Id. at ¶6, Tab A). Specifically, Ms. Moore welcomed Plaintiff to use the Library meeting room space for "a discussion of Bible teachings . . . and current status of the law," but asked that Plaintiff refrain from engaging in "[a] time of prayer petitioning God for guidance on the Church's proper role in the political process" and "[a] time of singing praise and giving thanks to God for the freedom we have in this country to participate in the political process" because "[b]oth activities are inherent elements of a religious service," which conflicts with the

Library's policy. (Id.). Ms. McNeil faxed this letter to Mr. Sheets on February 21, 2008, and then called him to verify that he had received it and to see if he had any further questions. (Id. at ¶¶6-7) Mr. Sheets never returned Ms. McNeil's call and she never heard anything further from him or anyone else affiliated with Plaintiff. (Id. at ¶7) Ms. McNeil assumed that Plaintiff would use the Friends Theater on February 27, 2008, as scheduled for the purposes permitted by the Library's rules. (Id.). However, Plaintiff unilaterally decided not to hold its event without ever communicating this decision to the Library. (Newcomb Afd. ¶3, Tab A, Plaintiff's Answer to Defendant's Interrogatory No. 5). Plaintiff's communication failure left the Library's largest meeting room vacant on February 27, 2008, when it could have been used by other groups in the community. (McNeil Afd. ¶7).

On March 7, 2008, Plaintiff filed this action asserting that its federal and state constitutional rights have been violated by the Library Director's decision to deny it access to the Library's meeting room to hold its "Politics and the Pulpit" event. More specifically, Plaintiff alleges that the Library has violated its First Amendment rights to Free Speech and Free Exercise of religion; its Fourteenth Amendment rights to Equal Protection and Due Process; and its right to the Free Exercise of religion under the Ohio Constitution. (Verified Complaint, ¶¶34-61). In its Prayer for Relief, Plaintiff seeks a declaratory judgment from the Court stating that the Library's Meeting Room Policy is facially unconstitutional and unconstitutional as applied and asks the Court to preliminarily and permanently enjoy the Library from enforcing its Meeting Room Policy to the extent it violates Plaintiff's federal and state constitutional rights. Plaintiff also seeks nominal damages and attorneys' fees. As the following discussion reveals, the Library's Meeting Room Policy does not violate Plaintiff's constitutional rights. As a result,

Plaintiff's Motion for Preliminary Injunction is unlikely to succeed on the merits, and therefore should be denied in its entirety and with prejudice.

## IV. LAW AND ARGUMENT

### A. Standard For Granting A Preliminary Injunction.

The granting or denial of a preliminary injunction is within the sound discretion of the trial court. Virginian Ry. Co. v. System Fed'n, R.E.D., 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937). In the Sixth Circuit, the standard for determining whether to grant a preliminary injunction requires consideration of the following factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. Northeast Ohio Coal for Homeless and Serv. Employees Int'l Union, Local 1199 v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006). These four considerations are "factors to be balanced, not prerequisites that must be met. Hamad v. Woodcrest Condominium Assoc., 328 F.3d 224, 230 (6th Cir. 2003). Notwithstanding this balancing approach, the likelihood of success and irreparable harm factors predominate the preliminary injunction inquiry. Thus, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." Gonzales v. National Bd. of Med. Examiners, 225 F.3d 620, 625 (6th Cir. 2000).

Plaintiff bears the burden of demonstrating its entitlement to a preliminary injunction, and its burden is a heavy one. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much

more stringent than the proof required to survive a summary judgment motion." Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000).

Moreover, the primary purpose of a preliminary injunction is to maintain the status quo until a final decision on the merits can be reached. Neveux v. Webcraft Tech., Inc., 921 F.Supp. 1568, 1571 (E.D. Mich. 1996) (citing Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). Here, the status quo is the Library's current Meeting Room Policy, which prohibits "religious services" in its meeting rooms and which Plaintiff seeks to alter. Where a plaintiff requests preliminary injunctive relief to alter the status quo so that it receives essentially all the relief to which it would be entitled after a successful trial on the merits, the plaintiff must "satisfy an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in [its] favor before such an injunction may be issued." Id. (quotation omitted). *See also* Glauser-Nagy v. Medical Mut. of Ohio, 987 F.Supp. 1002, 1011 (N.D.Ohio 1997) (where "a preliminary injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act . . . the requested relief should be denied unless the facts and law clearly favor the moving party.").

Accordingly, Plaintiff's Motion for Preliminary Injunction should be subjected to this higher standard and its request for preliminary injunctive relief denied because Plaintiff is unlikely to succeed on the merits of its claims and will suffer no irreparable harm if its Motion for denied. Moreover, if the Court grants Plaintiff's Motion, this will substantially harm others and disserve the public interest as explained more fully below.

**B.    The Court Should Deny Plaintiff's Motion For Preliminary Injunction Because It Is Unlikely To Succeed On The Merits Of Its First Amendment Claims.**

As a general rule, religious speech is protected by the First Amendment to the United States Constitution. Widmar v. Vincent, 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440

(1981). However, the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *See also* Lister v. Defense Logistics Agency, 482 F.Supp.2d 1003, 1008 (S.D.Ohio 2007) ("Government property is not necessarily a site for the exercise of religion or free speech."). Rather, it is well-settled that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Perry, 460 U.S. at 46.

The United States Supreme Court uses a forum analysis for evaluating the constitutionality of restrictions of speech on government property. Perry, 460 U.S. at 45-46. *See also* United Food & Commercial Workers Union, Local 1099 ("UFCW") v. Southwest Regional Transit Auth., 163 F.3d 341, 349 (6th Cir. 1998). This analysis first requires a court to determine within which forum the property is properly categorized: (1) traditional public forum; (2) designated public forum; or (3) nonpublic forum.[3] *See* Kincaid v. Gibson, 236 F.3d 342, 348 (6th Cir. 2001)(en banc) (citing Perry, 460 U.S. at 45). In a traditional public forum (like a street, sidewalk or park), strict scrutiny applies and the government may exclude speakers "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

---

[3] These are the three category of fora presently recognized in the Sixth Circuit. *See* Putnam Pit, Inc. v. City of Cookeville, Tennessee, 221 F.3d 834, 842 n.5 (6th Cir. 2000). However, as the Sixth Circuit has noted, "there has been some uncertainty among the circuits as to whether there are one or two categories of fora other than 'public' and 'nonpublic,' and what protection is due to these categories." Id. For instance, the Ninth and Second Circuits recognize an additional category—the limited public forum—where restrictions are permissible if viewpoint neutral and reasonably related to the limited purposes of the forum. *See* Faith Center Church Evangelistic Ministries v. Glover, 480 F.3d 891, 908 (9th Cir.), *cert. denied*, 128 S.Ct. 143, 169 L.Ed.2d 30 (2007); Bronx Household of Faith v. Bd. of Educ. of City of New York, 492 F.3d 89, 97 (2nd Cir. 2007).

A designated public forum exists where the government "intentionally open[s] a nontraditional public forum for public discourse." Putnam, *supra*, 221 F.3d at 843 (citing Cornelius, *supra*, 473 U.S. at 802; Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)). While the strict scrutiny standard is generally applicable to restrictions in a designated public forum, the Sixth Circuit has recognized that "these strict standards may not be applicable to those to whom the forum was not opened or to content that is not within the scope of the forum." Id. *See also* Denver Area Educ. Telecomms. Consortium, Inc. v. Federal Communications Comm'n, 518 U.S. 727, 750, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) ("Our cases have not yet determined, however, that government's decision to dedicate a public forum to one type of content or another is necessarily subject to the highest level of scrutiny."). Finally, in a non-public forum, access can be restricted so long as the restrictions are reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. Cornelius, *supra*, 473 U.S. at 800.

