**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITIZENS FOR COMMUNITY VALUES, INC., | : | |
| | : | |
| Plaintiff, | : | Case No. 2:08-cv-00223-GCS-NMK |
| | : | |
| vs. | : | Judge George C. Smith |
| | : | Magistrate Judge Norah McCann King |
| UPPER ARLINGTON PUBLIC LIBRARY | : | |
| BOARD OF TRUSTEES, | : | |
| | : | |
| Defendant. | : | |

---

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

---

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................iii

INTRODUCTION .................................................................................................................... 1

SUMMARY OF ARGUMENT .................................................................................................. 2

ARGUMENT ........................................................................................................................... 5

I.      Plaintiff is likely to succeed on its First Amendment free speech claim. .......................... 5

     A.      Banning "religious services" is viewpoint discrimination. ...................................... 5

         1.      *Good News Club* and *Widmar* directly rejected the same argument
the Library raises here. ................................................................................7

         2.      Plaintiff's prohibited speech expressed a religious point of view on
a topic permitted in the meeting rooms...................................................... 11

         3.      The Library's reliance on *Lamb's Chapel* and *Faith Center* is
misplaced. .................................................................................................. 12

         4.      The Library's reliance on *Bronx Household of Faith* is also
misplaced. .................................................................................................. 14

     B.      The Library has failed to articulate a valid Establishment Clause concern. ......... 15

         1.      The Establishment Clause does not prohibit religious speech,
including religious services, in public facilities....................................... 17

         2.      Allowing religious services during the Library's operating hours
does not raise Establishment Clause concerns........................................... 19

         3.      Paying to maintain the forum for a wide array of groups only
confers an incidental benefit on religion that does not raise
Establishment Clause concerns................................................................. 20

         4.      The Library's reliance on cases addressing unattended religious
displays is misplaced.................................................................................. 22

         5.      Eliminating its ban on religious services would reduce, not
increase, the Library's entanglement with religion................................... 23

     C.      The Library's ban on religious services is also a content-based restriction
in a designated public forum................................................................................ 24

II.      Because the Meeting Room Policy excludes speech and conduct solely because it
is religiously-motivated, Plaintiff is likely to succeed on its free exercise claims. .......... 28

A.      The Free Exercise Clause protects all religiously-motivated conduct, not
        just that which is mandated. ......................................................................... 29

B.      The Free Exercise Clause prevents the Library from denying Plaintiff
        access to a forum solely because its speech and conduct is religious-
        motivated ..................................................................................................... 30

III.    The Library can only satisfy its duty under the Equal Protection Clause by
        providing equal access, not merely by enforcing the policy consistently ......................... 32

IV.     The Library's memorandum further compounds the Meeting Room Policy's
        vagueness. .................................................................................................................... 33

V.      A Preliminary Injunction will prevent further irreparable harm to Plaintiff without
        harming the Library in any way. ....................................................................................... 36

CONCLUSION ........................................................................................................................... 38

## TABLE OF AUTHORITIES

**Cases**

*ACLU of Kentucky v. Grayson County*,
No. 4:01CV-202-JHM, 2008 WL 859279 (W.D. Ky. Mar. 28, 2008) ............................22

*ACLU of Ohio Foundation, Inc. v. Ashbrook*,
375 F.3d 484 (6th Cir. 2004) .........................................................................................22

*Arkansas Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)..........................................................................................3, 24, 25

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens*,
496 U.S. 226 (1990).................................................................................................2, 17

*Blanken v. Ohio Dep't of Rehab. and Corr.*,
944 F.Supp. 1359 (S.D. Ohio 1996) ....................................................................3, 29, 30

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) .........................................................................................36

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)......................................................................................................33

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
492 F.3d 89 (2d. Cir. 2007)............................................................................................14

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
331 F.3d 342 (2d. Cir. 2003)..............................................................................14, 15, 19

*Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*,
127 F.3d 207 (2d. Cir. 1997)..........................................................................................15

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
271 F.3d 1141 (9th Cir. 2001) .......................................................................................34

*Campbell v. St. Tammany Parish School Board*,
231 F.3d 937 (5th Cir. 2000) .........................................................................................26

*Capitol Square Review & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995)......................................................................................................22

*Ceniceros v. Bd. of Trustees of the San Diego Unified Sch. Dist.*,
106 F.3d 878 (9th Cir. 1997) .........................................................................................20

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993)........................................................................31, 32

*Church on the Rock v. City of Albuquerque*,
    84 F.3d 1273 (10th Cir. 1996) ........................................................19

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)...........................................................................34

*Concerned Women for America, Inc. v. Lafayette County*,
    883 F.2d 32 (5th Cir. 1989) ........................................................18, 27

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*,
    473 U.S. 788 (1985)........................................................................25

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*,
    492 U.S. 573 (1989)........................................................................22

*Doe v. Village of Crestwood*,
    917 F.2d 1476 (7th Cir. 1990) ........................................................22

*Employment Div., Dept. of Human Res. v. Smith*,
    494 U.S. 872 (1990)........................................................................30

*Fairfax Covenant Church v. Fairfax County Sch. Bd.*,
    17 F.3d 703 (4th Cir. 1994) ...........................................17, 18, 21, 32

*Faith Center Church Evangelistic Ministries v. Glover*,
    480 F.3d 891 (9th Cir. 2007) ............................................12, 14, 17

*Fraternal Order of Police v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999)............................................................31

*Gentala v. City of Tucson*,
    213 F.3d 1055 (9th Cir. 2000) ........................................................21

*Good News Club v. Milford Central Sch.*,
    533 U.S. 98 (2001)..................................................................*passim*

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)........................................................................36

*Gregoire v. Centennial Sch. Dist.*,
    907 F.2d 1366 (3d Cir. 1990)..........................................................19

*Hansen v. Ann Arbor Pub. Schs.,*
293 F.Supp.2d 780 (E.D. Mich. 2003)............................................................33

*Harper v. Poway Unified School District,*
345 F.Supp.2d 1096 (S.D. Cal. 2004)........................................................33, 34

*Hawley v. City of Cleveland,*
24 F.3d 814 (6th Cir. 1994) .....................................................15, 16, 17, 21

*Hawley v. City of Cleveland,*
No. 83CV-3402, 1991 WL 193518 (N.D. Ohio July 19, 1991) ......................................16

*Hill v. Colorado,*
530 U.S. 703 (2000)............................................................................36

*Kreisner v. City of San Diego,*
1 F.3d 775 (9th Cir. 1993) .................................................................22

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
508 U.S. 384 (1993).......................................................................9, 12

*Levitan v. Ashcroft,*
281 F.3d 1313 (D.C. Cir. 2002) ...........................................................29

*Lyng v. Nw.Indian Cemetery Protective Ass'n,*
485 U.S. 439 (1988)........................................................................4, 30

*Mitchell v. Helms,*
530 U.S. 793 (2000).........................................................................16

*Pfeifer v. City of West Allis,*
91 F.Supp.2d 1253 (E.D. Wis. 2000)................................................3, 26, 27, 28

*Prince v. Jacoby,*
303 F.3d 1074 (9th Cir. 2002) ............................................................20

*Putnam Pit, Inc. v. City of Cookeville,*
221 F.3d 834 (6th Cir. 2000) .............................................................28

*Rosenberger v. Rector and Visitors of Univ. of Virginia,*
515 U.S. 819 (1995)....................................................................2, 16, 21

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
547 U.S. 47 (2006)......................................................................4, 32

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ............................................................................................... 30

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002) ......................................................................... 29, 30

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio*
    *Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) ............................. 25, 26, 27

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ......................................................................................... 33, 34

*Widmar v. Vincent,*
    454 U.S. 263 (1981) ................................................................................... *passim*

## Other Authorities

Our Documents: D-Day, http://www.fdrlibrary.marist.edu/odddayp.html .................................. 12

Wikipedia, Amazing Grace, http://en.wikipedia.org/wiki/Amazing_grace .................................. 31

Wikipedia, America the Beautiful, http://en.wikipedia.org/wiki/
    America_the_Beautiful #Lyrics ........................................................................ 12

# INTRODUCTION

Defendant Upper Arlington Public Library Board of Trustees ("Library") admits to allowing a broad array of religious speakers use its meeting room, but denies Plaintiff the same access for an open event discussing politics from a legal and Biblical perspective—solely because the event includes religious singing and prayer. The Library has labeled Plaintiff's event as a "religious worship service" (despite Plaintiff's claims otherwise), and claims the Establishment Clause mandates its discriminatory policy. But the Supreme Court has held that labeling speech as "worship" is constitutionally irrelevant, and that distinguishing worship from other forms of religious speech is outside the government's competency. The proper constitutional question is whether the speech at issue addresses a topic otherwise permitted in the forum. Here, the Library does not dispute that the topic of Plaintiff's event, including the songs and prayer, falls within the scope of its forum. Thus, the Library cannot deny Plaintiff equal access to its meeting rooms. The Establishment Clause is no defense. The government does not endorse speech merely by permitting it to use a forum on a nondiscriminatory basis, nor does providing equal access confer a direct benefit on religion.

