## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION


**Citizens for Community Values, Inc.,**

**Plaintiff,**

                                                 **Case No. C-2-08-223**
**-V-**                                               **JUDGE SMITH**
                                               **Magistrate Judge King**

**Upper Arlington Public Library**
**Board of Trustees,**

                   **Defendant.**


## <u>OPINION AND ORDER</u>

On March 11, 2008, Plaintiff Citizens for Community Values, Inc. (hereinafter "Plaintiff" or "Citizens") filed a Motion and Supporting Memorandum for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 against Defendant Upper Arlington Public Library Board of Trustees (hereinafter "Defendant" or "the Library"), seeking to enjoin Defendant from enforcing its policy prohibiting Plaintiff from accessing the Library's meeting rooms for its "Politics and the Pulpit" event and other similar events (Docs. 4, 5). On May 13, 2008, Defendant filed a Response (Doc. 15). On May 23, 2008, Plaintiff filed its Reply (Doc. 16). After review of the parties' submissions, the Court suggested a consolidation of the hearing with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Both parties have agreed that all facts and applicable law are before the Court, and that this action is ripe for full adjudication on its merits without the need for an evidentiary hearing or further trial.[1] After

---

[1]*See United States v. McGee*, 714 F.2d 607, 613 (6th Cir. 1983) ("Where there are no triable issues of fact remaining to be resolved, the Court may properly convert a preliminary

consideration of the parties' submissions, the admissible evidence, and the applicable law, the

Court makes the following findings of fact and conclusions of law as required by Rule 52 of the

Federal Rules of Civil Procedure.[2]

## I.   BACKGROUND

Plaintiff Citizens is a nonprofit charitable, educational and religious corporation

organized under the laws of the State of Ohio.  Plaintiff strives to promote Judeo-Christian moral

values for civil government at the local, state, and national level.  To this end, Plaintiff offers

seminars and other educational events that are designed to promote these values.

Defendant Library is a body politic and corporate of the State of Ohio.  The Library

Board is responsible for providing general oversight and establishing operational policies for the

three branches of the Library.

The Library maintains meeting rooms at its three branches, which are made available to

the public, free of charge, when they are not being used for Library functions.  The Library's

meeting room policy states that meeting rooms are available on a first-come, first-served basis.

The Library's  meeting room policy provides in pertinent part:

> As an institution of education for democratic living, the library welcomes
> the use of its meeting rooms for cultural activities and discussion of public
> questions and social issues.  Our meeting rooms are available on equal terms to
> all groups in the community regardless of the beliefs and affiliations of their
> members, provided that the meeting is open to the public and no fee is charged for
> attending the meeting.

*        *        *

---

injunction to a permanent injunction without an evidentiary hearing.").

[2]To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted
as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

> The use of the meeting rooms for commercial, religious or political campaign meetings is not permitted. However, committees affiliated with a church (such as a church board of trustees) will be allowed to use the meeting rooms provided no religious services are involved.

(Verified Compl., Ex. 1). Though the Library's meeting room policy states that religious meetings are not permitted in the meeting rooms, the Library does not enforce this policy, and "permits a wide array of religious meetings in its meeting rooms." (Moore Aff. ¶ 5; *see also* Mell Aff. ¶ 9). The Library has, however, consistently enforced its other use restrictions, including the prohibition of religious services. (*Id*.).

Groups seeking to use Defendant's meeting rooms are required to review the meeting room policies and rules, complete the Organization Profile for Meeting Room Reservation Form ("Profile Form"), sign an Acceptance of Responsibility Form and then obtain prior approval from a Library employee. According to the Library's policies, "If there is doubt as to the eligibility of a group, the problem will be referred to the Library Director." (*Id.*).

Plaintiff Citizens had planned a series of events called "Politics in the Pulpit." The events were scheduled to occur just prior to the primary election in Ohio. Two of the events were held on February 26, 2008 and February 28, 2008, in Dayton and Cincinnati, Ohio respectively. Plaintiff desired to hold another event on February 27, 2008, from 7:00 p.m. until 8:30 p.m., in an Upper Arlington Public Library meeting room.

On February 14, 2008, a representative from Plaintiff Citizens, Bruce Purdy, contacted the Library to inquire about his group's desire to use the Library's meeting rooms for its February 27, 2008 "Politics and the Pulpit" event. Jan Mell, an employee with the Library in the Community Relations Department, took his call. As is her practice, Ms. Mell asked Mr. Purdy

some questions about his group and the proposed event to determine if his group and the event complied with the Library's meeting room policy. (Mell Aff. ¶¶ 2-3). Mr. Purdy told Ms. Mell that Plaintiff's event would be a community focus group and that some ministers would attend. When Ms. Mell specifically asked Mr. Purdy if any religious services would be conducted during the event, he told her no. (*Id.*). Ms. Mell then reserved the room for use and instructed Mr. Purdy to complete and fax a Profile Form to the Library. As instructed, Mr. Purdy completed and faxed the required Profile Form on behalf of Plaintiff Citizens, checking the boxes on the Profile Form indicating that Plaintiff is a civic and community organization. Along with the Profile Form, Mr. Purdy faxed a letter detailing the topics that would be covered in the proposed event. The letter described Plaintiff's proposed event as follows:

> The events we have planned, what we are calling "Politics and the Pulpit," will address the following topics:
>
> - A discussion of what the Bible teaches regarding involvement by Christians, Pastors, and Churches in politics;
> - A discussion of the current status of the law regarding political involvement by Christians, Pastor, Churches;
> - A time of prayer petitioning God for guidance on the Church's proper role in the political process; and
> - A time of singing praise and giving thanks to God for the freedom we have in this country to participate in the political process.

(Verified Compl. ¶¶ 10, 24, Ex. 4).

The next day, February 15, 2008, Mr. Purdy called to request written confirmation of Plaintiff's meeting room reservation. Ms. Mell then faxed the requested confirmation to Mr. Purdy that day, even though she still had not reviewed the Profile Form or the letter Mr. Purdy had faxed to the Library. (Mell Aff. ¶¶ 4-5). Five days later, on February 20, 2008, when Ms.