Here, Plaintiff contends that the Library's meeting rooms are designated public fora because the Library's Meeting Room Policy makes them generally available to a broad class of speakers for a broad class of topics. However, Plaintiff's approach to forum analysis is overly simplistic and its assertion regarding the characterization of the forum at issue here is inaccurate.

*1.      The Library's Meeting Rooms Are Non-Public Fora.*

To determine whether the government intended a location to be a designated public forum or a non-public forum, courts employ a two step analysis. Putnam, *supra*, 221 F.3d at 843. First, the court must determine whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property. Id. at 843-844. *See also* UFCW, *supra*, 163 F.3d at

352. Second, the court must look to whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose. Id. The purpose of this inquiry is to discern the government's intent in making the forum available for public use. Cornelius, *supra*, 473 U.S. at 802. Applying this two step analysis here compels the conclusion that the Library's meeting rooms are non-public fora.[4]

### a.    The Library Grants Only Selective Access To Its Meeting Rooms.

First, the Library acknowledges that it "welcomes the use of its meeting rooms for cultural activities and discussion of public questions and social issues," and that its meeting rooms "are available on equal terms to all groups in the community regardless of the beliefs and affiliations of their members, provided the meeting is open to the public and no fee is charged for attending the meeting." (Verified Complaint, Ex. 1).  Even so, that does not mean that every group wishing to use the Library's meeting rooms has carte blanche access to them.  *See* Faith Center, *supra*, 480 F.3d at 909 ("A policy with a broad purpose however is not dispositive of an intent to create a public forum by designation.").

To the contrary, the Library's Meeting Room Policy provides that its meeting rooms may not be used for "commercial, religious or political campaign meetings," for "religious services," or for workshops or seminars on "financial, estate or retirement planning, and related topics." (Verified Complaint, Ex. 1).  Moreover, groups wishing to use the Library's meeting rooms must first seek and obtain the Library's permission to do so, which Plaintiff acknowledges, and "[i]f there is any doubt as to the eligibility of a group, the problem [is] referred to the Library

---

[4] The Sixth Circuit has held that public libraries are limited public fora for First Amendment purposes. *See e.g.*, Neinast v. Bd. of Trustees of Columbus Metropolitan Library, 346 F.3d 585, 591 (6th Cir. 2003) ("For the purposes of First Amendment analysis, the Library is a limited public forum.").  However, Defendant is unable to find a single case from the Sixth Circuit where the Court was asked to categorize a meeting room within a public library under the Supreme Court's forum analysis.  Rather, this is a case of first impression in this Circuit.

Director" who makes the final determination about eligibility. (Id. at ¶¶12, 16, Ex. 1).
Additionally, while not-for profit, tax exempt groups may use the Library's meeting rooms for
free, for-profit entities may only use them for non-profit reasons and then must pay a fee to do
so. (Id. at Ex. 1).

The law is well-established that requiring prior permission for access to a forum
demonstrates that a public forum has not been created by designation. Cornelius, *supra*, 473
U.S. at 803. Similarly, "[b]y charging a fee in certain circumstances," the Library "has
demonstrated its desire to limit access to its meeting rooms for certain purposes and speakers.
Faith Center, *supra*, 480 F.3d at 909. Moreover, while the Library does not enforce its
prohibition on religious meetings, it has consistently applied its other use restriction (Moore Afd.
¶5), and "consistency in application is the hallmark of any policy designed to preserve the non-
public status of a forum." Hopper v. City of Pasco, 241 F.3d 1067, 1076 (9th Cir. 2001). *See
also* UFCW, *supra*, 163 F.3d at 352-353 (courts must look beyond stated intent to examine both
policy and practice of government to ascertain the exact nature of a forum). These factors
support a finding that the Library's meeting rooms are non-public fora.

     b.    The Limits Imposed By The Library On The Use Of Its Meeting Rooms
              Compliment The Forum's Purpose.

Second, the nature of the forum also supports the conclusion that the Library's meeting
rooms were not intended to be open for unlimited public expression. As the Supreme Court has
recognized, a library is quintessentially "a place dedicated to quiet, to knowledge, and to beauty."
Brown v. Louisiana, 383 U.S. 131, 142, 86 S.Ct. 719, 15 L.Ed.2d 63 (1966). The very purpose
of the library "is to aid in the acquisition of knowledge through reading, writing and quiet
contemplation." Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242, 1255
(3rd Cir. 1992). Here, the Library's meeting rooms are located within the Library itself and are

accessible during "regular library hours only" when other library patrons are present. (Verified Complaint, Ex. 1). As a result, the Library's Meeting Room Rules mandate that "[e]vents held in the library's meeting rooms must be conducted with a minimum of noise so as not to disturb other library patrons." (Id.). Therefore, "while the Library meeting room is compatible with different kinds of expressive activity such as group discussion or lecture . . . the forum was not intended to undermine the library's primary function as a venue for reading, writing, and quiet contemplation." Faith Center, *supra*, 480 F.3d at 910.

Where, like here, the Library's policy delineates the speakers and appropriate uses for the Library meeting rooms, the Library has consistently applied its policy restrictions, and the Library charges fees to use its meeting rooms in limited circumstances, the Court must conclude that the Library's meeting rooms were not dedicated for indiscriminate public use but constitute non-public fora. *See* Faith Center, *supra*, 480 F.3d at 910 (on similar facts Ninth Circuit found that public library meeting room was not dedicated for indiscriminate public use). As a result, restrictions on the use of the meeting rooms are subject to reasonableness, not strict scrutiny.

2. ***Restrictions On Access To The Library's Meeting Rooms Are Subject To The Reasonableness Standard, Not Strict Scrutiny.***

The state may limit access to a non-public forum based on subject matter or speaker identity so long as such restrictions are "reasonable." Cornelius, *supra*, 473 U.S. at 806. *See also* Perry, *supra*, 460 U.S. at 46 (restrictions on access to a nonpublic forum must be reasonable and viewpoint neutral). "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in light of the purpose of the forum and all the surrounding circumstances." Cornelius, 473 U.S. at 809. Given that the Library's meeting rooms are contained within the four walls of the Library, the nature and function of the Library as a whole

is relevant in evaluating the reasonableness of the Library's Meeting Room Policy and the restrictions it imposes on their use.

The general purpose of the Library's Meeting Room Policy is to make its meeting rooms available as a free community resource for non-profit endeavors. (Moore Afd. ¶4). Given the fact that the Library serves some 58,000 cardholders and only has five meeting rooms available for public use, the Library's Board of Trustees reasonably concluded that it had to impose some limits on the types of meetings that could be held in these rooms in order to maximize their availability for non-profit community groups without resources or funds to meet elsewhere. (Id.). To preserve the character of the forum as a free community resource for non-profit activities, the Library's Board of Trustees concluded that the meeting rooms could not be used for commercial, political or religious meetings;[5] for religious services; or for workshops or seminars on financial, estate or retirement planning, and related topics because those wanting to engage in these types of activities likely had other venues open to them and the resources to pay for those venues. (Id.).