The Meeting Room Policy prohibits both "religious meetings" and "religious services." The Library does not attempt to defend its ban on "religious meetings," conceding that it does not enforce that aspect of the policy. (Defendant's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction ("Library Memo."), p. 17; Mell Aff., ¶ 9). At a minimum, then, a preliminary injunction is appropriate for that aspect of policy to ensure that its presence in the policy does not chill the speech of potential applicants in the future. Moreover, as shown below, the Library's ban on "religious services" should also be preliminarily enjoined.

<u>**SUMMARY OF ARGUMENT**</u>

As discussed in Section I.A, the Library contends that its ban on "religious services" is viewpoint-neutral because religious worship is a distinct category of speech that does not present a religious point of view on a secular subject. (Library Memo., pp. 19-22). But the Supreme Court has rejected the idea that worship can be parsed from other religious speech, as the Library tries to do here. *Widmar v. Vincent*, 454 U.S. 263, 269 n.6 (1981). Even if speech can be labeled as "worship," it must still be permitted if addresses a topic that is allowed in the forum. *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 112 n.4 (2001). Here, as described in its letter to the Library, Plaintiff's event included prayer and singing that addressed Christians' involvement in our political process—a topic that is permitted under the Meeting Room Policy. (Compl., Ex. 4). Thus, by prohibiting these elements of Plaintiff's event, the Library is engaging in viewpoint discrimination.

The Establishment Clause does not justify this discrimination, as discussed in Section I.B. When the government opens a forum for a broad array of topics, like here, the Establishment Clause's guarantee of neutrality is respected, not offended, when religion is included in the forum. *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 839 (1995). And providing religious expression, including worship, with equal access to a forum does not create a risk of a mistaken inference of endorsement. Even schoolchildren understand that the government does not endorse everything that it allows. *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 251 (1990). These same principles apply "even where the upkeep, maintenance, and repair of the facilities" are paid by the government. *Rosenberger*, 515 U.S. at 842. Thus, it makes no difference that religious groups would have the same free access to the Library's meeting rooms that other community groups enjoy.

As shown in Section I.C, even if the Meeting Room Policy only discriminates on the basis of content, which the Library concedes (Library Memo., p. 19), it is still unconstitutional because the meeting rooms are "generally available to a class of speakers," making them a designated public forum. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998). The Library claims that its requirement that groups apply to use a meeting room proves that it has not opened a public forum. (Library Memo., p. 14). But like most designated public forums, the approval process is ministerial and approval is routinely granted. The Library also points to its restriction on commercial, religious, and political campaigning meetings as evidence that it did not intend to open a public forum. (Library Memo., p. 14). But the Library does not enforce its ban on "religious meetings," and the other categories are very narrow and do not suggest a non-public forum. *See, e.g., Pfeifer v. City of West Allis*, 91 F.Supp.2d 1253, 1266 (E.D. Wis. 2000) (holding that a virtually identical library meeting room policy created a designated public forum).

The Library also raises two principle objections to Plaintiff's free exercise claims, as discussed in Section II. First, it claims that the Free Exercise Clause only protects religious conduct that is "mandated" by one's religion. (Library Memo., pp. 34-35). But this Court has held otherwise, explaining that the State may not disregard free exercise rights "merely because the exercise of a religious practice is optional to the practitioner." *Blanken v. Ohio Dep't of Rehab. and Corr.*, 944 F.Supp. 1359, 1365 (S.D. Ohio 1996). Second, the Library contends that Plaintiff is free to exercise religion elsewhere, so its free exercise rights have not been burdened. (Library Memo., p. 36). But the First Amendment prohibits the government from discriminating against conduct solely because of its religious motivation in allocation the rights, benefits, and

privileges enjoyed by other citizens, including access to a government forum. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988).

Next, as discussed in Section III, the Library contends that it has satisfied the Equal Protection Clause by enforcing the Meeting Room Policy even-handedly with all its applicants. (Library Memo., p. 38). But uniform enforcement is not equal access. *See, e.g., Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 56-57 (2006). Because the Meeting Room Policy expressly discriminates on the basis of religion, applying it uniformly violates the Equal Protection Clause by denying religious speakers equal access to the forum.

In responding to Plaintiff's vagueness challenge, the Library makes no effort to define the terms in its policy, and cites only a California district court case addressing a school dress code policy that prohibited "derogatory connotations." (Library Memo., pp. 40-41). As discussed in Section IV, that case is easily distinguishable. The Meeting Room Policy is unconstitutionally vague because, as the Library concedes, it is "inherently inconsistent" with itself (Library Memo., p. 40), and because it is not enforced as written, which the Library also concedes. (Library Memo., p. 17). Instead, the Library allows "religious meetings" while prohibiting "religious services," but never defines either. And, as shown in the Library's rejection letter to Plaintiff, any "inherent element of a religious service" is enough to trigger the ban. (Compl., ¶ 27). The Library compounds this problem by equating "religious service" with "worship." (Library Memo., p. 19). But the Supreme Court has said that there is no meaningful way to distinguish between worship and other forms of religious speech. *Widmar*, 454 U.S. at 269 n.6.

Finally, as discussed in Section V, the Library claims that it will be harmed by a preliminary injunction, but this should be rejected. It raises speculative concerns about a injunction curtailing meeting room availability because of increased use. (Library Memo., p. 42).

But the Library presented no evidence that the meeting rooms are in high demand. And, to our knowledge, only one other applicant has been turned away as a result of the ban on "religious services." (Moore Aff., ¶ 5). Even if these concerns materialize, the Library is free to institute neutral policies governing time and frequency of use to maximize the availability of meeting rooms. This is a far better approach than maintaining the blatantly discriminatory policy the Library currently employs. Accordingly, a preliminary injunction is appropriate.

## ARGUMENT

I.   **Plaintiff is likely to succeed on its First Amendment free speech claim.**

The Library does not dispute that Plaintiff's religious speech is constitutionally protected. Rather, it labels Plaintiff's speech as a "religious service," which allegedly drains the speech of any content that would otherwise be permissible in the Library's meeting rooms. (*See, e.g.,* Library Memo., p. 29 (twice describing Plaintiff's event as a "pure" religious worship service "divorced from other religious speech")). But religious services, just like all other religious speech, can communicate a religious point of view on a secular subject—which is exactly what Plaintiff's speech does here. Thus, banning all religious services constitutes viewpoint discrimination. And the Library cannot find protection in the Establishment Clause; its guarantee of neutrality is respected, not offended, when religious groups are given equal access to public forums. As such, Plaintiff is likely to succeed on the merits of its free speech claim.

### A.   **Banning "religious services" is viewpoint discrimination.**

As written, the Library's Meeting Room Policy prohibits both "religious meetings" and "religious services," but it concedes that it does not enforce its ban on religious meetings. Instead, it divides religious speech into two categories, one permissible and one impermissible.

The permissible category includes all speech that presents a religious viewpoint on a secular subject matter. (Library Memo., p. 21). The impermissible category is speech that constitutes a "religious service," (Library Memo., p. 19), which the Library also refers to as "pure religious worship services divorced from other religious speech." (Library Memo., p. 29).

Applied to Plaintiff's proposed event, the Library permitted Plaintiff to discuss what the Bible says about political involvement, but it prohibited religious singing and prayer. (Compl., ¶ 27). It reached this conclusion even though, like the Bible study, both the prayer and singing addressed participation in the political process. Prayer and singing, the Library decided, constitute "inherent elements of a religious service" prohibited by the Meeting Room Policy. (Compl., ¶ 27).

Oddly, the Library claims that Plaintiff labeled its prayer and religious singing as a "religious service." (Library Memo., p. 7) (claiming that Mr. Purdy told a library representative "that his group's proposed event would not involve any religious services, but his letter said otherwise"); (Library Memo., p. 24) (claiming that "Plaintiff has drawn that distinction [between religious worship services and other forms of religious speech] for the Court.").

The Library is wrong. Nowhere in Plaintiff's letter does it describe its event as a religious service. (Compl., Ex. 4). It does not even use the words "worship" or "service." Moreover, when a library official specifically asked Mr. Purdy whether this event was a religious service, the Library concedes he said it was not. (Mell Aff., ¶ 5). Nonetheless, throughout its memorandum, the Library repeatedly insists that Plaintiff's proposed event constitutes a "religious service." It is the Library—not Plaintiff—attaching this label.

To summarize the Library's position, the Meeting Room Policy allows applicants to hold religious meetings, but those meetings may not contain speech elements, such as prayer or

religious singing, that would transform the meeting into a "religious service." Such elements are forms of "pure religious worship" that do not present a religious viewpoint on a secular topic. (Library Memo., p. 29).