Mell returned to work after the President's Day holiday, she saw the Profile Form submitted by Mr. Purdy for the first time and was "surprised to find a written letter from Mr. Purdy attached to the Profile Form, which described the proposed event very differently than Mr. Purdy had described it to me over the phone." (*Id*. at ¶ 5). Ms. Mell believes that description of the event contained in Mr. Purdy's letter conflicted with his earlier representation that the proposed event would not involve a religious service. (*Id*.).

A few days later, Ms. McNeil, the Library's Community Relations Manager, contacted Barry Sheets, another representative from Plaintiff Citizens, and informed him that the Library had reconsidered Plaintiff's request to use a meeting room. (Verified Compl. ¶ 26). In a follow-up letter dated February 21, 2008, Anne Moore, the Library Director, indicated that the proposed event, as described in Mr. Purdy's letter, was in conflict with the Library's stated policy precluding the use of the meeting rooms for religious services. (*Id*. at ¶ 26, Ex. 6). The Library Director explained that two of the proposed activities—"A time of prayer and petitioning God for guidance on the Church's proper role in the political process [and] A time of singing praise and giving thanks to God for the freedom we have in this country to participate in the political process"—created the conflict because "[b]oth activities are inherent elements of a religious service." (*Id*.). The Director indicated that the other proposed activities, which included a discussion of what the Bible teaches regarding involvement in politics and a discussion of the current status of the law, "are not inherent elements of a religious service" and "[t]hese activities therefore are not in conflict with the Library's stated policy." (*Id*. at Ex. 6). The Director concluded the letter by stating that Plaintiff could use the meeting room only for activities that were not in conflict with the stated policy, but must refrain from the activities "referenced

above" that were in conflict with the policy (i.e., those elements that the Library concluded were "inherent elements of a religious service"). (*Id*.).

Consequently, Plaintiff did not use the Library's meeting rooms for the February 27, 2008 "Politics and the Pulpit" event. Plaintiff would like to hold these Politics and the Pulpit events prior to future elections in Ohio, and desires to hold such events in the Library's meeting rooms, but is precluded from doing so under the Library's meeting room policy.

Plaintiff Citizens filed this lawsuit against Defendant Library for violations of their rights to free speech, free exercise of religion, equal protection and due process under the First and Fourteenth Amendments to the U.S. Constitution and Article I, Section 7 of the Ohio Constitution. Plaintiffs seek declaratory and injunctive relief. Specifically, Plaintiff asserts that Defendant Library, by applying its meeting room policy to exclude religious meetings and religious services, has engaged in unconstitutional content and viewpoint discrimination.

## II. DISCUSSION

Plaintiff Citizens initiated this case against Defendant Library asserting claims under 42 U.S.C. § 1983. To recover under 42 U.S.C. § 1983, a plaintiff must demonstrate that he was deprived of rights secured by the Constitution or laws of the United States by a person acting under color of state law. *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995). In the instant case, when Defendant Library denied Plaintiff Citizens use of the Library's meeting rooms for certain elements of Plaintiff's proposed event, Defendant was acting as a person under color of state law. Thus, the issue presented is whether Plaintiff was deprived of a constitutional right. And, more specifically, whether the First Amendment entitled Plaintiff to use the Library's meeting room for its entire Politics and the Pulpit event, including those elements Defendant

labeled as "inherent elements of a religious service."

## A.     First Amendment Analysis

Plaintiff Citizens argues that Defendant Library's meeting room policy violates Plaintiff's First and Fourteenth Amendment rights to freedom of speech and association.

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I.  The First Amendment is made applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  Religious speech is protected by the First Amendment. *See, e.g. Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111 (2001); *Widmar v. Vincent*, 454 U.S. 263, 269 (1981).  The First Amendment, however, does not guarantee that all forms of protected speech may be heard on property owned or controlled by the government. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).  Instead, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."  *Id*.

### 1.     Overview of Forum Analysis

Once it is confirmed that the at-issue speech is "protected speech" under the First Amendment, the Supreme Court uses a forum analysis for evaluating the constitutionality of restrictions of speech on government property. *Id.* at 45-46.  The level of scrutiny to be applied is determined by the nature of the forum. *See id*. at 44 ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.").  Thus, a court's first task is to identify the relevant forum.

For purposes of First Amendment analysis as applied to government owned property, the

Sixth Circuit recognizes three types of fora: (1) traditional public fora, (2) limited public fora or designated public fora, and (3) nonpublic fora. *See e.g.*, *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001)*; Spingola v. Village of Granville*, 39 Fed.Appx. 978, 982, 2002 WL 1491874, *4 (6th Cir. 2002); *Giles v. Garland*, 2008 WL 2468149, *7-8 (6th Cir. 2008).

### (a)    Traditional Public Forum

"A traditional public forum is a place 'which by long tradition or by government fiat has been devoted to assembly and debate,' such as a street or a park. *Kincaid*, 236 F.3d at 348 (*quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n***,** 460 U.S. 37, 45 (1983)). Efforts to exclude speakers from traditional public fora are "sharply circumscribed." *Id*. Content-based restrictions must withstand strict scrutiny; that is, such restrictions must be narrowly drawn to serve a compelling state interest. *Id*.; *Perry*, 460 U.S. at 45. "[C]ontent-neutral time, place and manner regulations [may be enforced] only if they are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Id*. (*quoting Perry*, 460 U.S. at 45).

### (b)    Designated Public Forum or Limited Public Forum.

The Sixth Circuit has described this second category of fora as "public property which the State has designated, perhaps for only a given time, as open for use by the public for expressive activity . . . ." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000). Where such a designation occurs, the same standards apply as apply to traditional public fora. *Id*.; *See also, Kincaid*, 236 F.3d at 348. The Sixth Circuit uses the terms "designated public forum" and

"limited public forum" interchangeably.[3]  *See e.g.*, *Kincaid* 236 F.3d at 348 ("The second type of forum has been alternatively described as a 'limited public forum,' . . . and as a 'designated public forum.'" (citations omitted)); *Spingola*, 39 Fed.Appx. at 982 (same); and *Giles v.*

---

[3]The Sixth Circuit as well as other circuits have acknowledged the confusion surrounding the use of the terms "designated public forum" and "limited public forum." *See United Food & Commercial Workers Local 1099 v. City of Sidney,* 364 F.3d 738, 750 (6th Cir. 2004) (acknowledging confusion in terminology and the proper level of scrutiny to apply); *Chiu v. Plano Indep. Sch.* Dist, 260 F.3d 330, 345-46 (5th Cir 2001) (same); *Goulart v. Meadows*, 345 F.3d 239, 249 (4th Cir. 2003) (same); *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 567 (7th Cir. 2001) ("[T]he use of this terminology . . . has introduced some analytical ambiguity because the [Supreme] Court previously had employed the term "limited public forum" as a subcategory of the designated public forum, subject to the strict scrutiny governing restrictions on designated public forums.").