Moreover, given the Library's primary function as sanctuary for reading, writing, and quiet contemplation, the Library has a reasonable interest in excluding activities from its meeting rooms—like religious services—that might interfere with this function. As the Ninth Circuit properly recognized in Faith Center, the controversy and distraction associated with allowing religious services to be held in the Library's meeting rooms "may alienate patrons and undermine the library's purpose of making itself available to the whole community." Faith Center, 480 U.S. at 911. See also Cornelius, 473 U.S. at 811 ("The First Amendment does not forbid a viewpoint-

---

[5] In practice, the Library does not enforce its ban on religious meetings. (Moore Afd. ¶5). Not only did the Library welcome Plaintiff to use the Friends Theater to conduct the religious discussion aspects of its proposed event, but the Library has opened up its meeting rooms to other religious speakers and religious discussion activities. (Mell Afd. ¶9).

neutral exclusion of speakers who would disrupt a non-public forum and hinder its effectiveness for its intended purpose."); Brody v. Spang, 957 F.2d 1108, 1122 (3rd Cir. 1992) (holding that reasonable grounds for content based restrictions include the desire to avoid controversy).

Accordingly, the Court should conclude that the Library's exclusion of "religious services" from its meeting rooms is reasonable in light of the forum's purpose and all the surrounding circumstances so that the Library's meeting rooms are not "transformed into an occasional house of worship." Faith Center, 480 F.3d at 910. To conclude otherwise would result in the "remarkable proposition that any public [building] opened for civic meetings must be opened for use as a church, synagogue, or mosque." Good News Club v. Milford Central School, 533 U.S. 98, 139, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (Souter, J., dissenting). Were that the case, even public meeting rooms in courthouses could be required to open their doors for religious services.

### 3. The Library's Meeting Room Policy Is Viewpoint Neutral And Constitutional.

Plaintiff's assertion that the Library engaged in unlawful viewpoint discrimination when it denied Plaintiff access to its meeting room space is factually inaccurate and legally incorrect. To being with, Defendant never denied Plaintiff access to its meeting rooms. Rather, it welcomed Plaintiff to use its meeting room space on February 27, 2008, but asked that Plaintiff conduct only those activities that did not conflict with the Library's Meeting Room Policy, which its representative Bruce Purdy affirmatively stated that he had read and that Plaintiff would follow. (Verified Complaint, Exs. 1, 6). Beyond that, a ban on religious services does not violate the First Amendment.

a.    <u>Religious Worship Is Not A Viewpoint But A Category Of Discussion</u>
     <u>Properly Excluded From The Library's Meeting Rooms</u>.

The Library's prohibition on allowing the public to have free use of its meeting rooms to hold religious services does not violate the First Amendment because this prohibition is not directed to viewpoint but to content and content discrimination is perfectly permissible where it preserves the purpose of the non-public forum. *See* <u>Perry</u>, *supra*, 460 U.S. at 46. The two leading Supreme Court cases that have considered the permissible use of public buildings for religious purposes have allowed such use only where it did <u>not</u> involve the pure conduct of religious worship services, which are distinct from other religious speech.

In <u>Lamb's Chapel v. Center Moriches Union Free School Dist</u>, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), a public school opened school property for after hours use by outside groups, but specified that "[t]he school premises could not be used by any group for religious purposes." <u>Id.</u> at 387. A church applied to use the school premises to show a six-part film on parenting from a Christian perspective, but its request was denied. <u>Id.</u> at 388-389. The Supreme Court held that it was unconstitutional viewpoint discrimination to allow school property to be used for the expression of views on family issues and child-rearing, without also allowing the property to be used from the expression of a religious viewpoint on the same subjects. <u>Id.</u> at 394. Significantly, the Court noted that the constitutionality of a policy prohibiting religious services was not at issue because the church did not challenge the district's denial of its earlier application for permission to hold its "Sunday morning services and for Sunday school." <u>Id.</u> at 389 n.2. Therefore, in <u>Lamb's Chapel</u>, the Court recognized that a ban on religious services was fundamentally different in kind from a ban on general use by a religious organization for non-service purposes.

Similarly, in Good News Club, *supra*, 533 U.S. 98, which Plaintiff asserts is "dispositive" here, a public school prohibited use of school property by outside groups "for religious purposes." Id. at 103. Good News Club, a private Christian organization for children, sought permission to hold its weekly after school meetings in the school cafeteria, but its request was denied by the school superintendent who found that "a fun time of singing songs, hearing a Bible lesson and memorizing scripture" was "the equivalent of religious worship." Id.

Applying Lamb's Chapel, the Supreme Court found that the school engaged in viewpoint discrimination when it excluded the Club from the after school forum because the subjects the organization sought to address were otherwise permitted in the forum—"the teaching of morals and character, from a religious standpoint." Id. at 109. More specifically, the Court found that "[t]he only apparent difference between the activity of Lamb's Chapel and the activities of the Good News Club is that the Club chooses to teach moral lessons from a Christian perspective through live storytelling and prayer, whereas Lamb's Chapel taught lessons through film." Id. at 109-110. Moreover, the Court found that its decision was fully supported by it prior holding in Rosenberger v. Rector and Visitors of Univ. of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), where a student organization was denied funding for printing expenses because its publication offered a Christian viewpoint, which the Court concluded was unconstitutional. Id. at 109 (citing Rosenberger, 515 U.S. at 831).

Accordingly, in Good News Club, the Court took care to simply "reaffirm [its] holding in Lamb's Chapel and Rosenberger that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." Id. at 111-112. Significantly, the Court noted that "[d]espite Milford's insistence that the Club's activities constitute 'religious worship,' the Court of Appeals made no such

determination." Id. at 112, n.4.  In fact, Justice Thomas, writing for the Court, explicitly stated that "the Club's activities ***do not constitute mere religious worship,*** divorced from any teaching of moral values."  Id. (emphasis added).  Again, the Supreme Court's distinction between religious worship and speech with a religious viewpoint has critical constitutional implications that are applicable here.

Not surprisingly, Plaintiff attempts to blur this distinction by asserting that it only sought to present a religious perspective on speech otherwise permissible within the forum.  According to Plaintiff, if it had desired to conduct "an event honoring the founding fathers (instead of God) for the freedom Americans have to participate in the political process, or an event where attendees sought guidance from political scientist (instead of God) on the Church's proper role in the political process" then its event would not have conflicted with the Library's Meeting Room Policy.  While this is accurate, Plaintiff did not propose to hold an event merely honoring or seeking guidance from God; it sought to hold an event where it would worship God through singing and prayer.

The Supreme Court and other federal courts have found that religious worship is categorically different from other religious speech.  *See* Lamb's Chapel, *supra*, 508 U.S. at 389 n.2; Good News Club, *supra*, 533 U.S. at 112 n.4.  *See also* Faith Center, *supra*, 480 F.3d at 915 ("Pure religious worship, however, is not a secular activity that conveys a religious viewpoint on otherwise permissible subject matter."); Bronx Household, *supra*, 127 F.3d at 221 (Cabranes, J., concurring in part, dissenting in part) ("Unlike religious 'instruction,' there is no real secular analogue to religious 'services,' such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism.").  For this reason, Plaintiff's reliance on Lister v. Defense Logistics Agency, *supra*, 482 F.Supp.2d 1003 (S.D. Ohio

2007)(Sargus, J.), is entirely misplaced because that case involved a prohibition on religious speech, not religious worship services. In fact, no lower court decision has extended the Supreme Court's holdings in Lamb's Chapel and Good News Club to compel a public building to open its doors for religious worship services. *See* Bronx Household, *supra*, 492 F.3d at 90 (vacating preliminary injunction barring City of New York from enforcing its prohibition on using school property after hours for religious worship services).

b.   The Ninth Circuit's Decision In *Faith Center* Provides Meaningful Guidance For The Court's Resolution Of This Factually Similar Dispute.