> 1. ***Good News Club* and *Widmar* directly rejected the same argument the Library raises here.**

The Library contends that its Meeting Room Policy is viewpoint neutral because religious worship is categorically distinct from other religious speech. (Library Memo., pp. 19-22). The U.S. Supreme Court has considered—and rejected—this exact argument in both *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), and in *Widmar v. Vincent*, 454 U.S. 263 (1981). This Court should do the same.

> a. ***Good News Club v. Milford Central School***

In *Good News Club*, a school district opened its facilities to district residents for social, civic, recreational, and entertainment events. 533 U.S. at 102. The local Good News Club sought to hold weekly after-school religious meetings in the school cafeteria. *Id.* at 103. The Club's meetings included both religious singing and prayer, the two "elements of a religious service" that the Library objected to in Plaintiff's event:

> The Club opens its session with Ms. Fournier taking attendance. As she calls a child's name, if the child recites a Bible verse the child receives a treat. After attendance, the Club sings songs. Next Club members engage in games that involve, *inter alia*, learning Bible verses. Ms. Fournier then relates a Bible story and explains how it applies to Club members' lives. The Club closes with prayer. Finally, Ms. Fournier distributes treats and the Bible verses for memorization.

*Id.* (quotation marks and citation omitted). The school rejected the Club's application because, in its view, the Club's activities "were not a discussion of secular subjects . . . from a religious perspective, but were in fact the equivalent of religious instruction itself." *Id.* at 104 (quotation

marks and citation omitted). The Supreme Court concluded that this was unconstitutional viewpoint discrimination. *Id.* at 112.

Looking first at Justice Souter's dissent, he makes the exact distinction the Library makes in its memorandum between worship and other religious speech: "It is beyond question that Good News intends to use the public school premises not for the mere discussion of a subject from a particular, Christian point of view, but for an <u>evangelical service of worship</u>." *Id.* at 138 (Souter, J., dissenting) (emphasis added). Worship services, Justice Souter argued, fell outside the scope of the school's limited public forum and therefore could be properly excluded—even if other religious speech must be allowed. *Id.* at 139 n.3.(Souter, J., dissenting).

The majority disagreed. Even if a Club meeting could be labeled as a "worship service," it may still present a Christian point of view on a secular subject. "According to Justice Souter, the Club's activities constitute 'an evangelical service of worship.' Regardless of the label Justice Souter wishes to use, what matters is the substance of the Club's activities." *Id.* at 112 n.4 (citation omitted); *see also id.* at 126 (Scalia, J., concurring) ("[W]e have previously rejected the attempt to distinguish worship from other religious speech"). Examining the substance of the meeting, the Court concluded that "the Club's activities do not constitute mere religious worship, divorced from any teaching of moral values." *Id.* at 112 n.4.

The Library relies heavily on this last phrase, which it reads as creating a "distinction between religious worship and speech with a religious viewpoint." (Library Memo., p. 21). But the Library is mistaken. The Court was simply pointing out that the Club's activities fell within the purview of the forum. Had the Club attempted to engage in worship that did not relate to moral values, then the school could have excluded it from the forum, just as it could deny any secular meeting that did not address a topic permitted in the forum. The relevant distinction was

between "mere religious worship" and worship that fell within the forum's scope, not between religious worship and other forms of religious speech. Whether speech can be labeled as worship is irrelevant; what matters is whether its content falls within what is permitted in the forum.

The Court found that the Club's meeting, including its prayer and singing, involved speech addressing secular subjects from a religious perspective. "[T]he Club chooses to teach moral lessons from a Christian perspective through live storytelling and prayer." *Id.* at 110; *see also id.* at 111 (rejecting notion that "any time religious instruction and prayer are used to discuss morals and character, the discussion is simply not a 'pure' discussion of those issues"). Thus, although the meetings had elements that could be described only as "religious worship," the meetings nonetheless "address[ed] a subject otherwise permitted under the rule . . . from a religious standpoint." *Id.* at 109.

Indeed, there was no difference between the Club's invocation of Christianity in the form of religious worship and "the invocation of teamwork, loyalty, or patriotism by other associations" in addressing a matter germane to the purpose of the forum. Prohibiting the Club's meeting based on its religious nature therefore constituted viewpoint discrimination.[1]

### b.      *Widmar v. Vincent*

*Widmar* is equally controlling here. In that case, a state university made its facilities generally available for registered student group activities, but prohibited their use "for purposes of religious worship or religious teaching." 454 U.S. at 265. Prior to this prohibition being

---

[1] The Library attempts to distinguish *Good News Club* by noting that the Court did not view the Club's activities as being any different than the film shown in *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), which the Library contends did not include religious worship. (Library Memo., p. 20). But the Library misunderstands the significance of what the Court was saying. It was not saying—as the Library suggests—that neither the Club's meeting nor the *Lamb's Chapel* film involved religious worship. Rather, the Court was saying that "both modes of speech use a religious viewpoint" to address permissible subjects, regardless of whether they could also be labeled as religious worship.

enacted, a Christian student club had held regular meetings on campus that consisted of "prayer, hymns, Bible commentary, and discussion of religious views and experiences." *Id*. at 265 n.2. The club described their meetings as followed: "Although these meetings would not appear to a casual observer to correspond precisely to a traditional worship service, there is no doubt that worship is an important part of the general atmosphere." *Id.* at 283 (White, J., dissenting) (quotation marks and citation omitted).

On this basis, the University discontinued the Club's meetings as violating their policy prohibiting "religious worship and religious teaching."*Id.* at 263. Like the Library here, counsel for the University enforced the policy more narrowly than it was written, "indicat[ing] that the regulation would not bar discussion of biblical texts under circumstances that did not constitute 'religious worship.'" *Id.* at 284 n.1 (White, J., dissenting) (citation omitted). The Court held that the regulation "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion." *Id.* at 269.

Just like the dissent in *Good News Club*, the *Widmar* dissent argued that the University's policy was permissible because it properly drew a line "between verbal acts of worship and other verbal acts." *Id.* at 285. (White, J., dissenting). But the majority flatly rejected that such a distinction is possible:

> [T]he dissent seems to attempt a distinction between the kinds of religious speech explicitly protected by our cases and a new class of religious 'speech acts,' constituting 'worship.' . . . [T]he dissent fails to establish that the distinction has intelligible content. There is no indication when singing hymns, reading scripture, and teaching biblical principles, cease to be singing, teaching, and reading—all apparently forms of speech, despite their religious subject matter—and become unprotected worship.

*Id.* at 269 n.6 (quotation marks and citations omitted). Accordingly, the University was prohibited from trying to distinguish between religious worship and other forms of religious speech.

> **2.     Plaintiff's prohibited speech expressed a religious point of view on a topic permitted in the meeting rooms.**

Here, the Library echoes the same argument that the *Good News Club* dissent and the *Widmar* dissent made, and which was rejected by the majority in both cases. It is trying to label Plaintiff's event (or at least the prayer and singing) as a religious service, thereby putting it outside the purview of the forum. But the label is not constitutionally relevant, *Good News Club*, 533 U.S. at 112 n.4, and has no "meaningful content." *Widmar*, 454 U.S. at 269 n.6. Rather, it's the event's *substance* that matters. Prayer and singing can be used to express a religious point of view on a secular subject—and Plaintiff's event is a clear example of that.

As described in its letter to the Library, the Plaintiff's event was specifically designed to address only two topics: what the Bible teaches about political involvement by Christians, and the scope of Christians' freedom to engage in political activity in this country. (Compl., Ex. 4). These are both permissible subject matters under the Library's meeting room policy. The Library has consistently said that Plaintiff could hold its event discussing these two subjects, as long as it did not include any prayer or religious singing. (Compl., ¶ 27; Library Memo., pp. 8-9).

Plaintiff's prayer and religious singing both addressed these permissible subject matters. The prayer was intended to help the attendees better understand, through seeking God's guidance, "the Church's proper role in the political process." (Compl., ¶ 10). Similarly, the time of singing was intended to thank God "for the freedom we have in this country to participate in the political process." (Compl., ¶ 10). In so doing, the singing teaches that our freedoms are inalienable, being derived from our Maker.

Our Nation's history is replete with examples of patriotic songs and prayers that celebrate our freedom from a distinctly religious viewpoint. "America the Beautiful," for example, is our National Hymn that celebrates the sacrifices made for the freedoms we enjoy, while calling on God to shed His grace on our Nation.[2] And on D-Day, June 6, 1944, President Franklin D. Roosevelt offered a famous patriotic prayer uniting the country and asking God for direction and safety in fighting this war.[3]

Thus, just as the Good News Club used prayer and singing to teach morals and character development from a religious perspective, *see Good News Club*, 533 U.S. at 110-11, prayer and singing may be used to celebrate and teach about the freedoms Americans enjoy. And that is exactly what Plaintiff sought to do here. As such, the Meeting Room Policy discriminates on the basis of viewpoint.