As many of the circuit courts have pointed out, the confusion stems from the Supreme Court's application of differing levels of scrutiny to regulation of speech in a limited public forum as compared to the regulation of speech in a designated public forum. *Compare Good News Club*, 533 U.S. at 106-07 (government restrictions taking place in limited public fora are permissible so long as the restrictions (1) do "not discriminate against speech on the basis of viewpoint" and (2) are "reasonable in light of the purpose served by the forum") *with Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (content-based prohibitions in designated public fora are subject to strict scrutiny, and therefore, permissible only if they are necessary to serve a compelling state interest and they are drawn narrowly to achieve that interest).

Those circuits that distinguish the term "designated public forum" from the term "limited public forum" query whether the forum in question has been indiscriminately open for use by the general public (designated public forum) or whether the forum has been open just to certain categories of speakers and subjects (limited public forum). *See e.g., Bronx Household of Faith v. Bd. of Educ. of Cty. of New York*, 492. F.3d 89, 97 (2d Cir. 2007); *Donovan v. Punxsutawney Area Sch. Bd. Dist.*, 336 F.3d 211, 225 (3d Cir.2003); *Chiu*, 260 F.3d at 345-46; *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006); *Faith Center church Evangelistic Ministries v. Glover*, 480 F.3d 891, 908 (9th Cir. 2007); *Summum v. City of Ogden*, 297 F.3d 995, 1002 n. 4 (10th Cir. 2002).  As Judge Moore of the Sixth Circuit noted in a concurring opinion, "The distinction is important because our sister circuits have held that restrictions on speech in a limited public forum are allowed if they are content-neutral and reasonable, while restrictions in a designated public forum must be analyzed under the strict-scrutiny standard." *Giles v. Garland*, 2008 WL 2468149, *13 (6th Cir. 2008) (citations omitted).

*Garland*, 2008 WL 2468149, *7-8 (same). Though the Sixth Circuit uses the terms interchangeably, like circuits that distinguish between limited public fora and designated public fora, applying differing levels of scrutiny for each (*see* discussion *supra* at n. 3), the Sixth Circuit, following *Good News*, applies a lesser level of scrutiny when the forum has been open to just certain categories of speakers and subjects. *See e.g.*, *Redmond v. The Jockey Club*, 244 Fed.Appx. 663, 668, 2007 WL 2250978, *5 (6th Cir. 2007) ("In such a limited public forum, the state may constitutionally restrict speech, so long as it does not discriminate against speech on the basis of viewpoint, and the restriction is reasonable in light of the purpose served by the forum."); *United Food*, 364 F.3d at 750. In such instances, government restrictions on speech must be viewpoint-neutral and reasonable in light of the purpose of the forum. *Good News*, 533 U.S. at 106-07.

### (c) Nonpublic Forum

Public property that does not fall into either of the first two categories is classified as a nonpublic forum. *See Pouillon*, 206 F.3d at 715. Regulation of speech in nonpublic fora is subject to less demanding judicial scrutiny: "The government may control access to a nonpublic forum 'based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *Kincaid*, 236 F.3d at 348 (*quoting Cornelius,* 473 U.S. at 806).

### 2.      Classification of Defendant Library's Meeting Room

As set forth above, the Court's first task is to determine the nature of the forum. Plaintiff

Citizens argues that the Library's meeting rooms are designated public fora and that the

Library's restrictions are subject to strict scrutiny. Defendant Library contends that their

meeting rooms are nonpublic fora and that the restrictions are reasonable and viewpoint neutral.

The Supreme Court, in *Cornelius*, explained the process by which the government creates

a public forum:

> The government does not create a public forum by inaction or by permitting
> limited discourse, but only by intentionally opening a nontraditional forum for
> public discourse. Accordingly, the Court has looked to the policy and practice of
> the government to ascertain whether it intended to designate a place not
> traditionally open to assembly and debate as a public forum. The Court has also
> examined the nature of the property and its compatibility with expressive activity
> to discern the government's intent. For example, in *Widmar v. Vincent*, 454 U.S.
> 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), we found that a state university that
> had an express policy of making its meeting facilities available to registered
> student groups had created a public forum for their use. The policy evidenced a
> clear intent to create a public forum, notwithstanding the University's erroneous
> conclusion that the Establishment Clause required the exclusion of groups
> meeting for religious purposes. Additionally, we noted that a university campus,
> at least as to its students, possesses many of the characteristics of a traditional
> public forum.

*Cornelius*, 473 U.S. at 802-03 (citations omitted). Following *Cornelius*'s emphasis on

governmental intent, the Sixth Circuit has stated that when determining the nature of the forum,

the "touchstone of [a court's] analysis is whether the government intended to open the forum at

issue." *Kincaid*, 236 F.3d at 348-49 (citations omitted). "To determine whether the government

intended to create a limited public forum, we look to the government's policy and practice with

respect to the forum, as well as to the nature of the property at issue and its 'compatibility with

expressive activity.'" *Id*. (*quoting Cornelius*, 473 U.S. at 802). In the instant case, evaluating

these factors, the Court finds that the Library intended to make the meeting rooms a limited public forum.

### (a)    Library Policies and Practices with Respect to the Meeting Rooms

The operative policy statements governing the meeting rooms indicate an intent on the Library's part to open the meeting rooms to a broad range of expressive activity:  "[T]he library welcomes the use of its meeting rooms for cultural activities and discussion of public questions and social issues.  Our meeting rooms are available on equal terms to all groups in the community regardless of the beliefs and affiliations of their members . . . ." (Verified Compl., Ex. 1).  Groups associated with the City of Upper Arlington and not-for-profit, tax exempt groups can use the rooms without charge, and other groups and businesses can use the meeting rooms for a nominal charge so long as the rooms are being used for a "non-profit reason." (*Id*.).