The fact that Defendant welcomed Plaintiff to conduct the religious discussion portions of its proposed "Politics and the Pulpit" event and asked only that Plaintiff refrain from engaging in religious services makes this case nearly identical to Faith Center, *supra*, 480 F.3d 891. In Faith Center, the Ninth Circuit was asked to determine the constitutionality of a public library meeting room use policy that prohibited the meeting rooms from being used for "religious services." Id. at 903. Faith Center, which wanted to use a meeting room to host an event involving religious discussion in the morning and a "praise and worship" service in the afternoon, argued that a prohibition on religious worship services was impermissible viewpoint discrimination because "prayer, praise and worship" is an educational, cultural, and community-related activity otherwise permitted in the forum that was suppressed due to Faith Center's religious perspective.[6] Id. at 911-912. Plaintiff proffers this same argument here. The Ninth Circuit rejected this argument, and so should this Court.

---

[6] The flyers Faith Center used to advertise its event divided the day's activities into a "Wordshop" from 11:00 a.m. until 12:00 noon and an afternoon "Praise and Worship" service from 1:00 p.m. to 3:00 p.m. led by a pastor. The topic of the morning "wordshop" was described as "The Making of an Intercessor, an End-time call to Prayer for every Believer, and how to pray fervent, effectual Prayers that God hears and answers." Faith Center, 480 F.3d at 903-904.

As the Ninth Circuit noted, drawing a distinction between regulation on the basis of subject matter or viewpoint "is not a precise one." Id. at 912 (quoting Rosenberger, *supra*, 515 U.S. at 831). The test for determining whether viewpoint discrimination has occurred is whether the government has excluded perspectives on a subject matter otherwise permitted in the forum. Id. at 912 (citing Lamb's Chapel, *supra*, 508 U.S. at 393). Applying that test, the Ninth Circuit concluded that the library's ban on religious services was not impermissible viewpoint discrimination because "[p]ure religious worship . . . is not a secular activity that conveys a religious viewpoint on an otherwise permissible subject matter." Id. at 915. Rather, "[r]eligious worship . . . is not a viewpoint but a category of discussion within which many different religious perspectives abound." Id. The Ninth Center then explained that if the library had excluded religious worship services by Mennonites from its forum, that would constitute unlawful viewpoint discrimination, but "a blanket exclusion of religious worship services from the forum is one based on the content of speech." Id.

The Ninth Circuit also rejected Faith Center's alternative argument that the prohibition on religious services constitutes viewpoint discrimination because religious worship cannot be distinguished from other permissible forms of religious speech and that trying to enforce such a distinction would entangle the government with religion in a manner forbidden by the Establishment Clause. While the Court acknowledged that drawing this distinction may be difficult, it noted that Faith Center drew the distinction itself when it divided its afternoon religious worship service from its morning activities. Id. at 918. As the Ninth Circuit explained, "The [library] may not be able to identify whether Faith Center has engaged in pure religious worship, but Faith Center can and did." Id. The same is true here.

When Plaintiff's representative applied to use the Library's meeting room space for its "Politics and the Pulpit" event, he divided Plaintiff's proposed activities into four distinct parts:

- A discussion of what the Bible teaches regarding involvement by Christians, Pastors, and Churches in politics;

- A discussion of the current status of the law regarding political involvement by Christians, Pastors, and Churches;

- A time of prayer petitioning God for guidance on the Church's proper role in the political process; and

- A time of signing praise and giving thanks to God for the freedom we have in this country to participate in the political process.

(Verified Complaint, Ex. 4). As the Ninth Circuit acknowledged, "[r]eligious worship services can be distinguished from other forms of religious speech by the adherents themselves." Faith Center, 480 F.3d at 918. Here, Plaintiff has drawn that distinction for the Court, which compels the Court to reach the same conclusion here that was reached by the Ninth Circuit in Faith Center—that the Library's decision to exclude religious services from its meeting rooms is a permissible exclusion of a category of speech that is meant to preserve the purpose behind the non-public forum. Id. Unlike the film on child rearing issues in Lamb's Chapel and the teaching of morals and character development in Good News Club, there is no secular equivalent to prayer, praise and worship. Significantly, Plaintiff does not contend that the Library is guilty of viewpoint discrimination because it bars political groups from using its meeting rooms. Insisting that the Library's ban on religious services is unconstitutional "looks less like a reach for equal treatment, and more like a reach for an affirmative preference for religious speakers over political speakers." Campbell v. St. Tammany Parish School Bd., 231 F.3d 937, 943 (5th Cir. 2000). See also Heffron v. Internat'l Soc. For Krishna Consciousness, Inc., 452 U.S. 640, 652-653, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("[R]eligious organizations" do not "enjoy

rights to communicate . . . superior to those of other organizations having social, political or ideological messages to proselytize.").

Plaintiff tries to distinguish Faith Center, but its effort is unpersuasive.[7] First, Plaintiff's assertion that the policy at issue here is subject to more stringent scrutiny than the policy at issue in Faith Center is inaccurate. The fact that the Sixth Circuit does not recognize the limited public forum as a separate category of fora is immaterial because the Library's meeting room space is properly categorized as a non-public forum, not a designated public forum. Hence, the Library's policy is subject to the same standard applied by the Ninth Circuit in Faith Center—restrictions on use need only be reasonable and viewpoint neutral. Faith Center, 480 F.3d at 910.

Second, the restriction at issue here is no broader than that at issue in Faith Center. Even though the Library's policy as written, precludes the use of its meeting rooms for "religious meetings," in practice the Library does not follow this policy. (Moore Afd. ¶5). Rather, the Library permits a wide array of religious discussion activities in its meeting rooms as illustrated by its invitation to Plaintiff to engage in the religious discussion aspect of its proposed event. (Verified Complaint, Ex. 6; Mell Afd. ¶9). Nevertheless, Plaintiff insists that Faith Center is distinguishable because the Library did not permit it to engage in praying and singing whereas the Ninth Circuit found these to be permissible activities. Plaintiff's assertion is inaccurate and misleading. In Faith Center, the Ninth Circuit specifically refused to comment on the permissibility of singing in the library's meeting rooms. See Faith Center, 480 F.3d at 914 n.13. With regard to praying, the Ninth Circuit concluded that prayer had previously been allowed in the library's meeting rooms as part of communicative activities about the Bible, social and

---

[7] Plaintiff contends that Faith Center is inapplicable to Plaintiff's claims under the Free Exercise and Equal Protection Clauses, which Defendants acknowledge. This is because the Ninth Circuit did not address these claims after finding that Faith Center's First Amendment Free Speech claim was untenable. Faith Center, 480 F.3d at 906 n.7. However, Faith Center is otherwise entirely applicable to the resolution of Plaintiff's claims.

political issues, and the sharing of life experiences; hence it was acceptable. Id. at 914. However, the Ninth Circuit did not conclude that prayer, standing alone, was a permissible meeting room activity.[8] To the contrary, it concluded that pure "praise and worship" were not religious viewpoint activities otherwise permitted in the forum. Id. at 915.

Third, while the Ninth Circuit concluded that the government is not competent to distinguish between "pure religious worship services" and other forms of religious speech, it did not have to make this distinction because Faith Center made it for the Court. Id. at 918. The same is true here. The Library's Director did not, as Plaintiff suggests, have to "parse out the permissible religious speech from the impermissible." (Motion, p. 13). Rather, it relied on Plaintiff's own description of its activities, which it broke into four distinct parts, to determine which activities were permissible. For these reasons, Plaintiff cannot distinguish Faith Center in any material respect and the Court should look to this decision for guidance here, especially because there is no Sixth Circuit case law on point as this is a case of first impression in this Circuit.