**3.      The Library's reliance on *Lamb's Chapel* and *Faith Center* is misplaced.**

The Library nonetheless contends that the Supreme Court has found that "religious worship is categorically different from other religious speech," citing *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 398, 389 n.2 (1993). (Library Memo., p. 21). But that footnote says nothing of the sort. All it says is that the school also denied Lamb's Chapel request to use its facilities for Sunday services, and that the church did not challenge this denial in court. The Court expressly stated that the "validity of this denial [was] not before [the Court]." *Id.*

---

[2] *See* Wikipedia, America the Beautiful, http://en.wikipedia.org/wiki/America_the_Beautiful #Lyrics (last visited on May 23, 2008).

[3] The full text of the prayer is available at Our Documents: D-Day, http://www.fdrlibrary.marist.edu/odddayp.html (last visited on May 23, 2008).

*Faith Center Church Evangelistic Ministries v. Glover*, 480 F.3d 891 (9th Cir. 2007) also acknowledges that religious worship may, and almost always does, express a religious viewpoint on a secular subject.  It specifically noted that Faith Center engaged in discussing the Bible, prayer, and singing, all of which "convey a religious perspective on subjects that are or have been permitted in" the forum. *Id*. at 914; *see also id.* at 917 (describing singing and prayer as "permissible components of religious speech" and contrasting them with "impermissible religious worship").  Indeed, the Ninth Circuit acknowledged that "[i]t is difficult to imagine . . . that religious worship could ever truly be divorced from moral instruction or character development." *Id*. at 915 n.14. Thus, in the court's view, most (if not all) worship conveys a religious perspective on a secular topic (moral instruction or character development), and could not have been excluded from the forum.

*Faith Center* distinguished such worship from "*pure* religious worship," which is "not a secular activity that conveys a religious viewpoint on otherwise permissible subject matter." *Id.* at 915 (emphasis added). In the sparse record before it, the only evidence the court had about the substance of Faith Center's event was a flyer describing the disputed portion of the event as a "praise and worship" service. *Id.* at 903. There was no further description of the service's subject matter, so there was no way for the court to determine if it addressed a subject that was otherwise permitted in the forum. Moreover, according to the court, Faith Center admitted that its "praise and worship" service was "pure religious worship." *Id.* at 918. Under those circumstances, the court held that the praise and worship service could be excluded from the forum.

*Faith Center* does not support the Library's novel proposition that engaging in prayer or religious singing automatically transforms speech into pure religious worship that is incapable of addressing a secular topic from a religious perspective. Plaintiff provided the Library a detailed

description of its event, so the Library was fully aware that the prayer and singing addressed a topic allowed in the forum. Plaintiff has never described it as "pure religious worship" or as a "religious service." The Library is the one attempting to attach those labels to Plaintiff's event. As such, under *Good News Club*, *Widmar*, and *Faith Center*, the Library is discriminating on the basis of viewpoint by prohibiting Plaintiff's event as originally constituted.

### 4.      The Library's reliance on *Bronx Household of Faith* is also misplaced.

The Library cites *Bronx Household of Faith v. Community School District No. 10*, 127 F.3d 207, 216-17 (2d Cir. 1997) ("*Bronx I*") for the proposition that "there is no fundamental right to free speech in a limited forum from which various times [sic] of speakers and subjects are properly excluded, nor is the free exercise of religion a fundamental right in a limited public forum." (Library Br., p. 38). *Bronx I* involved a church that challenged a school district policy that made school facilities available to community groups to rent, but prohibited "religious worship and religious instruction." *Id.* at 210. The court held that the school district had opened a limited public forum, and that the rental policy was reasonable and viewpoint neutral. *Id.* at 215.

But the Second Circuit later reversed course and affirmed a preliminary injunction against the school district's ban on religious worship and instruction. *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342 (2d Cir. 2003) ("*Bronx II*"). The Second Circuit noted that when the Supreme Court granted certiorari in *Good News Club*, it wanted to resolve a conflict among the circuits "on the question whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech," and cited *Bronx I* as part of the split. *Id.* at 352 (citing *Good News Club*, 533 U.S. at 105). Applying *Good News Club*, the Second Circuit looked at the substance of the church's worship services, which included elements such as prayer, the singing of Christian songs, and communion, and found that "it

cannot be said that the meetings of the Bronx Household of Faith constitute only religious worship, separate and apart from any teaching of moral values." *Id.* at 354 (citing *Good News Club*, 533 U.S. at 112 n.4). Because other groups were allowed to undertake the teaching of morals and character development on school premises, the school was engaging in unconstitutional viewpoint discrimination. *Id.*

Thus, the most recent Second Circuit decision on the merits in that case[4]—which the Library fails to cite in its memorandum—is fully consistent with Plaintiff's position here.

**B.      The Library has failed to articulate a valid Establishment Clause concern.**

The Library raises a single interest which it claims is sufficiently compelling to justify its viewpoint discriminatory meeting room policy: avoiding an Establishment Clause violation. (Library Memo., p. 27). But courts have consistently agreed the Establishment Clause does not require the government to deny equal access to government facilities for religious expression, including worship.

In *Hawley v. City of Cleveland*, for example, the Sixth Circuit rejected an Establishment Clause challenge to a chapel in Cleveland Hopkins International Airport run by the Catholic Diocese. 24 F.3d 814 (6th Cir. 1994). The chapel was available for "meditation, reflection, prayer, and quiet time throughout the day and early evening, and for more formal worship services." *Id.* at 819. The airport had a policy allowing other non-profit service organizations to utilize space in the terminal, and based on that policy, "the City cannot deny equal access to the

---

[4] The Second Circuit issued a third opinion in the case last year. *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 492 F.3d 89 (2d Cir. 2007) ("*Bronx III*"). But the court did not reach a decision on the merits of the case because one judge thought the ban on worship services discriminated based on viewpoint, one judge thought it was viewpoint-neutral, and the third judge thought the case was not ripe for adjudication because the school district had revised its rental policy and had yet to enforce the revised version against the church. *Id.* at 91.

Diocese." *Hawley v. City of Cleveland*, No. 83CV-3402, 1991 WL 193518, at *6 (N.D. Ohio July 19, 1991), *affirmed*, 24 F.3d at 822 (Ex. 1).

*Hawley* reflects the fundamental Establishment Clause requirement of government neutrality towards religion. And the "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 839 (1995) (citations omitted); *see also Mitchell v. Helms*, 530 U.S. 793, 809 (2000) (plurality) (explaining that the Court has relied on the principle of neutrality in consistently "upholding aid that is offered to a broad range of groups or persons without regard to their religion.").

Thus, when religious groups utilize a forum that has been opened for a wide array of expression, there is no risk that the reasonable person will mistakenly infer that the government is endorsing religion.[5] This is true even in the context of public schools, where concerns about improper governmental endorsement of religion are heightened:

> [The school's] fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students. To the extent a school makes clear that its recognition of respondent's proposed club is not an endorsement of the views of the club's participants,

---

[5] The Library appears confused about the proper standard under the "endorsement test." It argues that allowing worship would cause "a reasonable observer to perceive that the government was endorsing religion." (Library Memo., p. 31). Elsewhere, however, it argues that the "casual observer" should not be deemed familiar with the Library's Meeting Room Policy because "there is no empirical evidence to support such a finding." (Library Memo, p. 28). The Library provides no legal authority for its "casual observer" standard. And its demand for empirical evidence contradicts its own acknowledgement that the "reasonable person standard is an objective standard." (Library Memo., p. 32). The reasonable observer in the endorsement test "must be deemed aware of the history and context of the community and forum in which the religious speech takes place." *Good News Club*, 533 U.S. at 119 (quotation marks and citation omitted).

> students will reasonably understand that the school's official recognition of the
> club evinces neutrality toward, rather an endorsement of, religious speech.

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 251 (1990) (citation omitted).

Indeed, "if a State refused to let religious groups use facilities open to others, then it would

demonstrate not neutrality but hostility toward religion." *Id.* at 248.

It is not surprising, then, that the Library did not cite any case in its memorandum holding

that the government is *required* by the Establishment Clause to exclude or expel a religious

speaker from a public meeting space. Even *Faith Center*, upon which the Library so heavily

relies, only held that the Free Speech Clause *allowed* the government to exclude pure religious

worship from a limited forum. 480 F.3d at 918. It never suggested that the Establishment Clause

*required* the government to do so.

Nonetheless, the Library contends that this case presents three "unique circumstances"

that "Establishment Clause case law has never addressed." (Library Memo., p. 31). In fact, there

is substantial case law on all three. And none provide any support for the Library's alleged

Establishment Clause interest.

1.       **The Establishment Clause does not prohibit religious speech,
         including religious services, in public facilities.**

The first "unique circumstance" is that "religious services, unlike other types of religious

speech or discussion, are almost exclusively held in buildings or spaces dedicated to that specific

purpose." (Library Memo., p. 28). Putting aside the fact that the Library provides no factual

support for this claim,[6] it is unclear what point the Library is trying to make, or how this is a

"unique circumstance."