Notwithstanding the Library's broad policy statements, its regulations exclude certain activity from the meeting rooms.  First, the regulations exclude the use of the rooms for commercial meetings. (*Id*.).  This restriction, however, is relatively narrow given that the policy limits the use of the meeting rooms to "not-for-profit reasons."  The Library regulations also exclude two categories of expressive activity that would likely qualify as not-for-profit reasons: "The use of the meeting rooms for . . . religious or political campaign meetings is not permitted." (*Id*.).  Like the exclusion of commercial meetings, the exclusion of political campaign meetings is relatively narrow, covering only a small subcategory of political speech.  Though the exclusion of religious meetings is quite broad, the policy regulations qualify that restriction in a later sentence: "However, committees affiliated with a church (such as a church board of trustees) will be allowed to use the meeting rooms provided no religious services are involved."

(*Id.*).  Thus, despite the conflicting language, the regulations do appear to allow "religious meetings," including meetings containing religious discussion, so long as the meetings do not consist of a religious service.

This interpretation of the Library's policy with respect to "religious meetings" is somewhat consistent with the Library's practices.  In practice, the Library "does not enforce this policy," but instead "permits a wide array of religious meetings in its meeting rooms." (Moore Aff. ¶ 5; Mell Aff. ¶ 9).  For example, Ms. Mell, a Library Community Relations Department employee, stated that the Library has approved the use of the meeting rooms for monthly church committee meetings, an event discussing Islamic religion and culture, a church's meeting to discuss establishing a new church, and a church's showing of religious videos. (Mell Aff. ¶ 9). Ms. Moore, the Library's Director, stated that the Library does, however, enforce its regulation prohibiting religious services, citing denial of a church's request to use the meeting rooms for religious worship services while the church was undergoing renovations. (Moore Aff. ¶ 5).  The Library has not defined "religious worship services," but, as evidenced in the instant case, it is the Library's practice to sever out and prohibit those portions of a proposed event that the Library concludes are "inherent elements of a religious service," and to label those elements as "religious worship services." (*See* Verified Compl. ¶ 26, Ex. 6).

The Library's policy statements and practices make clear that the Library intended its meeting rooms to be fora open to a wide range of groups and to be utilized for a wide range of expressive activity, including meetings, discussions, lectures, and any other non-profit activities that would serve the community.

### (b) Compatibility With Expressive Activity

The Court next considers the compatibility of the library meeting room with expressive activity.  In *Cornelius*, the Supreme Court instructed:

> In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum. Accordingly, we have held that military reservations and jailhouse grounds do not constitute public fora.

*Cornelius*, 473 U.S. at 804 (citations omitted).

A public library is a place dedicated to the pursuit of knowledge, where "the worthy missions of facilitating learning and cultural enrichment" are fostered.  *United States v. Am. Library Ass'n*, 539 U.S. 194, 203 (2003).  In the instant case, the Library's policy and practice of permitting use of its meeting rooms for such a broad range of activity indicates that the rooms are compatible with expressive activity.  Further, Defendant Library has not put forth any evidence demonstrating that the type of expressive activity proposed by Plaintiff would be disruptive or would undermine its "principal functions."

### (c) Conclusion

In summary, the Library, by policy and practice, permits the use of its meeting rooms for non-profit purposes except where the content of the proposed event is within one of a few narrow exclusions. In addition, the Library's meeting rooms are compatible with expressive activity.

If the Court were to agree with Defendants—that the Library meeting rooms have remained nonpublic fora despite their extensive use for expressive activity and their compatibility with expressive activity—the Court cannot envision any instance in which public property would be categorized as a designated or limited public forum.

The Court therefore concludes that the Library's meeting rooms fall within the second category of fora, limited or designated public fora. This conclusion is consistent with the findings of other courts, including the Sixth Circuit, who have considered the nature of public libraries for First Amendment purposes. *See Concerned Women for America, Inc.*, *v. Lafayette County*, 883 F.2d 32, 34-35 (5th Cir. 1989) (holding that library's auditorium was a forum created by government designation for First Amendment purposes); *Faith Center Church Evangelistic Ministries*, 480 F.3d 891, 910 (9th Cir. 2007) (holding that library's meeting room was a limited public forum); and *Pfeifer v. City of West Allis*, 91 F.Supp.2d 1253 (E.D. Wisc. 2000) (holding that library's meeting room was a designated public forum for First Amendment purposes). *See also*, *Neinast v. Bd. of Trustees of Columbus Metropolitan Library,* 346 F.3d 585, 591 (6th Cir. 2003) ("For the purposes of First Amendment Analysis, the Library is a limited public forum."); *Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1259 (3d. Cir. 1992) (same); *Mainstream Loudoun v. Board of Trustees of the Loudoun County Library*, 24 F.Supp.2d 552, 563 (E.D. Va. 1998) (same); *and Sund v. City of Wichita Falls, Tex.,* 121 F.Supp.2d 530, 548 (N.D. Tex. 2000) ("The Wichita Falls Public Library, like all other public libraries, is a limited public forum for purposes of First Amendment analysis.").

As indicated above (Section II.A.1.b), the Sixth Circuit, in analyzing speech restrictions in designated or limited public fora will apply a lesser level of scrutiny if the forum has been open to just certain categories of speakers and subjects. Plaintiff contends that Defendant Library has opened its meeting rooms to a sufficiently wide variety of uses such that restrictions on speech must be analyzed under a strict scrutiny standard. Plaintiff's position is not without support. *C.f., Concerned Women*, 883 F.2d at 33-34 (finding a designated public forum and

applying strict scrutiny where a library auditorium was "open for use of groups or organizations of a civic, cultural or educational character" even though the library had a policy of prohibiting "meetings for social, political, partisan or religious purposes"); *Pfeifer*, 91 F.Supp.2d at 1262, 1266 (finding a designated public forum and applying strict scrutiny where library's meeting room was open to "public programs sponsored by nonprofit educational and cultural agencies," even though library had a policy of prohibiting "regular meetings" of organizations, "commercial sales" presentations, "meetings that are politically partisan" and "religious services or instructions"). *But c.f.*, *Faith Center*, 480 F.3d at 902-03, 910 (finding a limited public forum and subjecting regulations to something less than strict scrutiny review where library's meeting room was open to organizations using the space for "meetings, programs, or activities of educational cultural or community interest," but where library's policy prohibited schools from using the meeting room "for instructional purposes as a regular part of the curriculum" and also prohibited "religious services"). The Court finds, however, because the Library restricts access to certain speakers and subjects, that the lesser level of scrutiny is appropriate. Therefore, the Court must next examine the library's restrictions to determine if they are viewpoint-neutral and reasonable in light of the purpose of the forum. *Good News Club*, 533 U.S. at 106-07.