### 4. The Library's Meeting Room Policy Also Passes Strict Scrutiny Review.

The Sixth Circuit has held that strict scrutiny "may not be applicable to those to whom the forum was not opened or to content that is not within the scope of the forum." Putnam, supra, 221 F.3d at 843. Here, religious services are not the type of content that is within the scope of the forum and the Court is free to reject Plaintiff's demand for strict scrutiny review of the Library's Meeting Room Policy. Even if the Court were to conclude that the Library's

---

[8] As the Ninth Circuit explained, "Faith Center's morning 'Wordshop' included a call to prayer-speech that may be properly characterized as proselytizing. Nonetheless, because this proselytizing activity also further the discussion about communication and communicating with a higher authority, it cannot be grounds for exclusion." Faith Center, 480 F.3d at 918.

meeting rooms are designated public fora, and that the Library's Meeting Room Policy is, therefore, subject to strict scrutiny review, it still passes constitutional muster.

a.     The Library Has A Compelling Interest In Complying With The Establishment Clause.

The Library's prohibition on the use of its meeting rooms for "religious services" is required for the Library to comply with the mandates of the Establishment Clause of the First Amendment, which prohibits laws "respecting an establishment of religion." U.S. CONST. amend I.[9]  The Supreme Court has held that an interest in avoiding an Establishment Clause violation "may be characterized as a compelling," and therefore justify content-based discrimination. See Good News Club, supra, 533 U.S. at 112-113 (citing Widmar, supra, 454 U.S. at 271).  Plaintiff contends that the Library has no compelling interest in complying with the Establishment Clause because there is a distinction between government speech endorsing religious and private speech endorsing religion, which is protected by the Free Speech and Free Exercise Clauses.  While this distinction may indeed exist, the causal observer who overhears a religious worship service being conducted in the Library's meeting rooms is unlikely to appreciate this distinction especially considering the "unique circumstances" presented here, which Plaintiff wholly ignores.  See County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 629, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (whether a challenged practice passes the endorsement test "depends on a sensitivity to the unique circumstances and context of a particular challenged practice . . . .") (O'Connor, J., concurring).  See also Make the Road by Walking v. Turner, 378 F.3d 133, 148 (2nd Cir. 2000) ("where allowing private expression in a nonpublic forum may imply government endorsement of the expression, limiting or excluding speakers may be reasonable.").

---

[9]  The Establishment Clause is applicable to the States and local governments through the Fourteenth Amendment.  ACLU of Ohio Foundation, Inc. v. Ashbrook, 375 F.3d 484, 490 (6th Cir. 2004).

First, religious services, unlike other types of religious speech or discussion, are almost exclusively held in buildings or spaces dedicated to that specific purpose. Converting a public library meeting room into such a space, even temporarily, raises a strong inference that a reasonable observer would view the government as endorsing the service taking place at the library, particularly where the space is provided free of charge and the services are conducting during normal library hours in a non-soundproof room.[10] Forcing the Library to aid Plaintiff in its mission to convert others to its belief that "the Bible is the inspired Word of God and . . . is the source of . . . all ethical standards governing the affairs of men; that the God of the Bible is sovereign over all areas of life . . ." (Verified Complaint, ¶8), is the very essence of an Establishment Clause violation. *See e.g.,* Locke v. Davey, 540 U.S. 712, 722, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ("Since the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an "established" religion.").

Second, Plaintiff's proposed religious service would take place during the Library's normal operating hours when the library is open to all members of the community who are diverse in age, race, ethnicity, and religious faith. (Moore Afd. ¶2). This is in stark contrast to the facts in Lamb's Chapel and Good News Club wherein Establishment Clause defenses were rejected because the religious activities in question took place in public schools after school hours. *See* Good News Club, *supra*, 533 U.S. at 113 ("The Establishment Clause defense fares no better in this case. As in Lamb's Chapel, the Club's meetings were held after school hours, not

---

[10] The Court should reject Plaintiff's contention that there is no realistic danger that the community would think that the Library is endorsing religion by allowing worship services in its meeting rooms because the Library expressly prohibits those who use its meeting rooms from stating or implying that the Library is a sponsor of the event. This argument presumes that the casual observer is intimately familiar with the Library's Meeting Room Policy, but there is no empirical evidence to support such a finding.

sponsored by the school . . . ."). This factor also distinguishes the case at bar from <u>Rusk v.</u> <u>Crestview Local Sch. Dist.</u>, 379 F.3d 418 (6th Cir. 2004), upon which Plaintiff relies.

In <u>Rusk</u>, the Sixth Circuit found that a public school's distribution of flyers advertising religious activities, in addition to other community activities, could not be viewed as an endorsement of religion. <u>Id.</u> at 424. Critical to the Court's holding was the fact that none of the religious activities advertised in the flyers were school-sponsored events, which the Court found further diminished any risk that impressionable elementary students would mistakenly conclude that the school endorsed them. <u>Id.</u> at 423. Moreover, <u>Rusk</u> and <u>Concerned Women for America,</u> <u>Inc. v. Lafayette County</u>, 883 F.2d 32 (5th Cir. 1989), which Plaintiff also cites, are also readily distinguishable because neither case involved a request to use governmental property for pure religious worship services divorced from other religious speech.[11]

The Supreme Court, the Sixth Circuit, and district courts in the Sixth Circuit have all recognized that religious imagery on public property can violate the Establishment Clause where it leaves a reasonable observer with the impression that the government is endorsing religion. *See e.g.,* <u>County of Allegheny</u>, *supra*, 492 U.S. at 598-599 (crèche display, which sat on the Grand Staircase of the county courthouse—the "main" and "most beautiful part" of the building—violated Establishment Clause, notwithstanding the presence of secular holiday symbols located elsewhere in the courthouse, because "[n]o viewer could reasonably think that it occupies this location without the support and approval of the government."); <u>ACLU of Ohio</u>

---

[11] In <u>Concerned Women</u>, the Fifth Circuit concluded that the auditorium in a public library was a public forum, not a limited public forum, because the library had "unwittingly" opened it up for indiscriminate use notwithstanding its policy prohibiting use of the auditorium for certain activities including those with a "religious purpose." <u>Concerned Women</u>, 883 F.2d at 33-34. Significantly, the plaintiff in that case wanted to use the library's auditorium for a meeting where its members would "discuss family and political issues, pray about those issues, and seek to apply Biblical principles to them," not to engage in a pure praise and worship service divorced from other religious speech. <u>Id.</u> Moreover, the Fifth Circuit did not reject the library's Establishment Clause argument, but stated only that there was no violation absent "empirical evidence that religious groups will dominate use of the library's auditorium, causing the advancement of religion to become the forum's 'primary effect' . . . " <u>Id.</u> at 35.

Foundation, Inc. v. Ashbrook, *supra*, 375 F.3d 484, 494 (6th Cir. 2004) (finding that a reasonable observer would view judge's courtroom display of Ten Commandments as state endorsement of religion in violation of Establishment Clause even though posted next to the Bill of Rights); ACLU of Kentucky v. Grayson County, No. 4:01CV-202-JHM, 2008 WL 859279 at *11 (W.D.Ky. Mar. 28, 2008) (Ex. 5) (inclusion of Ten Commandments in a display entitled "Foundations of American Law and Government Display" located in county courthouse violated Establishment Clause because "a reasonable person would conclude that [the display] . . . has the effect of endorsing religion, and therefore violates the second prong of the Lemon test . . . .").