---

[6] It is highly unlikely that the Library could ever prove this claim. It is very common for
churches to meet in public facilities such as schools and community centers. For example, the
Fourth Circuit noted in *Fairfax Covenant Church v. Fairfax County School Board* that in a given

If the Library believes this is the first case addressing religious worship in a government facility, it is wrong. *Hawley*, for example, involved an airport chapel run by the Catholic Diocese that was used for, among other things, "formal worship services." 24 F.3d at 819. And, as discussed above, both *Widmar* and *Good News Club* involved clubs engaging in religious worship. Even the dissents in those cases acknowledged that the Establishment Clause does not prohibit worship services in public facilities. *Good News Club*, 533 U.S. at 141 (Souter, J., dissenting) ("[T]he Establishment Clause d[oes] not bar a religious student group from using a public university's meeting space for worship. . . ."); *Widmar*, 454 U.S. at 282 (White, J., dissenting) ("A state university may permit its property to be used for purely religious services without violating the First and Fourteenth Amendments.").

There are many other such cases, including some that the Library cites in its memorandum. In *Fairfax Covenant Church v. Fairfax County School Board*, the Fourth Circuit held—over the same Establishment Clause defense raised here—that a public school could not charge a church more than other non-profit groups to use its facilities for its Sunday morning church services. 17 F.3d 703, 708-09 (4th Cir. 1994). And in *Concerned Women for America, Inc. v. Lafayette County*, the Fifth Circuit held, also over an Establishment Clause defense, that a library could not prohibit its auditorium from being used to "discuss family and political issues, pray about those issues, and seek to apply Biblical principles to them," which is indistinguishable from the Plaintiff's proposed event here. 883 F.2d 32, 33-34 (5th Cir. 1989).

Thus, the Library is clearly wrong when it says that "[n]o court has ever held that the United States or Ohio Constitutions require a government who opens up a public space to

---

year, as many as 91 churches had used public school facilities within a single school district. 17 F.3d 703, 705 (4th Cir. 1994). If, as the Library contends, the Establishment Clause prohibits religious worship services from taking place in government facilities, then the 91 churches in this one school district would be required to find a new meeting place.

community groups to open up that same space for religious worship services." (Library Memo., p. 42). As discussed above, cases like *Widmar*, *Good News Club*, *Bronx II*, and others have struck down policies that have opened up meeting space for community groups but denied religious groups equal access, including for religious worship. *See also Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1281 (10th Cir. 1996) (holding that the Establishment Clause was not a "compelling interest that justifies [the city's] policy prohibiting sectarian instruction and religious worship at its Senior Centers."); *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1382 (3d Cir. 1990) (holding that a religious group that was entitled to use public school facilities for religious discussion was entitled to engage in religious worship as well).

> ### 2. Allowing religious services during the Library's operating hours does not raise Establishment Clause concerns.

The second "unique circumstance" the Library sets forth is that "Plaintiff's proposed religious service would take place during the Library's normal operating hours." (Library Memo, p. 28). Again, this is not a unique circumstance that "Establishment Clause case law has never addressed." (Library Memo., p. 31). The Supreme Court and other courts have addressed this on several occasions, finding it constitutionally irrelevant.

In *Good News Club*, for example, the Club's meetings followed regular school activities so closely that the Good News instructor had to wait to begin the meeting until the classroom was clear. 533 U.S. at 144 (Souter, J., dissenting). The school argued that this close proximity in time made it more likely that children would perceive that the school was endorsing the club. But the Court rejected this argument, explaining that "consistent with *Lamb's Chapel* and *Widmar*, the school could not deny equal access to the Club for any time that is generally available for public use," regardless of whether school was in session. 533 U.S. at 114 n.5 (emphasis added).

Similarly, in *Prince v. Jacoby*, a school district enacted policies allowing officially-recognized student clubs to "meet during student/staff time during school hours." 303 F.3d 1074, 1078 (9th Cir. 2002). The district refused to recognize a Christian student club whose goal was, in part, to "[e]vangelize [its] campus for Jesus Christ" and who enlisted a "Worship Leader" officer who was required to "select the praise and worship songs and lead the World Leaders Club in prayer and worship." *Id.* at 1097 n.1 (Berzon, J., dissenting).

The dissent argued, just like the Library here, that "the Establishment Clause forbids student religious activities in the public school building during periods when the students are compelled by law to attend school in that building." *Id.* at 1099 (Berzon, J.,dissenting). The majority strongly disagreed, holding that it "does not violate the Establishment Clause for a public school to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups that use meeting rooms for sectarian activities, accompanied by some devotional exercises." *Id.* at 1092 (quotation marks and citation omitted). "[S]econdary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Id.* at 1094; *see also Ceniceros v. Bd. of Trustees of the San Diego Unified Sch. Dist.*, 106 F.3d 878 (9th Cir. 1997) (holding that the Establishment Clause did not justify a school's prohibition on religious student clubs meeting during lunch while school was in session).

3. **Paying to maintain the forum for a wide array of groups only confers an incidental benefit on religion that does not raise Establishment Clause concerns.**

The third "unique circumstance" the Library raises is that it would allow religious worship services to be conducted for free in a government building. (Library Memo., p. 30). Again, this concern has been addressed and rejected by multiple courts. In *Hawley*, the Sixth

Circuit rejected the argument that the city's failure "to charge the diocese a fair market rent constitutes impermissible aid to religion in violation of the Establishment Clause." 24 F.3d at 820. Similarly, in *Fairfax Covenant Church*, the school argued that a "below-market rental rate to churches amounts to a direct financial subsidy and therefore establishes a religion in violation of the Establishment Clause, relying on *School District of Grand Rapids v. Ball* . . . ." 17 F.3d at 708. The Library makes the same argument, and even relies on *Ball* for support. (Library Memo., p. 31).

The Fourth Circuit explained that *Widmar* "rejected these very arguments" and held that "the costs of maintaining a public forum do not advance the views and beliefs of those using the forum." *Id.* at 708. *Rosenberger* held likewise. 515 U.S. at 842-43 (allowing sectarian activities and devotional exercises in government meeting room does not violate the Establishment Clause "even where the upkeep, maintenance, and repair of the facilities" are paid by the government); *see also Gentala v. City of Tucson*, 213 F.3d 1055, 1061 (9th Cir. 2000) (Establishment Clause did not prohibit City from refunding costs of an event described as "a time of praise and worship with singing and prayer" as part of a neutral program that help fund civic events).

Furthermore, the Library already allows churches and other religious organizations to use its meeting rooms for free. The Meeting Room Policy expressly provides that "committees affiliated with a church (such as a church board of trustees) will be allowed to use the meeting rooms." (Compl., Ex. 1). And the Library notes that St. Agatha's Catholic Church, the Upper Arlington Christian Assembly, and the Covenant Presbyterian Church have all used meeting room facilities within the past few months. (Mell Aff., ¶ 9). This completely undermines the Library's claim that the Establishment Clause forbids it from "employ[ing] its facilities or funds

in a way that give any church, or all churches, greater strength in our society than it would have by relying on its members alone." (Library Memo., p. 31).

Thus, none of the three circumstances the Library raises are unique or constitutionally relevant. As such, it has failed to present a valid Establishment Clause interest justifying its discriminatory Meeting Room Policy.

### 4. The Library's reliance on cases addressing unattended religious displays is misplaced.

The Library also cites a series of cases involving Ten Commandment and crèche displays and tries to analogize the Plaintiff's event to such a display. (Library Memo., pp. 29-30).[7] But all of these cases are readily distinguishable because they involve government-sponsored, unattended displays. In those cases, the government did not open up a forum with neutral criteria for private citizens to put up their own displays. Thus, these cases do not control here.

In fact, in cases where the government has opened up a forum for private displays, courts have repeatedly rejected the notion that such a forum must exclude religious displays to comply with the Establishment Clause. *See, e.g., Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) (upholding constitutionality of a privately-sponsored cross being displayed in a state-owned plaza, where the state had permitted a variety of other unattended displays as well); *Kreisner v. City of San Diego*, 1 F.3d 775 (9th Cir. 1993) (rejecting Establishment Clause challenge to a religious display in public park where other unattended displays were allowed).

---

[7] The Library relies on the following cases: *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989) (crèche display in county courthouse); *ACLU of Ohio Foundation, Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004) (judge put up Ten Commandments display in courtroom); *ACLU of Kentucky v. Grayson County*, No. 4:01CV-202-JHM, 2008 WL 859279 (W.D. Ky. Mar. 28, 2008) (Ten Commandments display in county courthouse). The Library also relies on *Doe v. Village of Crestwood*, 917 F.2d 1476 (7th Cir. 1990), which involved a city-sponsored festival where a Catholic mass was conducted. *Id.* at 1478. The court specifically noted that there would have been no Establishment Clause concerns with having the mass in a public forum had a private organization sponsored the event. *Id.*

5. **Eliminating its ban on religious services would reduce, not increase, the Library's entanglement with religion.**

If the Library drops its ban on "religious services," it will no longer be required to screen each application to determine if any aspect of the event constitutes an "inherent element of a religious service." (Compl., ¶ 27). The Meeting Room Policy would be entirely neutral toward religion—as the Establishment Clause requires. But attempting to draw a line between pure religious worship and other forms of religious speech "would require the [Library]—and ultimately the courts—to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases." *Widmar*, 454 U.S. at 269 n.6 (citation omitted).