### 3. Application of Forum Analysis

Defendant Library contends its prohibition of "religious services," and its practice of severing out and prohibiting portions of events it concludes are "inherent elements of a religious service," constitute viewpoint neutral and reasonable restrictions. Plaintiff counters that the Library is engaging in viewpoint discrimination and argues that such viewpoint discrimination is presumptively unconstitutional irrespective of the forum. For the reasons articulated in the

16

following analysis, the Court finds that the Library's prohibition of those portions of Plaintiff's event that it concluded were "inherent elements of religious services" constitutes viewpoint discrimination. The Supreme Court's decision in *Good News Club* supports this finding.

        **(a)**      ***Good News Club***

In *Good News Club*, a Christian organization geared towards pre-teen children, the Good News Club, applied to use an elementary school's facilities for its after school weekly meetings. 533 U.S. at 103. The meetings included prayer, "singing songs, hearing a Bible lesson and memorizing scripture." *Id.* The elementary school had a policy that opened its facilities for "instruction in any branch of education, learning or the arts" and also for "social civic and recreational meetings . . . and other uses pertaining to the welfare of the community . . . ." *Id*. at 102. The policy prohibited use of the school facilities "by any individual or organization for religious purposes." *Id*. at 103. Based upon this prohibition, the school board rejected the Club's request to use the facilities for its weekly meetings. *Id.* The Good News Club sued, and the district court granted summary judgment for the school, reasoning that the Club's "proposed use deals specifically with religious subject mater and not . . . merely a religious perspective on secular subject mater." *See Good News Club*, 21 F.Supp.2d 147, 160 (N.D.N.Y. 1998). A divided appellate court affirmed, stating "it is clear from the conduct of the meetings that the Good News Club goes far beyond merely stating its viewpoint. The Club is focused on teaching children how to cultivate their relationship with God through Jesus Christ. Under even the most restrictive archaic definitions of religion, such subject matter is quintessentially religious." 202 F.3d 502, 510 (2d. Cir. 2000). A divided Supreme Court reversed, finding that the school's exclusion of the Club constituted viewpoint discrimination. 533 U.S. at 107.

Based upon the parties' agreement, the Supreme Court treated the school as a limited public forum. *Id*. at 106. Consequently, the Court stated that the school could limit the use of the forum so long as any restrictions: (1) did not "discriminate against speech on the basis of viewpoint"; and (2) were "reasonable in light of the purpose served by the forum." *Id*. at 106-107 (citations omitted). The Court, in applying the foregoing test to determine whether the exclusions constituted viewpoint discrimination, indicated that its analysis was guided by two of its prior opinions, *Lamb's Chapel* and *Rosenburger*. *Id*. at 107.

In *Lamb's Chapel*, a unanimous Supreme Court declared unconstitutional the denial of an evangelical church's request to use school facilities to show a film series dealing with child-rearing questions from a Christian perspective. *Lamb's Chapel v. Center Moriches Union Free Shcool Dist.*, 508 U.S. 384, 393 (1993). The Court explained that "it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and childrearing except those dealing with the subject matter from a religious standpoint." *Id*.

In *Rosenburger*, the Supreme Court found the University of Virginia's denial of funding for a student group that published a newspaper with a Christian editorial viewpoint unconstitutional, explaining:

> By the very terms of the [University fund's] prohibition, the University does not exclude religion as subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995).

As noted above, the *Good News Club* Court, relying on *Lamb's Chapel* and *Rosenburger*,

18

concluded that the school's exclusion of the Good News Club constitutes impermissible viewpoint discrimination. *Good News Club*, 533 U.S. at 112. In reaching this conclusion, the Court rejected the Second Circuit's contention that the exclusion of activities that were "quintessentially religious" does not constitute viewpoint discrimination:

> We disagree that something that is "quintessentially religious" or "decidedly religious in nature" cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint. *See* 202 F.3d, at 512 (Jacobs, J., dissenting) ("[W]hen the subject matter is morals and character, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters"). What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons. It is apparent that the unstated principle of the Court of Appeals' reasoning is its conclusion that any time religious instruction and prayer are used to discuss morals and character, the discussion is simply not a "pure" discussion of those issues. According to the Court of Appeals, reliance on Christian principles taints moral and character instruction in a way that other foundations for thought or viewpoints do not. We, however, have never reached such a conclusion. Instead, we reaffirm our holdings in *Lamb's Chapel* and *Rosenberger* that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that Milford's exclusion of the Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination.

*Id*. at 111-12.

In a dissenting opinion, Justice Souter sets forth a detailed description of the Good News Club's activities and characterized those activities as "an evangelical service of worship calling children to commit themselves in an act of Christian conversion." *Id*. at 137-38. The Court acknowledged that Justice Souter's recitation of the Club's activities was accurate, but saw "no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys." *Id*. at 112, n.4. The Court indicated that Justice Souter's label of the activities as "an evangelical service of worship" was insignificant, stating that "what

matters is the substance of the Club's activities . . . ." *Id.* The Court also rejected the school's insistence that the Club's activities constitute "religious worship," noting that the Court of Appeals made no such determination. The Court then added, "[i]n any event, we conclude that the Club's activities do not constitute *mere* religious worship, divorced from any teaching or moral values." *Id.* (emphasis added).