If mere religious imagery on public property can leave a reasonable observer with the impression that government is endorsing that religious image, it is hardly a stretch of imagination or logic to conclude that the same reasonable observer who overhears a religious worship service emanating from a public library meeting room would conclude that the government is endorsing that religious service. *See* Doe v. Village of Crestwood, 917 F.2d 1476, 1478 (7th Cir. 1990) ("A religious service under government auspices necessarily conveys the message of approval or endorsement."). The Establishment Clause was designed to ensure the government's neutrality toward religion, not its endorsement of it. Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 1358-1359, 79 L.Ed.2d 604 (1984) (The purpose of the Establishment Clause is "'to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other.'") (quoting Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2125, 29 L.Ed. 2d 745 (1971)).

Third, the Library's Meeting Room Policy would allow Plaintiff, a non-profit organization, to use its meeting rooms free of charge to hold its religious worship services. (Verified Complaint, Ex. 1). The use of public funds to subsidize religion presents a classic Establishment Clause problem. "The Establishment Clause is not limited to precluding the State

from conducting religious exercise. It also forbids the State to employ its facilities or funds in a way that give any church, or all churches, greater strength in our society than it would have by relying on its members alone." School Dist. of Abington Township, Pa. v. Schempp, 374 U.S. 203, 229, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Douglas, J., concurring). Requiring a public library to open up its meeting rooms for free to any group wanting to conduct a religious service therein is no different than a requirement that the Bible be read or the Lord's Prayer recited at the commencement of the school day—all of these activities violate the Establishment Clause because "public funds, though small in amount, are being used to promote a religious exercise. Through the mechanism of the State, all of the people are being required to finance a religious exercise that only some of the people want and that violates the sensibilities of others." Id. As Justice Douglas correctly noted, "[w]hat may not be done directly may not be done indirectly less the Establishment Clause become a mockery." Id. at 230. *See also* Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 385, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (holding that the Establishment Clause absolutely prohibits government-financed or government-sponsored "indoctrination into the religious beliefs of a particular religious faith.").

Given these unique circumstances, which Plaintiff wholly ignores and which the Establishment Clause case law has never addressed, there can be no doubt that allowing Plaintiff to conduct its religious worship services in the Library's meeting rooms would cause a reasonable observer to perceive that the government was endorsing religion in violation of the Establishment Clause. *See e.g.,* ACLU of Kentucky v. Mercer County, 432 F.3d 624, 636 (6th Cir. 2005) ("Under the endorsement test, the government violates the Establishment Clause when it acts in a manner that a reasonable person would view as an endorsement of religion."). *See also* Ams. United for Separation of Church & State v. City of Grand Rapids, 980 F.2d 1538,

1543-1544 (6th Cir. 1992) (explaining that the reasonable person standard is an objective standard, similar to the judicially-created "reasonable person" standard of tort law). Accordingly, the Library's desire to avoid this perception provides compelling justification for its ban on allowing religious worship services to be held in its meeting rooms; therefore, the Library's Meeting Room Policy passes strict scrutiny review.

b.     <u>The Library's Meeting Room Policy Does Not Result In Excessive Entanglement In Religion</u>.

The Court must also reject Plaintiff's assertion that the Library's Meeting Room Policy forces "unconstitutional governmental entanglement with religion." (Motion, p. 13). Library Director Ann Moore was not, as Plaintiff asserts, put in the untenable position of having to "parse out the permissible religious speech from the impermissible." Rather, Plaintiff made that distinction itself when its representative broke its proposed event into four distinct parts (Verified Complaint, Ex. 6), making it easy for Ms. Moore to rely upon Plaintiff's own description of its proposed event to determine which parts were permissible religious discussion and which parts were impermissible religious worship service activities.

To be sure, if the Library were required to allow religious worship services in its meeting rooms as Plaintiff demands, such a policy would actually foster the government's excessive entanglement in religion. For example, the Library would be required to review applications from various religious groups to determine what among of a number of religious practices (*e.g.,* receiving communion, faith healing, baptism, exorcism, snake handling, or animal sacrifice), it should allow in the library, and which it should not. Moreover, when more than one religious group sought to use the meeting rooms for services at the same time, then the Library would be put in the untenable position of having to pick and choose among these groups. Decisions like

these would serve only to excessively entangle the government in religion in violation of the Establishment Clause.

Finally, even if the Court were to conclude that the Library's Meeting Room Policy excessively entangles government in religion, there is a straightforward way to resolve this concern. In Faith Center, the library proposed altering its meeting room application to include a certificate by the applicant that the meeting room will not be used for religious services, which would allow the library to rely on the honesty of the applicant while avoiding any potential entanglement issues.[12] Faith Center, *supra*, 480 F.3d at 919 n.19. Surely, the Library could make a similar modification to its meeting room reservation form that would assuage any entanglement concerns the Court might have.

As the Supreme Court has cautioned, "we keep in mind 'the myriad subtle ways in which the Establishment Clause can be eroded,'" Santa Fe Independent Sch. Dist. v. Doe, 530 U.S. 290, 314, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (citing Lynch, *supra*, 465 U.S. at 694). Permitting religious worship services in a non-public or designated public forum is not a subtle but, rather, a blatant way of eroding the Establishment Clause. Moreover, forcing the government to relinquish all control over the manner in which its property is used once a speaker asserts that it wants to use that property to present a "religious viewpoint" would elevate religion to a preferred status that the Establishment Clause forbids. For all of these foregoing reasons, Defendant has a compelling interest in complying with the Establishment Clause, which justifies its legitimate prohibition on allowing religious worship services to be held in its meeting rooms.

---

[12] While this question is not included on the meeting room reservation form currently in use, a representative from the Library's Community Relations department often asks an applicant if their proposed use of the meeting room involves a religious service. (*See* Mell Afd. ¶3). Interestingly enough, when Library employee Jan Mell asked Plaintiff's representative Bruce Purdy this precise question, he assured her that Plaintiff's proposed event did not involve religious services when, in fact, it did. (Id. at ¶¶3, 5).

As a result, Plaintiff is unlikely to succeed on the merits of its First Amendment Free Speech claim, and the Court should deny Plaintiff's Motion for Preliminary Injunction.

**C.** **The Court Should Deny Plaintiff's Motion For Preliminary Injunction Because It Is Unlikely To Succeed On The Merits Of Its Free Exercise Claims.**

The First Amendment prohibits the enactment of any law "prohibiting the free exercise" of religion. U.S. CONST. amend I. Similarly, Article 1, Section 7 of the Ohio Constitution, which is directed to religious freedom, provides, in pertinent part, that "any interference with the rights of conscious [shall not] be permitted." Plaintiff contends that the Library has violated the Free Exercise Clause and the Ohio Constitution by "wholly exclud[ing] it form the forum." Plaintiff's assertion is untenable.

First, the gravamen of a free exercise claim is that the government forces one to do something contrary to one's religion, or presents one with a Hobson's choice between forsaking one's religion or suffering serious negative consequences. *See e.g.,* Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (Jehovah's Witnesses' free exercise claim predicated upon their being required to build tanks for the military or forego unemployment benefits after quitting). Absent a showing that the plaintiff was required to affirm or deny a belief or engage (or refrain from engaging) in a practice prohibited by (or mandated) by his or her religion, no claim for violation of free exercise rights will be sustained. *See* Mozert v. Hawkins Cty. Bd. of Educ., 827 F.2d 1058, 1065 (6th Cir. 1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1998). Here, Plaintiff asserts that it "sincerely believes that Christian pastors have a duty to preach and teach Biblical truths, and that Christians in general have a duty to participate in the political process." (Motion, p. 15). However, Plaintiff has not proffered any evidence that the religious beliefs of any of its members "mandates" that they conduct religious worship services in a public library or anywhere outside

the province of a recognized church. Accordingly, Plaintiff has no viable Free Exercise claim. *See e.g.* Hansen v. Ann Arbor Public Schools, 293 F.Supp.2d 780, 808-809 (E.D.Mich. 2003) (court rejected free exercise claim by high school student who felt morally compelled to defend her faith against opposing views about homosexuality where, *inter alia,* there was no evidence that she was required to "affirm or deny a belief" or to "engage in a practice" prohibited by her religion.).