Yet the Library contends that dropping its prohibition on religious worship services would actually *increase* its entanglement with religion: "the Library would be required to review applications from various religious groups to determine what among of a number of religious practices (e.g., receiving communion, faith healing, baptism, exorcism, snake handling, or animal sacrifice), it should allow in the library, and which it should not." (Library Memo., p. 32). That is not true. As explained in Section II.B, *infra*, specifically targeting religious practices in this way would violate the Free Exercise Clause.

The Library may address these concerns by enacting neutral and generally applicable regulations which it feels are necessary for the libraries to properly function. For example, the Library may require groups using the meeting rooms to refrain from consuming food or beverages. But it may not prohibit users from consuming food or beverages solely because they are doing so for religious reasons (e.g., receiving communion).

The Library also contends that it would become more entangled with religion because "when more than one religious group sought to use the meeting room for services at the same time, then the Library would be put in the untenable position of having to pick and choose among these groups." (Library Memo., p. 32). But the Meeting Room Policy already makes its meeting rooms available on a first-come, first-served basis (Compl., ¶ 12), and this same standard may (and should) be applied equally to religious groups.

As such, the Library's contention that Plaintiff is attempting to "forc[e] the government to relinquish all control over the manner in which its property is used once a speaker asserts that it wants to use that property to present a 'religious viewpoint'" is entirely unfounded. (Library Memo., p. 33). The First Amendment, properly understood, merely requires equal access— which is all Plaintiff is seeking here.

**C.      The Library's ban on religious services is also a content-based restriction in a designated public forum.**

To create a designated public forum, "the government must intend to make the property 'generally available' to a class of speakers." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998). The Library has made its meeting rooms generally available to non-profit community groups. It does not dispute that Plaintiff falls within this category of speakers, but contends that the meeting rooms are not generally available because groups do not have "carte blanche access to them." (Library Memo., p.14). But virtually every government facility opened for public use requires users to get prior permission, if nothing more than to ensure availability and maintain the orderly function of the facility. Requiring permission, by itself, is therefore of little relevance.

Rather, the relevant inquiry is whether the application process is merely ministerial, or if it requires individualized, non-ministerial judgments about who would be allowed to use the

forum. *Forbes*, 523 U.S. at 679-80; *see also Cornelius v. NAACP Legal Defense and Educ. Fund, Inc*., 473 U.S. 788, 804 (1985). In *Forbes*, a political candidate sued a television broadcaster for excluding him from a televised candidate debate. The Court held that the debate was not a designated public forum because the broadcaster "did not make its debate generally available to candidates for Arkansas' Third Congressional District seat." 523 U.S. at 680. Rather, it "made candidate-by-candidate determinations as to which of the eligible candidates would participate." *Id.* Specifically, it evaluated the public's perception of the candidate, his financial support, and whether he had generated interest in local and national media. *Id.* at 682. After conducting this evaluation, the broadcaster excluded Forbes because his candidacy "had generated no appreciable public interest." *Id.* at 682.

The Library's application process, by contrast, is far more ministerial. The Meeting Room Reservation form requests the name, contact information, and a basic description of the group submitting the application. (Compl., Ex. 1). This is needed to ensure that the applicant falls within the "class of speakers" which the forum is open to. The form also asks applicants to check a box next to the type of meeting they wish to have, and provides two lines to describe the meeting's purpose. *Id*. There is no individualized assessment of the meeting's content. The Library does not pick and choose which groups to give access to, but makes the meeting rooms available to "all groups in the community." *Id.* In fact, the Library identified only one other time where it enforced its ban on "religious services." Where the government, "grants permission as a matter of course," courts will "infer an intent to designate property a public forum." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth..*, 163 F.3d 341, 350 (6th Cir. 1998).

The Library also contends that its meeting rooms are non-public forums because they may not be used for "commercial, religious, or political campaign meetings," for "religious services," or for financial seminars.[8] *Id.* But designated public forums often include such limitations, and those used here are quite narrow. They do not diminish the fact that the Library's policy reflects the intent to provide information on a sweeping range of subjects. *See id.* at 355 (explaining that the government "may not demonstrate intent to keep [a] forum nonpublic simply by declaring a purpose that involves excluding protected speech based on its content") (citation omitted).

*Pfeifer v. City of West Allis*, 91 F.Supp.2d 1253 (E.D. Wis. 2000) is instructive on this point. *Pfeifer* involved a library meeting room policy very similar to the one here. It was open for use by "nonprofit educational and cultural agencies." *Id.* at 1256. But it prohibited "commercial sales presentations," "religious services or instruction," and "meetings that are politically partisan." *Id.* Despite these exclusions, the court concluded that the library's meeting room was a designated public forum. *Id.* at 1266.

Evaluating these restrictions, the *Pfeifer* court noted that the restriction on commercial speech was "very narrow" because non-profit groups (the class of speakers for which the forum was opened) "do not usually make commercial sales presentations." *Id.* at 1262. The ban on

---

[8] Quoting *Campbell v. St. Tammany Parish School Board*, 231 F.3d 937, 943 (5th Cir. 2000), the Library accuses Plaintiff of trying to "reach for an affirmative preference for religious speakers over political speakers," since Plaintiff does not challenge the Library's bar on political groups. (Library Memo., p. 24). This is ironic because in its application to use a meeting room, Plaintiff described itself as a "public policy organization," explained that each aspect of its event addressed politics, and noted that this was one of "several events leading up to the March 4 elections." (Compl., Ex. 3). Yet the Library did not reject Plaintiff's event pursuant to its ban on political groups. Plaintiff is therefore not reaching for an "affirmative preference." It merely wants to be allowed to speak freely from its religious perspective the same way it was permitted to speak freely from its political perspective.

politically partisan speech was also very narrow, the court explained, because it "covers only a small subcategory of political speech," namely, political party meetings. *Id.* at 1262-63.

The same is true here. The Library has opened the forum for non-profit community groups, which are unlikely to engage in commercial speech. It prohibits only a narrow subset of political speech, campaign meetings, but allows a broad array of political speech, including Plaintiff's discussion of what the Bible teaches about political involvement. (Compl., Ex. 1). And, although the policy prohibits "religious meetings," the Library admits that it does not enforce this aspect of the policy and actually allows a "wide array of religious discussion activities." (Library Memo., p. 25). This further demonstrates the Library's intent to make the meeting rooms "generally available" to non-profit community groups.

In *Concerned Women for America*, the Fifth Circuit addressed another very similar library meeting room policy, which opened the facility

> for use of groups or organizations of a civil, cultural or educational character, but not for social gatherings, entertaining, dramatic productions, money-raising, or commercial purposes. It is also not available for meetings for social, political, partisan or religious purposes, or when in the judgment of the Director of Branch Librarian any disorder is likely to occur.

883 F.2d at 33. But the library refused to allow an event, much like the one here, designed to "discuss family and political issues, pray about those issues, and seek to apply Biblical principles to them." *Id.* at 33-34. The Fifth Circuit upheld a preliminary injunction motion, holding that the plaintiff had shown "a substantial likelihood of proving that the library has created a public forum." *Id.* at 34.

Moreover, the Library has not established a "relationship between the reasons for [its] restriction on access and the forum's purpose." *United Food*, 163 F.3d at 351. The Library's stated purpose for the forum is to provide a location "for cultural activities and discussion of

public questions and social issues." (Compl., Ex. 1). But specifically excluding "religious services" does not further this purpose. The Library contends that it does so because of the "controversy and distraction" a religious service may cause. (Library Memo, p. 17). But the Library welcomes other "controversial" speech, such as a video presentation on Abu Ghraib, as well as a broad array of other political and religious speech. (Mell Aff., ¶ 9). The Library also claims the exclusion is necessary because events "must be conducted with a minimum of noise." (Library Memo., p.16).[9] But this concern is not unique to "religious services," and cannot justify the Library's narrowly targeted ban.

In short, the Library has made its meeting rooms generally available to a class of speakers, community groups, to use for a broad array of topics. This constitutes a designated public forum. And because the Library admits that its ban on "religious services" is content-based (Library Memo., p. 19), the meeting room policy is subject to strict scrutiny. *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 843 (6th Cir. 2000).

## II. Because the Meeting Room Policy excludes speech and conduct solely because it is religiously-motivated, Plaintiff is likely to succeed on its free exercise claims.