**(b)     Application of *Good News Club***

Defendant's contention that its exclusion of Plaintiff's proposed activities does not constitute unlawful viewpoint discrimination is premised entirely upon (1) its conclusion that a ban on religious services does not violate the First Amendment (Def.'s Memo. in Opp. at 18); and (2) its characterization of Plaintiff's proposed activities as "pure conduct of religious worship services" and as "pure religious worship service" (Def.'s Memo. in Opp. at 2, 19, 29).

The Court does not need to reach the tough questions of whether a religious worship service can be prohibited or what constitutes "mere worship." Even assuming "*mere* religious worship" could be precluded, Plaintiff's proposed Politics and the Pulpit event was not so restrictive. Admittedly, Plaintiff's proposed event, like the Club's proposed meeting in *Good News Club*, included prayer and singing, activities that could be labeled "quintessentially religious," and if conducted in isolation, could arguably be considered "mere religious worship." However, just like in *Good News Club*, Plaintiff's other activities—"A discussion of what the Bible teaches regarding involvement by Christians, Pastors, and Churches in politics"; and "A discussion of the current status of the law regarding political involvement by Christians, Pastors, and Churches"—were clearly consistent with the activities permitted by the Library. And, just as the *Good News Club* Court found that the "Club's activities do not constitute *mere* religious

worship, divorced from any teaching or moral values," this Court finds that Plaintiff's proposed Politics and the Pulpit event did not consist of mere religious worship, divorced from any discussion of public questions or social issues. Thus, if Defendant had excluded Plaintiff's proposed event in its entirety, the instant case would be factually indistinguishable from *Good News Club*.

Instead of prohibiting the Plaintiff's entire proposed event, however, Defendant severed out and excluded just the singing and praying activities, labeling those activities "inherent elements of a religious service." Plaintiff's practice of excluding "inherent elements of a religious service" cannot be reconciled with the *Good News Club* Court's conclusion that activities that are "quintessentially religious" or "decidedly religious in nature" can also constitute speech with a religious viewpoint. *See Good News Club*, 533 U.S. at 111. Further, as noted above, the *Good News Club* Court declined to address the school's argument that the Club's activities (including singing and prayer) could be excluded as religious worship, stating that "[i]n any event, we conclude that the Club's activities do not constitute mere religious worship, divorced from any teaching of moral values." *Id*. at 112, n.4. A corollary to the Court's statement is that "mere religious worship" that is not "divorced from" otherwise permissible speech cannot be excluded from a limited public forum. And, this Court has already concluded that the prayer and singing elements of Plaintiff's event were not "divorced from" the otherwise permissible discussion elements of Plaintiff's event.

Defendant Library contends that the Ninth Circuit's Decision in *Faith Center* provides support for their practice of severing out and excluding activities it concludes are "inherent elements of a religious service." (*See* Def.'s Memo. in Opp. at 22-26). *Faith Center* does not,

however, provide the support Defendant suggests.

*Faith Center*, like the instant case, involved a public library that made its meeting rooms available to the public during operating hours for "educational, cultural and community related meetings, programs and activities." 480 F.3d at 902. And, like Defendant Library, the *Faith Center* library prohibited the use of its meeting rooms for religious services. *Id*. at 903. The Faith Center Church Evangelistic Ministries sought to use the meeting rooms for two events. The first event, held in the morning, was described by Faith Center Church as a "wordshop," and the topic was "The Making of an Intercessor, and End-time call to Prayer for every Believer, and how to pray fervent, effectual Prayers that God hears and answers." *Id*. at 903-04. The library agreed that the morning event "was the type of religious speech activity that would be permitted under [its] current policy." *Id*. at 904. The second event, held in the afternoon, was described by Faith Center Church simply as a "Praise and Worship Service." *Id*. at 903. The library barred the religious worship service from the meeting room, arguing that its exclusion of religious services was "a permissible exclusion of a category of speech meant to preserve a limited public forum for its intended uses." *Id.* at 904. The Faith Center Church sued to enjoin the library from excluding its event, and the district court granted Faith Center Church's motion for a preliminary injunction.

On appeal, the Ninth Circuit reversed the district court, concluding that the prohibition of Faith Center Church's religious worship services was "a permissible exclusion of a category of speech that is meant to preserve the purpose behind the limited public forum." *Id*. at 918. In reaching this conclusion, the *Faith Center* court distinguished "pure religious worship" from speech conveying a religious viewpoint. *Id*. at 915. The court maintained that the Supreme

Court has also made this distinction: "[I]n *Good News Club* . . . the Court distinguished the Club's activities from 'mere religious worship' and implicitly acknowledged that religious worship exceeded the boundaries of the limited public forum." *Id*. (*citing Good News Club*, 533 U.S. at 112, n.4). The *Faith Center* court twice emphasized that the district court proceeded on the basis that the afternoon "praise and worship" session constituted pure religious worship services, and that Faith Center Church did not dispute this characterization, but instead argued that the court could not constitutionally prohibit pure religious worship services. *See Id*. at 905, 915.[4]

The Faith Center Church argued that distinguishing religious worship from other permissible forms of religious speech would entangle the government with religion in a manner forbidden by the Establishment Clause. *Id*. at 916. In response, the *Faith Center* court admitted that the distinction is "challenging" and "one that the government and the courts are not competent to make." *Id*. at 918. The court explained, however, that the distinction "was already made by Faith Center itself when it separated its afternoon religious worship service from its morning activities . . . The [library] may not be able to identify whether Faith Center has engaged in pure religious worship, but Faith Center can and did." *Id*.