Second, Plaintiff's reliance on Church of the Lukumi Babalu Aye v. City of Haileah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), and Employment Div., Dept. of Human Resources v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) is misplaced. These cases involved laws prohibiting specific religious practices. For example, in Church of the Lukumi, the municipal ordinances at issue prohibited animal sacrifice, which was challenged by a church of the Santeria religion. The Supreme Court sustained the challenge on a finding that the ordinances were not neutral but rather had as their object the suppression of a central element of the Santeria religion. Church of Lukumi, 508 U.S. at 542. The Court also found that the ordinances were not of general applicability and could not survive strict scrutiny. Id. at 545-547. In contrast, Smith involved a state law prohibiting payment of unemployment benefits to persons discharged for misconduct. The law was applied in the case of employees of a drug rehabilitation program who were discharged for using peyote at a Native American Church ceremony. The Supreme Court found that the state statute was a valid and neutral law of generally applicability and, therefore, enforceable. Smith, 494 U.S. at 890.

Church of Lukumi and Smith have no applicability here because the Library's Meeting Room policy does not bar any particular religious practices, like animal sacrifice or the ingestion of Peyote, nor does it interfere in any way with the free exercise of religion by singling out a

particular religion or imposing any disabilities on the basis of religion. Plaintiff's members are free to practice their religion; they or any other group just cannot conduct their religious services in the Library's meeting rooms. In <u>Bronx Household</u>, *supra*, the Second Circuit rejected the exact same First Amendment Free Exercise argument Plaintiff makes here, correctly noting that "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires," and that this right has not been taken from the plaintiff. <u>Bronx Household</u>, *supra*, 127 F.3d at 216. The same is true here, whether Plaintiff's claim is analyzed under the First Amendment or the Ohio Constitution.

Third, Plaintiff's reliance on <u>Fairfax Covenant Church v. Fairfax County Sch. Bd.</u>, 17 F.3d 703 (4th Cir. 1994), does not advance its argument. The forum at issue in <u>Fairfax</u> was a public forum, not a designated public forum as Plaintiff contends. <u>Id.</u> at 706. There, the Fourth Circuit concluded that in a public forum, religious speakers had to be granted access to the forum on equal terms with others and that the school board's adoption of a rental rate structure that discriminated against the religious uses of the public forum by charging more rent violated the plaintiff's First Amendment free speech and free exercise rights. <u>Id.</u> at 709. <u>Fairfax</u> is inapplicable here because the Library's meeting rooms are not public fora, but non-public fora and the Library may properly exclude those activities from its meeting rooms that are inconsistent with the forum's purpose. *See* <u>Perry</u>, *supra*, 460 U.S. at 55 (in a non-public forum, all speech is not equally situated and the government may draw distinctions which relate to the special purpose for which the property is used). Furthermore, there is no rental rate issue here since all non-profit groups are treated the same—they all have free access to the Library's meeting rooms.

Finally, even if the Court were to conclude that the Library's Meeting Room Policy is not neutral and generally applicable and that it is subject to strict scrutiny under the First Amendment and the Ohio Constitution, the Policy passes strict scrutiny review because the Library has a compelling need to comply with the Establishment Clause as previously explained as the prohibition on allowing religious services to be held in its meeting rooms is narrowly tailored to accomplish this goal because it permits other forms of religious speech. For these reasons, Plaintiff is unlikely to succeed on the merits of its Free Exercise claims and Defendant respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction.

**D.** **The Court Should Deny Plaintiff's Motion For Preliminary Injunction Because It Is Unlikely To Succeed On The Merits Of Its Equal Protection Claim.**

Section 1 of the Fourteenth Amendment provides, in pertinent part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, §1. To establish a violation of the Equal Protection Clause, it must first be shown that the defendant's actions result in similarly-situated individuals receiving disparate treatment. *See* City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); Gillard v. Norris, 857 F.2d 1095, 1100 (6th Cir. 1988). If it is shown that similarly-situated persons receive disparate treatment, and if that disparate treatment invades a "fundamental right" such as speech or religious freedom, then the strict scrutiny standard governs and the defendant's actions will be sustained only where they are narrowly tailored to serve a compelling government interest. *See* Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); 37712, Inc. v. Ohio Dept. of Liquor Control, 113 F.3d 614, 621 (6th Cir. 1997).

Here, Plaintiff is unlikely to succeed on the merits of its Equal Protection claim because Plaintiff was not treated any differently by the Library than any other non-profit group seeking to

use its meeting room space. Plaintiff was given express permission to use the Friends Theater free of charge to present its religious viewpoint with regard to Biblical teachings and the current status of the law regarding political involvement by Christians, Pastors and Churches. (Verified Complaint, Ex. 6). The Library simply asked that Plaintiff refrain from engaging in religious service activities—which are distinct from other forms of religious speech—the same limitation imposed on *all* groups seeking to use its meeting room space. (Verified Complaint, Ex. 6; Moore Afd. ¶5). The law is well-settled that the government may impose limitations on the use of a non-public forum where those limitations are reasonably necessary to preserve the purpose of the non-public forum. *See* Cornelius, *supra*, 473 U.S. at 800.

Even if the Court were to conclude that Plaintiff was treated differently from other similarly-situated groups, Plaintiff still must show that this disparate treatment invaded its fundamental rights before strict scrutiny applies. Plaintiff cannot make this showing. As the Second Circuit has recognized, there is no fundamental right to free speech in a limited forum from which various times of speakers and subjects are properly excluded, nor is the free exercise of religion a fundamental right in a limited public forum. *See* Bronx Household, *supra*, 127 F.3d at 216-217. Logic dictates that the same must be true with regard to a non-public forum where the government has even greater latitude to restrict use of its space.

Moreover, the Supreme Court has held that where a challenged governmental action does not violate the Free Exercise Clause, as is the case here, this conclusion definitely answers the question of whether the challenged action impermissibly infringes upon a fundamental right to religion. *See* Davey, *supra*, 540 U.S. at 720 n.3. Thus, an equal protection claim that challenges a governmental action not found to violate the Free Exercise Clause gives rise only to rational basis review, not strict scrutiny. Id. *See also* Johnson v. Robinson, 415 U.S. 361, 375 n.4, 94

S.Ct. 1160, 39 L.Ed.2d 389 (1974) (explaining that once a law is found to be valid with respect to the free exercise right, there is "no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test" in addressing an equal protection claim).

Here, the Library's Meeting Room Policy, which does not interfere with Plaintiff's Free Exercise rights, passes rational basis review because the Library has a reasonable interest in excluding activities form its meeting rooms—like religious services—that might interfere with the Library's primary function as a sanctuary for reading, writing, and quiet contemplation. The Library also has a reasonable interest in avoiding the type of controversy that might result if religious groups are permitted to hold worship services in the meeting rooms, thereby transforming the Library into an occasional house of worship. Even if the Court were to apply strict scrutiny, the Library's ban on allowing religious services to be held in its meeting rooms is permissible because it is mandated by the Establishment Clause and is narrowly drawn because it permits discussion from a religious viewpoint and precludes only religious worship services, which is constitutionally permissible. *See e.g.,* Byrne v. Terrill, No. 2:05-CV-15, 2005 WL 2043011 (D.Vt. Aug. 1, 2005) (Ex. 6) (finding that the State's interest in avoiding the appearance of endorsing religion was compelling justification for its prohibition on issuing vanity license plates that refer to a deity where the exclusion of religious references was viewpoint neutral).