The Library makes two principle arguments for why it believes Plaintiff's free exercise claims must fail. First, it claims that the First Amendment and Article I, Section 7 of the Ohio Constitution only protect those religious beliefs that are "mandated" by a particular religion. (Library Memo., pp. 34-35). Second, it claims that these constitutional provisions only protect against total bans on particular religious activities. (Library Memo., pp. 35-36). Since Plaintiff is

---

[9] To the extent the Library contends that its limitations on noise shows that it did not intend to open a public forum, that argument should be rejected. Time, place, or manner restrictions such as this have "little relevance to forum analysis" because they do not limit who may access the forum or what topics they can address. *Pfeifer*, 91 F.Supp.2d at 1262. The same is true for the Library's rental fee charged to for-profit entities, upon which the Library also relies. (Library Memo., p. 15).

free to exercise its religion in places other than the Library's meeting rooms, the argument goes, Plaintiff's free exercise rights are not implicated. Both arguments must fail.

### A. The Free Exercise Clause protects all religiously-motivated conduct, not just that which is mandated.

The Library argues that Plaintiff has not articulated a sufficient burden on its exercise of religion to trigger protection under the Free Exercise Clause because it "has not proffered any evidence that the religious beliefs of its members 'mandates' that they conduct religious worship services in a public library or anywhere outside the province of a recognized church." (Library Memo., pp. 34-35). But that is not the proper standard. Plaintiff need only show that its belief is sincere—a proposition that the Library does not dispute. It need not show that its religious conduct is "mandated" by its beliefs.

This principle is well established. In *Blanken v. Ohio Department of Rehabilitation and Correction*, this Court concluded that a "state may not proscribe a religious activity with impunity, without a compelling justification, merely because the exercise of a religious practice is optional to the practitioner." 944 F.Supp. 1359, 1365 (S.D. Ohio. 1996); *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 171 (3d Cir. 2002) ("Neither the Supreme Court nor our Court has intimated that only compulsory religious practices fall within the ambit of the Free Exercise Clause"); *Levitan v. Ashcroft*, 281 F.3d 1313, 1319 (D.C. Cir. 2002) ("A requirement that a religious practice be mandatory to warrant First Amendment protection finds no warrant in the cases of the Supreme Court or of this court").

Requiring religious compulsion would create a host of problems. Requiring religious compulsion to make a free exercise claim "would run the risk of excluding practices which are generally believed to be exercises of religion worthy of protection." *Blanken*, 944 F.Supp. at 1365 (quotation marks and citation omitted). For example, Christian denominations have various

opinions about the importance of regularly attending worship services. *Id.* Following the

Library's logic, for those denominations that do not *mandate* such attendance, "a state could

burden such activities without a compelling interest." *Id.*

Moreover, determining whether a religious practice is mandatory or optional would

require courts to inquire into "the centrality of particular beliefs or practices to a faith," and the

"validity of particular litigants' interpretations of those creeds," tasks that are "not within the

judicial ken." *Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 887 (1990)

(quotation marks and citation omitted). The Library's proposed standard directly contradicts

these basic First Amendment principles.

> **B.     The Free Exercise Clause prevents the Library from denying Plaintiff access
> to a forum solely because its speech and conduct is religious-motivated.**

The Library also claims that the Free Exercise Clause is not implicated here because

Plaintiff's members "are free to practice their religion; they or any other group just cannot

conduct their religious services in the Library's meeting rooms." (Library Memo., p. 36). The

Free Exercise Clause is not so limited. It prohibits the government from discriminating against

religiously-motivated conduct in allocating "the rights, benefits, and privileges enjoyed by other

citizens." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988).  This applies

"not only when a coercive law or regulation prohibits religious conduct," as the Library

contends, "but also when government denies religious adherents access to publicly available

money or property." *Tenafly*, 309 F.3d at 169 (citing *Sherbert v. Verner*, 374 U.S. 398, 404-05

(1963)).

Here, the Library is denying Plaintiff access to an otherwise available forum solely on the

basis that it seeks to exercise its religion in the forum. Apart from its religious nature, Plaintiff's

speech and conduct falls well within the parameters of what is permitted under the Meeting

Room Policy. For example, the Library does not prohibit talking or silent meditation in its meeting rooms; but it does if motivated by a desire to communicate to God through prayer. Nor does the Library prohibit singing, so a group could sing "Amazing Grace" as part of a presentation on the abolitionist movement.[10] But a group could not sing the same song if done to worship God.

Similarly, the Meeting Room Policy allows food and drinks in some of its meeting rooms. (Compl., Ex. 1). So one can eat food or drink as a refreshment. But if done with a religious motivation, such as taking communion or celebrating a Seder, that exact same conduct is prohibited. (Library Memo., p. 32 (noting that communion is not currently allowed under the Policy)). Prohibiting religiously-motivated activities in a government forum—when the same activities are permitted in the forum if done for non-religious reasons—blatantly violates the Free Exercise Clause. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 536-37 (1993) (striking down law that prohibited killing animals for religious ceremonies but allowed killing animals for food or recreational hunting); *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Free Exercise Clause prohibits the government from "deciding that secular motivations are more important than religious motivations").

The fact that Plaintiff may exercise its religion elsewhere is irrelevant. Burdening access to a forum is sufficient to trigger the Free Exercise Clause's protection. In *Fairfax Covenant Church*, for example, the Fourth Circuit held that a school's meeting room policy charging religious groups a higher rate to use its facilities "interferes with or burdens the Church's right to

---

[10] "Amazing Grace" was written by John Newton, who abandoned his career as a slave trader after a violent storm that hit his slave ship, prompting him to convert to Christianity. *See* Wikipedia, Amazing Grace, http://en.wikipedia.org/wiki/Amazing_grace (last visited on May 20, 2008). The song Amazing Grace is widely associated with his slave-trading past and his fight to end slave trafficking. *Id.*

speak and practice religion protected by the Free Exercise Clause." 17 F.3d at 707 (citation

omitted). If the Free Exercise Clause prohibits the government from charging more for citizens

to use a forum for religious exercise, it certainly also prohibits the Library's outright ban.

The Library attempts to distinguish *Fairfax Covenant Church* on the basis that it was held

to be a designated public forum, and the meeting rooms here are not. But the Library cites no

authority suggesting that the nature of the forum is relevant to a Free Exercise claim. Rather, the

only relevant inquiry is whether the government denies someone a right or benefit based on

religiously-motivated conduct, but provides the benefit when the same conduct is not religiously-

motivated. *Church of the Lukumi Babalu Aye*, 508 U.S. at 536-37. That is precisely what the

Meeting Room Policy does here.

### III. The Library can only satisfy its duty under the Equal Protection Clause by providing equal access, not merely by enforcing the policy consistently.

The District claims Plaintiff's equal protection claim must fail because Plaintiff's event

was subject to "the same limitation imposed on *all* groups seeking to use its meeting room

space." (Library Memo., p. 38). In other words, the Library is arguing that it cannot violate the

Equal Protection Clause as long as it applies its Meeting Room Policy in the same manner on all

groups. But this puts form above substance. Applying policies across the board is not the same as

giving equal treatment. *See, e.g., Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,

547 U.S. 47, 56-57 (2006) (holding that universities failed to provide military recruiters with

equal access to their campuses even though they imposed their non-discrimination requirement

in the same manner on all recruiters).

Rather, the proper inquiry is whether the Meeting Room Policy's enforcement results in

equal access to the forum. As explained above, the Meeting Room Policy discriminates against

religious groups on its face. It has broadly opened a forum for community expression, but

prohibits conduct solely because it is religiously-motivated and speech that encompasses a viewpoint that is unique to religion (i.e., "inherent elements of a worship service"). Thus, applying the Meeting Room Policy evenly will result in religious expression being discriminatorily singled out for exclusion from the forum.

By classifying permissible speech based on its viewpoint (*see supra* Section I.A), and permissible conduct based solely on the actor's motivation (*see supra* Section II.B), the Library is impinging on the fundamental rights of free speech and the free exercise of religion. As such, the policy is subject to strict scrutiny under the Equal Protection Clause, *see Hansen v. Ann Arbor Pub. Schs.*, 293 F.Supp.2d 780, 807 (E.D. Mich. 2003), which it cannot survive.

## IV. The Library's memorandum further compounds the Meeting Room Policy's vagueness.

It is telling that the only authority the Library cites to defend against Plaintiff's vagueness challenge is a district court opinion from California addressing a completely unrelated school district dress code policy.[11] That case, *Harper v. Poway Unified School District*, 345 F.Supp.2d 1096 (S.D. Cal. 2004), is distinguishable for several reasons.

First, the policy at issue in *Harper* is entirely dissimilar to the policy at issue here. That policy prohibited students from making "derogatory connotations directed toward sexual identity." *Id.* at 1112. Though certainly not clear, the policy in Harper is much more specific than the Library's ban on "religious services." Thus, *Harper* is not instructive here.

Second, the "degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Schools are given "much greater discretion in enforcing their rules."