Thus, *Faith Center* does not, as Defendant suggests, support the Library's practice of severing out and excluding elements it concludes constitute "inherent elements of a religious service." Instead, the *Faith Center* court indicated that making such a distinction is "one that the government and courts are not competent to make." *Id*. at 918. The court emphasized that its

_____

[4]The only evidence before the district court about the substance of the afternoon event was Faith Center's flyer describing the event as a "praise and worship" service. *Id*. at 903, 916.

holding was based upon Faith Center Church's own characterization of its event as a pure worship service. *Id*. at 905, 915. In the instant case, Plaintiff Citizens never described its event or even elements of its event as "pure religious worship." In fact, Plaintiff's representative, Mr. Purdy, described Plaintiff's event as a "community focus group," and when specifically asked if any religious services would be conducted during the event, responded "no." (Mell Aff. ¶¶ 2-3). It was the Library, rather, who made that distinction and attached those labels to the prayer and singing activities. Moreover, the *Faith Center* Court acknowledged that a variety of the activities that occur at Faith Center Church's meetings—including praying and singing—are permissible because the activities "convey a religious perspective on subjects that are or have been permitted in the [library's] meeting room, such as a discussion of the Bible, discussions of social and political issues, and sharing of life experiences." *Id*. at 914. The court distinguished the pure worship service from these permissible activities, stating: "we simply do not have 'elements of worship' that further secular goals."*Id*. at 916. In the instant case, the prayer and singing elements that Defendant Library seeks to exclude are indistinguishable from those activities that the *Faith Center* court acknowledged are permissible as conveying a religious perspective on otherwise permissible subject matter.

The Supreme Court has also cautioned against distinguishing between religious worship and speech from a religious perspective:

> [T]he dissent fails to establish that the distinction [between 'religious' speech and speech 'about' religion] has intelligible content. There is no indication when 'singing hymns, reading scripture, and teaching biblical principles' cease to be 'singing, teaching, and reading'-all apparently forms of 'speech,' despite their religious subject matter-and become unprotected 'worship.'
>
>        *   *   *
>
> [E]ven if the distinction drew an arguably principled line, it is highly doubtful that

it would lie within the judicial competence to administer. Merely to draw the distinction would require the university-and ultimately the courts-to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases.

*Rosenberger*, 515 U.S. at 845 (*quoting Widmar*, 454 U.S. at 269-70, n.6) (citations omitted).

To permit the Library to draw the distinctions necessary for it to sever out and exclude activities it concludes are "inherent elements of a religious service," would inevitably entangle it with religion in a manner forbidden by the Constitution.

In summary, the Court finds that the singing and prayer elements of Plaintiff's proposed Politics and the Pulpit event do not constitute mere religious worship, divorced from the otherwise permissible discussion elements of Plaintiff's event. Instead, the Court finds that the elements constitute speech conveying a religious viewpoint. Thus, the Court concludes that Defendant's exclusion of Plaintiff's activities from the Library's meeting rooms, pursuant to its practice of severing out and excluding activities it concludes are "inherent elements of a religious service," constitutes unlawful viewpoint discrimination, and consequently violates Plaintiff's First Amendment free speech rights.

**B.      Establishment Clause Defense**

Defendant Library maintains that, even if their actions violate Plaintiff's First Amendment rights, the violation is justified because it has a compelling interest in not violating the Establishment Clause of the First Amendment, which prohibits laws "respecting an establishment of religion." (Def.'s Memo. in Opp. at 27); U.S. Const. amend I. In other words, Defendant contends that its practice of severing out and excluding activities it concludes are "inherent elements of a religious service" is required to avoid violating the Establishment

Clause.

The Court disagrees.

The Court acknowledges that the interest of Defendants in complying with its constitutional obligations may be characterized as compelling. *See e.g.*, *Widmar*, 454 U.S. at 271; *Good News Club*, 533 U.S. 112. The Supreme Court, however, rejected Establishment Clause defenses similar to the Library's in *Good News Club, Lamb's Chapel* and *Widmar*.

Defendant attempts to distinguish these cases by presenting three "unique circumstances" that "Establishment Clause case law has never addressed." (Def.'s Memo. in Opp. at 27-31). Two of these "unique circumstances" arguments can be readily dismissed because they rest upon the faulty premise that Plaintiff's proposed event consisted of pure religious services. *See id*. at 28, 30. The final "unique circumstance" the Library sets forth is that Plaintiff's proposed event would take place during the Library's normal operating hours. *Id*. at 28. Though this is a distinguishing factor from *Lamb's Chapel* and *Good News Club*, which involved use of a school's facilities after school hours, it is not a unique circumstance that "Establishment Clause case law has never addressed."

In *Good News Club*, for example, the Club's meetings followed regular school activities so closely that the Good News Club instructor had to wait to begin the meeting until the classroom was clear. 533 U.S. at 144 (Souter, J., dissenting). The school argued that this close proximity in time made it more likely that children would perceive that the school was endorsing the Club. The Court rejected this argument, explaining that "consistent with *Lamb's Chapel* and *Widmar*, the school could not deny equal access to the Club for any time that is generally available for public use." 533 U.S. at 114, n.5.

Similarly, in *Prince v. Jacoby*, a school district enacted policies allowing officially-recognized student clubs to "meet during student/staff time during school hours." 303 F.3d 1074, 1078 (9th Cir. 2002). The district refused to recognize a Christian student club whose goal was, in part, to "[e]vangelize [its] campus for Jesus Christ" and who enlisted a "Worship Leader" officer who was required to "select the praise and worship songs and lead the World Leaders Club in prayer and worship." *Id*. at 1097, n.1 (Berzon, J., dissenting). The dissent argued, just as the Library does in the instant case, that "the Establishment Clause forbids student religious activities in the public school building during periods when the students are compelled by law to attend school in that building." *Id*. at 1099 (Berzon, J., dissenting). The majority disagreed, holding that it "does not violate the Establishment Clause for a public school to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups that use meeting rooms for sectarian activities, accompanied by some devotional exercises." *Id*. at 1092 (quotation marks and citation omitted). "[S]econdary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Id*. at 1094; *see also Ceniceros v. Bd. of Trustees of the San Diego Unified Sch. Dist.*, 106 F.3d 878 (9th Cir. 1997) (holding that the Establishment Clause did not justify a school's prohibition on religious student clubs meeting during lunch while school was in session).

Finally, at least two courts have considered whether the Establishment Clause is implicated by a religious group's use of a public library's meeting rooms. In *Concerned Women*, for example, a Christian prayer group sought to use the library's auditorium to "discuss family and political issues, pray about those issues, and seek to apply Biblical principles to them." 883

F.2d at 33-34.  The court held that the library had created a designated public forum and consequently could not exclude the religious speech unless it was necessary to serve a compelling interest. *Id*. at 34-35.  The court then concluded that the Establishment Clause was not implicated explaining:

> [The Christian group's] stated purpose is to preserve, protect, and promote traditional and Judeo-Christian values through education, legal defense, legislative programs, humanitarian aid and related activities. In the absence of empirical evidence that religious groups will dominate use of the library's auditorium, causing the advancement of religion to become the forum's "primary effect," an equal access policy will not offend the Establishment Clause.