**E.    The Court Should Deny Plaintiff's Motion For Preliminary Injunction Because It Is Unlikely To Succeed On The Merits Of Its Due Process Claim.**

Finally, Plaintiff asserts that the Library's Meeting Room Policy violates the Due Process Clause of the First and Fourteenth Amendments because it is vague and lacks objective standards for deciding what speech, particularly religious speech, is permitted in the meeting rooms. According to Plaintiff, this lack of objective standards gives Library officials "unbridled

discretion in enforcing the Policy," which Plaintiff contends creates "the risk of ad hoc and discriminatory application." Plaintiff's assertions are unfounded.

A policy may be found void for vagueness if a reasonable person of ordinary intelligence could not understand what conduct is prohibited. *See* Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 803 (1973). Here, a reasonable person of ordinary intelligence could read the Library's Meeting Room Policy and understand what activities are impermissible.[13] Simply because the phrase "religious services" is undefined does not render the Library's Meeting Room Policy unconstitutionally vague. To the contrary, a reasonable person of ordinary intelligence can fully appreciate what is meant by the term "religious services," which explains why Jan Mell, who has been booking the Library's meeting rooms for some twenty years, cannot recall a single instance where an applicant asked her to define the term, including Plaintiff's representative Bruce Purdy, who denied that any "religious services" would be held during Plaintiff's proposed event when Ms. Mell specifically asked. (Mell Afd. ¶8).

In Harper ex rel. Harper v. Poway Unified Sch. Dist., 345 F.Supp.2d 1096 (S.D.Cal. 2004), the district court rejected the same due process argument made by a high school student who was suspended for wearing a t-shirt with a message expressing religious condemnation of homosexuality. There, the school maintained a policy prohibiting students from wearing "clothing or accessories (including backpacks) that promote or portray violence or hate behavior including derogatory connotations directed toward sexual identity." Id. at 1110-1111. The student alleged that this policy, and others, were vague, lacked sufficient objective standards to

---

[13] Defendant acknowledges that its prohibition on "religious meetings" is inherently inconsistent with its provision that "committees affiliated with a church will be allowed to use meeting rooms . . . ." (Verified Complaint, Ex. 1). Moreover, Defendant further acknowledges that it does not enforce this policy but allows its rooms to be used by any person or group for religious meetings and discussion. (Moore Afd. ¶5; Mell Afd. ¶9). Accordingly, Defendant would be willing to rework the language of its Policy to clarify that religious meetings are permitted in its meeting rooms if the Court so requires, but is unwilling to withdraw its prohibition on religious services.

curtain the discretion of school officials, and allowed for ad hoc and discriminatory enforcement in violation of his due process rights—the same arguments Plaintiff makes here. Id. at 1111. The court rejected the plaintiff's due process claim having found that a reasonable student in plaintiff's position who had read the school's policies would understand that the language on his t-shirt "Homosexuality is shameful" is clearly derogatory toward sexual identity and prohibited by the school's policies. Id. at 1112. The result here should be the same.

Finally, Plaintiff's assertion that the lack of objective criteria in the Library's Meeting Room Policy will lead to its arbitrary application is unsupported by any empirical evidence. To the contrary, the empirical evidence firmly establishes that the Library has consistently enforced its ban on allowing religious services to be held in its meeting rooms. (Moore Afd. ¶5). For this additional reason, Plaintiff is unlikely to succeed on the merits of its Due Process Claim.

**F.    The Court's Denial Of Plaintiff's Motion For Preliminary Injunction Will Not Cause Plaintiff Irreparable Harm, But Granting The Motion Will Inflict Substantial Harm On Others And Will Disserve The Public Interest.**

As previously explained, Plaintiff seeks to alter the status quo—the Library's current Meeting Room Policy—by requesting preliminary injunctive relief. As a result, its Motion for Preliminary Injunction is subject to a heavier burden and Plaintiff must show not only that it has a strong likelihood of success on the merits of its claims, but that it would suffer irreparably injury absent an injunction, that granting an injunction would not cause substantial harm to others, and that the public interest would be served by granting the injunction. Neveux, *supra*, 921 F.Supp. at 1571. Plaintiff cannot make this showing.

First, Plaintiff is unlikely to succeed on the merits of any of its claims as detailed above, which is fatal to its request for preliminary injunction. *See* Gonzales, *supra*, 225 F.3d at 625 ("[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success

on the merits is usually fatal.") Second, Plaintiff's assertion that it will suffer irreparable harm if its Motion for Preliminary Injunction is denied rests solely upon its contention that it's fundamental rights to free speech and free exercise of religion have been violated, which they have not. In point of fact, Plaintiff was never denied access to the Library's meeting rooms. Third, if the Court were to grant Plaintiff's Motion for Preliminary Injunction, this would cause substantial harm to others. The Library serves some 58,000 cardholders and has only five meeting rooms available for public use. If the Library were forced to open its meeting rooms up for religious services, this would sharply curtail their availability for use by other non-profit community groups without resources or funds to meet elsewhere, ultimately impeding the Library's ability to serve "[a]s an institution of education for democratic living." (Moore Afd. ¶4). Instead, the Library would be transformed into a free house of worship in violation of the Establishment Clause.

Finally, the public interest will best be served by denying Plaintiff's Motion for Preliminary Injunction, which will uphold the status quo and maximize the availability of the Library's limited resources for use by non-profit community groups in furtherance of the Library's mission. For these reasons, the Court should deny Plaintiff's Motion for Injunctive Relief in its entirety.

## V. <u>CONCLUSION</u>

No court has ever held that the United States or Ohio Constitutions require a government who opens up a public space to community groups to open up that same space for religious worship services. Plaintiff was given the same access to the Library's meeting rooms that is given to any other non-profit community group—it was welcome to use the Friends Theater "for cultural activities and discussion of public questions and social issues," even from a religious

perspective. What Plaintiff could not and cannot lawfully do is transform the Library's meeting room space into a free house of worship. Accordingly, Defendant The Upper Arlington Public Library Board of Trustees respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction in its entirety and with prejudice.

Respectfully submitted,
SCHOTTENSTEIN, ZOX & DUNN


/s/ Susan Porter
Susan Porter, Esq. (0036867)
250 West Street
Columbus, Ohio 43215
(614) 462-2314 (telephone)
(614) 462-5135 (facsimile)
E-mail: SPorter@szd.com
*Trial Attorney for Defendant*

OF COUNSEL:
Angelique Paul Newcomb, Esq. (0068094)
SCHOTTENSTEIN, ZOX & DUNN
250 West Street
Columbus, Ohio 43215
(614) 462-2257 (telephone)
(614) 462-5135 (facsimile)
E-mail: ANewcomb@szd.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of May 2008, a copy of the foregoing Defendant's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction was filed electronically and served upon the following individuals via the Court's electronic notification system:

> Timothy D. Chandler, Esq.
> ALLIANCE DEFENSE FUND
> 101 Parkshore Drive, Suite 100
> Folsom, California 95630
> tchandler@telladf.org
> *Attorney for Plaintiff*
>
> and
>
> David R. Langdon, Esq.
> LANGDON & HARTMAN LLC
> 11175 Reading Road, Suite 104
> Cincinnati, Ohio 45241
> dlangon@langdonlaw.com
> *Attorney for Plaintiff*

/s/ Angelique Paul Newcomb
Angelique Paul Newcomb