---

[11] The Library also cites *Broadrick v. Oklahoma*, 413 U.S. 601 (1973), but only to identify the proper legal standard for a vagueness challenge, not to demonstrate that its policy prohibiting religious services provides the necessary objective standards. (Library Memo., p. 40).

*Harper,* 345 F.Supp.2d at 1112 (noting that schools need not tolerate student speech that the government could not otherwise censor outside the school). Away from the school context, however, a law that "interferes with the right of free speech or of association," like the meeting room policy, is subject to "a more stringent vagueness test." *Village of Hoffman Estates*, 455 U.S. at 499.

Finally, the *Harper* court utilized an overly simplistic vagueness analysis. It merely asked whether a reasonable student would understand that the particular speech at issue— "Homosexuality is shameful"—is derogatory toward sexual orientation. *Harper,* 345 F.Supp.2d at 1112. But vagueness challenges, like the one here, may be brought both as-applied and facially. *See, e.g., City of Chicago v. Morales*, 527 U.S. 41, 55 (1999). Thus, courts must look beyond the particular application of the challenged policy, and determine if the policy is unconstitutionally vague on its face. If the policy is ambiguously written—even if it may clearly apply in one instance—it is unconstitutionally vague. *See, e.g., Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 n.7 (9th Cir. 2001) ("In a facial vagueness challenge, the ordinance need not be vague in all its applications if it reaches a substantial amount of constitutionally protected conduct.") (quotation marks and citations omitted).

Applying this analysis to the Library's policy, Plaintiff is likely to succeed on this claim. First, the Library concedes that its policy, as written, is "inherently inconsistent" with itself. (Library Memo., p. 40). It further concedes that it does not enforce the policy as written, but only applies a ban on "religious services." (Library Memo., p. 17). Ironically, the Library matter-of-factly states "a reasonable person of ordinary intelligence can fully appreciate what is meant by the term 'religious services'"—and how it is different than a "religious meeting." (Library

Memo., p. 40). But the Library has never said what it means by the term, either in the Meeting Room Policy or in its memorandum.

We know from its letter to Plaintiff that the Library does not allow prayer under its Meeting Room Policy. (Compl., ¶ 27). Yet people pray in a vast array of different circumstances—whether as a family before a meal, in the hospital with a loved one, or silently to one's self—and a reasonable person would never understand that a simple act of prayer, by itself, would convert that event into a "religious service."

Apparently recognizing this problem, the Library's letter does not refer to Plaintiff's event as a "religious service," but said it included impermissible "inherent elements of a religious service"—a phrase not found anywhere in the Meeting Room Policy. (Compl., ¶ 27). Those elements included prayer and religious singing, but did not include Plaintiff's "discussion of Bible teachings." (Compl., ¶ 27). Without any objective standards, it is impossible for a reasonable person to know why prayer and religious singing are "elements of a religious service," and discussing the Bible is not.

Elsewhere in its memorandum, the Library appears to equate "religious service" with "worship." (Library Memo., p. 19). But this provides no additional guidance. The Supreme Court has explained that it is impossible to know when singing hymns, reading scripture, and teaching biblical principles cease to be singing, teaching, and reading, and become worship. *Widmar*, 454 U.S. at 269 n.6. The distinction between "worship" and other forms of religious speech has no "intelligible content." *Id.*

Ultimately, without any definition of what constitutes a "religious service," the Meeting Room Policy vests unbridled discretion in library officials to determine what speech is permissible in the forum. There could be no clearer example of this than the Library's own

characterization of its policy: "Plaintiff did not propose to hold an event merely honoring or seeking guidance from God; it sought to hold an event where it would worship God through singing and prayer." There is no meaningful way to distinguish "honoring" God and "worshipping" God—yet the Library claims to allow one and prohibit the other. This creates a threat of arbitrary enforcement that, by itself, is enough to find the policy unconstitutionally vague. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

For this reason, the Library's argument that the policy is not vague because Plaintiff has failed to provide any empirical evidence of arbitrary enforcement also must fail as a matter of law.[12] Such evidence is not needed to succeed on a vagueness challenge; the *threat* of arbitrary enforcement is sufficient. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 732 (2000) ("A statute can be impermissibly vague . . . if it authorizes or even encourages arbitrary and discriminatory enforcement"). Moreover, the Library's claims to have consistently enforced its policy (Library Memo., p. 41) carry no weight when the Library cannot even define the restriction it claims to be consistently enforcing. Accordingly, Plaintiff is likely to succeed on its vagueness challenge.

**V.      A Preliminary Injunction will prevent further irreparable harm to Plaintiff without harming the Library in any way.**

If this Court concludes that it is likely the Library infringed on Plaintiff's constitutional rights, then a finding of irreparable harm is mandated. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citation omitted). The Library does not dispute this, but claims it did not infringe on those rights because it "never denied [Plaintiff] access to the Library's meeting rooms." (p.42). Not true. The Library is denying Plaintiff access to conduct its desired event. It will only

---

[12] This argument should also be rejected at this stage because the issue is before this Court on Plaintiff's Motion for Preliminary Injunction, prior to Plaintiff conducting any discovery. Plaintiff is not required to prove its case at this stage; it need only show that it is likely to succeed on the merits.

grant access to do a *different* event, one that the Library has sanitized of any "inherent elements of a worship service."  Such blatant discrimination against religious speech and conduct is unquestionably unconstitutional.

Nonetheless, the Library claims that its need to "maximize the availability of the Library's limited resources" tips the balance of harms in its favor. (Library Memo., p. 42). But the Library's own evidence—or lack thereof—says otherwise. Despite submitting affidavits from several of its employees, the Library proffers no evidence that its meeting rooms are in high demand or that applicants have been turned away due to lack of availability.

Nor has it shown that the demand for meeting room space will increase if it drops the ban on religious services. Plaintiff would like to hold an event prior to the November election, and additional events prior to future elections. (Compl., ¶ 29). And there does not appear to be much demand from other organizations. The Library has only identified one other time in the past twenty years where an applicant sought to use a meeting room for a "religious service."

In the unlikely circumstance demand significantly increases, the Library is free to impose restrictions ensuring that everyone has an opportunity to use the meeting rooms. It could, for example, limit the frequency with which groups may use a room or the length of time an event may occur. These types of neutral regulations are far more preferable than the blatantly discriminatory policy the Library is seeking to uphold.

Thus, a preliminary injunction will not affect the Library's control over its facilities, or its ability to ensure that its rooms are available for use by a wide range of community groups. In fact, by removing its discriminatory restriction, a preliminary injunction would actually help further the Library's stated mission of serving the *entire* community, including those who are religious.

## CONCLUSION

By singling out "religious services," the Library's Meeting Room Policy creates a constitutionally inferior category of religious speech; a distinction which the Supreme Court has described as having no "intelligible content" and outside "the judicial competence to administer." *Widmar*, 454 U.S. at 269 n.6. In so doing, the Library has jettisoned more than two decades of equal access jurisprudence. Accordingly, Plaintiff respectfully requests that this Court preliminarily enjoin the Meeting Room Policy's discriminatory ban on "religious meetings," which the Library does not contend is constitutional, and on "religious services."

Respectfully submitted,

/s/Timothy D. Chandler

Benjamin W. Bull[+]
AZ Bar No. 009940
Attorney for Plaintiff
ALLIANCE DEFENSE FUND
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Email: bbull@telladf.org

Kevin H. Theriot*
KS Bar No. 21565
Attorney for Plaintiff
ALLIANCE DEFENSE FUND
15192 Rosewood
Leawood, Kansas 66224
Telephone: (913) 685-8000
Email: ktheriot@telladf.org

Timothy D. Chandler*
CA Bar No. 234325
Attorney for Plaintiff
Heather Gebelin Hacker*
AZ Bar No. 024167, CA Bar No. 249273
Attorney for Plaintiff
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 932-2850
Email: tchandler@telladf.org
        hghacker@telladf.org

David R. Langdon
OH Bar No. 0067046
Attorney for Plaintiff
LANGDON & HARTMAN LLC
11175 Reading Road, Ste. 104
Cincinnati, Ohio 45241
Telephone: (513) 733-1038
Email: dlangdon@langdonlaw.com

*Admitted *pro hac vice*
+Of Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2008, I electronically submitted the foregoing document

with the Clerk of Court using the CM/ECF system for filing and transmittal of a Notice of

Electronic Filing to the following CM/ECF registrants:

**Timothy D Chandler**
tchandler@telladf.org,mschmidt@telladf.org

**Heather Gebelin Hacker**
hghacker@telladf.org

**Kevin Theriot**
ktheriot@telladf.org,jrennels@telladf.org

**David R Langdon**
dlangdon@langdonlaw.com

*Attorneys for Plaintiffs*

**Angelique Paul Newcomb**
ANewcomb@szd.com

**Susan Porter**
sporter@szd.com

*Attorneys for Defendants*

/s/ Timothy D. Chandler
Timothy D. Chandler
CA Bar No. 234325
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 932-2850
Email: tchandler@telladf.org