*Id*. at 35 (citation omitted).  Similarly, in *Pfeifer*, the court concluded that the Establishment Clause did not provide a justification for the library's ban of Plaintiff's religious instruction program from its meeting room, explaining: "Because the Library granted access to a wide variety of nonreligious private organizations, as in *Widmar*, there is no 'realistic danger that the community would think that the [Library] was endorsing religion or any particular creed, and any benefit to religion or the Church would have been incidental.'" 91 F.Supp.2d at 1266 (*quoting Lamb's Chapel*, 508 U.S. at 395).

The Supreme Court, in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), held that government action does not offend the Establishment Clause if it: (1) "has a secular purpose"; (2) "does not have the principal or primary effect of advancing or inhibiting religion"; and (3) "does not foster an excessive entanglement with religion." *Id*. at 612-13.  In the instant case, all three prongs are clearly met.  First, a neutral policy and practice would reflect a secular purpose.
 Second, the Court is not persuaded that the primary effect of the forum would be to advance religion.  As the Supreme Court stated in *Widmar*, "[i]t is possible—perhaps even foreseeable—that religious groups will benefit from access to [the] facilities.  But . . . a religious

organizations enjoyment of merely 'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion." 454 U.S. at 273. Plaintiff seeks to hold its Politics and the Pulpit event near election dates. The event is obviously not endorsed by Defendant. The event is open to all members of the public. In sum, permitting Plaintiff to hold its event "would ensure neutrality, not threaten it," because Plaintiff is "seek[ing] nothing more than to be treated neutrally and given access to speak about the same topics as are other groups." *Good News Club*, 533 U.S. at 114. Further, Plaintiff has not presented any evidence demonstrating that religious groups will dominate use of the Library's meeting room, causing the advancement of religion to become the forum's "primary effect." *See Concerned Women*, 883 F.2d at 35. Regardless, the *Good News Club* Court noted: "When a limited public forum is available for use by groups presenting any viewpoint, however, we would not find an Establishment Clause violation simply because only groups presenting a religious viewpoint have opted to take advantage of the forum at a particular time." 533 U.S. at 119, n.9. Third and finally, a neutral practice and policy would not require Plaintiff to draw the distinctions necessary for it to sever out and exclude activities it concludes are "inherent elements of a religious service," a practice this Court has already concluded would inevitably entangle it with religion in a manner forbidden by the Constitution.

Accordingly, the Court concludes that Defendant does not have a compelling state interest in avoiding an Establishment Clause violation by excluding elements of Plaintiff's proposed events.

**C.      Application of the Permanent Injunction Standard**

The standard for a permanent injunction is "essentially the same" as the standard for a preliminary objection with the exception that a plaintiff must demonstrate actual success on the merits rather than a mere likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987) (*citing Univ. of Texas v. Camenisch*, 451 U.S. 390, 392 (1981)). Thus, a plaintiff seeking a permanent injunction must establish each of the following four elements: (1) actual success on the merits; (2) a substantial threat that it will suffer irreparable injury without the relief requested; (3) that the threatened injury outweighs any damage that the injunction may cause to others; and (4) that the injunction will serve the public interest. *See, e.g. Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004). The Sixth Circuit has noted, however, that "[i]n First Amendment cases, the first factor will often be determinative." *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001) (*citing*, *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

Applying the foregoing standard, the Court finds that issuance of a permanent injunction is proper. As set forth in detail above, Plaintiff has demonstrated actual success on the merits. Consequently, the Court finds that Plaintiff has suffered irreparable injury. *See Deja Vu of Nashville*, 274 F.3d at 400 ("[T]he Supreme Court has recognized that even minimal infringement upon First Amendment values constitutes irreparable injury." (citation omitted)). And, Plaintiff faces continuing irreparable injury because it desires to hold future events in the Library's meeting rooms. (Verified Compl. ¶ 29). Moreover, no substantial harm is inflicted on others merely by protecting Plaintiff's First Amendment rights. *See Deja Vu of Nashville*, 274

F.3d at 400 ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." (citation omitted)). Thus, the Court concludes that the threatened injury outweighs any damage that the injunction may cause to others. Finally, issuance of a permanent injunction will serve the public interest because "it is always in the public interest to prevent violation of a party's constitutional rights." *Id.* (citation omitted).

In summary, the Court finds that Plaintiff has demonstrated actual success on the merits and that issuance of a permanent injunction would prevent irreparable injury to Plaintiff, not unduly damage Defendant, and is in the best interest of the public.

## III.    CONCLUSION

For the foregoing reasons, the Court finds Defendant Library's practice of prohibiting activities its concludes are "inherent elements of a religious service" or elements that are "quintessentially religious" is unconstitutional as specified herein. Plaintiff's arguments for injunctive relief are therefore well taken. The Court **PERMANENTLY ENJOINS** Defendant from severing out and excluding activities from its meeting rooms that it concludes are "inherent elements of a religious service" or elements that are "quintessentially religious." In reaching this narrow holding, the Court expresses no opinion on the constitutionality of Defendant Library's policy of precluding religious services.

Final judgment shall be rendered in favor Plaintiff, Citizens for Community Values, Inc., and against Defendant, The Upper Arlington Public Library Board of Trustees.

Within fourteen days of this date, Plaintiff's counsel shall submit a proposed form of judgment in conformity with this Opinion and Order. Defendant shall have fourteen days to file

an objection to Plaintiff's proposed judgment.  Furthermore, Plaintiff shall file a brief in support

of their request for attorneys' fees together with supporting time and expense records to support

the amount requested within thirty days from the date hereof.  Defendant shall then have

fourteen days from the date of Plaintiff's brief to file a responsive brief.  If necessary, the Court

will then schedule a hearing on the issue of attorney's fees.

The Clerk shall remove Document 4 from the Court's pending motions list.

**IT IS SO ORDERED.**

_/s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**